IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DOUGLAS ASHBY, CAROL PORTO,                    01-CV-1446-BR
GRANT WENZLICK, LEO NEWBERRY,
and EVELYN BROEFFLE,                           OPINION AND ORDER

          Plaintiffs,

v.

FARMERS INSURANCE COMPANY OF
OREGON and FARMERS GROUP, INC.,

          Defendants.


N. ROBERT STOLL
STEVEN D. LARSON
DAVID F. REES
MARK A. FRIEL
Stoll Stoll Berne Lokting & Schlachter, P.C.
209 S.W. Oak St., Fifth Floor
Portland, OR 97204
(503) 227-1600

CHARLES A. RINGO
974 N.W. Riverside Blvd.
Bend, OR 97701
(503) 330-6447

          Attorneys for Plaintiffs


1 - OPINION AND ORDER

**BARNES H. ELLIS**
**STEPHEN A. REDSHAW**
**TIMOTHY W. SNIDER**
Stoel Rives, LLP
900 S.W. Fifth Ave., Suite 2600
Portland, OR  97204-1268
(503)224-3380

　　　　　Attorneys for Defendants

**BROWN, Judge.**

　　　Plaintiffs brought this class action under the Fair Credit
Reporting Act (FCRA), 15 U.S.C. § 1681, *et seq.*  Plaintiffs
allege Defendants failed to send adverse-action notices to some
new insureds and sent inadequate adverse-action notices to other
new and renewal insureds whose premiums increased in whole or in
part based on information in their consumer credit reports.

　　　The following Motions are before the Court:

　　　1.   Defendants' Motion for Summary Judgment (#400) that
FCRA no longer authorizes private enforcement of Plaintiffs'
claims;

　　　2.   Defendants' Motion for Partial Summary Judgment (#404)
that Defendants did not take adverse actions against any named
Plaintiffs within the applicable statute of limitations;

　　　3.   Defendants' Motion for Summary Judgment (#402) that
Plaintiffs are not entitled to statutory damages under FCRA
because Defendants' alleged FCRA violations were not willful as
a matter of law; and

2  - OPINION AND ORDER

4.   Plaintiffs' Motion for Partial Summary Judgment (#412) that (a) Defendants took adverse actions under FCRA against all named Plaintiffs, (b) Defendants' written adverse-action notices failed to comply with FCRA as a matter of law, and (c) Defendants did not provide oral or electronic adverse-action notices that were sufficient to comply with FCRA.  The parties' Cross-Motions to Amend Class Definition (#390, #416) address many of the same issues that are resolved in this Opinion and Order.  The Court shall issue an Opinion and Order on those Motions in due course.

For the reasons that follow, the Court **DENIES** Defendants' Motion for Summary Judgment (#400), **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary Judgment (#402), **GRANTS in part** and **DENIES in part** Defendants' Motion for Partial Summary Judgment (#404), and **GRANTS in part** and **DENIES in part** Plaintiffs' Motion for Partial Summary Judgment (#412).

## BACKGROUND[1]

---

[1]   The history of the FCRA litigation in this Court is set forth in numerous Opinions and Orders issued in this case and other cases and is not repeated here.  *See Mark v. Valley Ins. Co.,* CV 01-1575-BR; *Razilov v. Nationwide Mut. Ins. Co.*, CV 01-1466-BR; *Rausch v. Hartford Fin. Svcs. Group, Inc.,* CV 01-1529-BR; *Spano v. Safeco Ins. Co.,* CV 01-1464-BR; *Edo* v. *GEICO Casualty Co.,* CV 02-678-BR; and *Willes v. State Farm Fire and Casualty Co.,* CV 01-1457-BR.  Judgments have been entered in favor of Defendants in *Edo* and *Willes*.  Settlement agreements have been reached in *Mark, Razilov,* and *Rausch (Reynolds)*.

In *Safeco Insurance Company v. Burr,* 127 S. Ct. 2201 (2007), the Supreme Court affirmed in part, reversed in part, and remanded the Ninth Circuit's decision in *Reynolds v. Hartford Financial Services Group*, 435 F.3d 1081 (9th Cir. 2006), relating to other FCRA cases pending in this Court.  This matter is now before the Court on the parties' Cross-Motions for Summary Judgment in light of the prior rulings in *Safeco v. Burr* and *Reynolds v. Hartford* that were upheld by the Supreme Court.

## STANDARDS

Fed. R. Civ. P. 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  The moving party must show the absence of an issue of material fact.  *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002).  In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine issue of material fact for trial.  *Id.*

An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarmo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The court must draw all reasonable inferences in favor of the nonmoving party.  *Villiarmo,* 281 F.3d at 1061.

A mere disagreement about a material issue of fact, however, does not preclude summary judgment.  *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1389 (9th Cir. 1990).  When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary."  *Wong v. Regents of Univ. of Cal.,* 379 F.3d 1097 (9th Cir. 2004), as amended by 410 F.3d 1052, 1055 (9th Cir. 2005)(citing *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1147 (9th Cir. 1998)).

The substantive law governing a claim or a defense determines whether a fact is material.  *Miller v. Glenn Miller Prod. Inc.,* 454 F.3d 975, 987 (9th Cir. 2006).  If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment.  *Id.*

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (#400) - FACTA

Defendants contend Plaintiff's FCRA claims are barred following the enactment of the Fair and Accurate Credit Transaction Act (FACTA) in 2003.  FACTA, *inter alia,* amended FCRA to eliminate private enforcement of FCRA violations under 15 U.S.C. § 1681m(a).  Under the heading "[n]o civil actions," the statute provides "[s]ections 1681n and 1681o of this title shall not apply to any failure by any person to comply with this section."  15 U.S.C. § 1681m(h)(8).  FACTA, however, permits

administrative enforcement and actions for damages and injunctive relief by state attorneys general.  15 U.S.C. § 1681s.  The issue here is whether FACTA should be applied retroactively to bar further prosecution of actions filed before FACTA was enacted. Congress was silent on the issue.

In *Landgraf v. USI Film Products,* the Supreme Court set out guidelines for determining whether a statute should have retroactive effect:

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach.  If Congress has done so, of course, there is no need to resort to judicial default rules.  When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.  *If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.*

511 U.S. 244, 280 (1994)(emphasis added).

Defendants contend FACTA should apply retroactively because Plaintiffs' pre-FACTA rights have not been impaired.  *See Southwest Ctr. for Biological Diversity v. United States Dep't of Agric.,* 314 F.3d 1060, 1061 (9th Cir. 2002)(court noted the general rule that the court should apply the law in effect when the court makes its decision).  Here, however, contrary to

6  - OPINION AND ORDER

Defendants' assertion, Plaintiffs' pre-FACTA rights to statutory damages will be lost if the Court applies FACTA retroactively.

Although the Ninth Circuit has not specifically addressed the issue, every court that has addressed FCRA claims involving the adequacy of adverse-action notices has found FACTA should not be applied retroactively because the plaintiffs' pre-FACTA rights to bring an individual action would be impaired.  In a FCRA class action involving facts similar to those before this Court, the Seventh Circuit (citing *Landgra*f) held FACTA "has an impermissibly retroactive effect when applied to claims that accrued before its December 1, 2004 effective date." *Killingsworth v. HSBS Bank Nev., N.A.*, 507 F.3d 614, 623 (7th Cir. 2007)("[B]efore FACTA was enacted, plaintiffs had a private cause of action for damages under the statute . . . that would be impaired if FACTA's amendment eliminating private rights of action were applied retrospectively."). *See also Grab v. Am. Lawyers Co.*, CV 05-00812, 2007 WL 842045, at *7 (D. Haw. Mar. 19, 2007).  In *Grab*, the plaintiff was delisted from a lawyers' directory based on information in his consumer credit report.  He was not provided with an adverse-action notice.  The court held the plaintiff's right to damages based on the alleged FCRA violation would be impaired if FACTA were applied retroactively.  Moreover, the court noted "there is no clear Congressional intent to the contrary, [and] the presumption

against retroactivity applies." *Id.  See also Miller v. Corestar Fin. Group,* CV 05-5133, 2007 WL 419194, *4 (E.D. Pa. Feb. 5, 2007) ("FACTA's elimination of a private right of action for violations of the clear and conspicuous FCRA notice requirement as to credit offers is more than a procedural change . . . and would have an impermissible retroactive effect.").

Defendants rely on *Perry v. First National Bank,* 459 F.3d 816 (7th Cir. 2006), for the proposition that Congress "preserved" a company's liability for FCRA violations but placed responsibility for enforcing such liability on state attorneys general.  *Perry,* however*,* preceded *Killingsworth* and did not specifically address the retroactivity issue.  In *Killingsworth*, the court noted *Perry's* holding and then addressed the remaining issue of retroactivity.  *Perry,* therefore, is not inconsistent with *Killingsworth.*

The application of FACTA retroactively in this case would preclude Plaintiff's class action and impair the right of each class member to recover statutory damages.  The Court concludes such a result is impermissible under *Landgraf* absent clear Congressional direction to the contrary.  As noted, Congress was silent on the issue.

Accordingly, the Court **DENIES** Defendants' Motion for Summary Judgment (#400) that FACTA bars Plaintiffs' action.

## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (#404)
## STATUTE OF LIMITATIONS - ADVERSE ACTIONS

Defendants assert they did not take adverse actions against any Plaintiff as to the premium rate charged for either new or renewal insurance.  Defendants also assert in the alternative that any adverse actions taken by them occurred after the applicable statute of limitations had expired.  Plaintiffs, however, maintain each of them suffered adverse actions within the applicable limitations period and Defendants failed to provide adequate oral or electronic notice to supplement their inadequate written notice of the adverse actions.

### Background

In Plaintiffs' original Complaint filed on September 28, 2001, Plaintiff Ashby (then the only named Plaintiff) brought an action against Farmers Group, Inc. (FGI) in which Plaintiff alleged he represented a class of insureds who purchased automobile and personal lines of insurance from "defendant [FGI's] *subsidiaries* from March 20, 2000 to date (the 'Class Period')."  (Emphasis added.)

On April 1, 2002, Ashby, joined by co-Plaintiffs Wenzlick and Porto, filed an Amended Complaint alleging they purchased personal lines of insurance from "Defendants' subsidiaries from October 28, 1999 to date (the 'Class Period')."  (Emphasis added.)  FGI denied the allegations that Plaintiffs purchased

insurance from FGI's "subsidiaries."

On February 20, 2003, the Court dismissed FGI as a Defendant based on its finding that Farmers Insurance Company of Oregon (FICO) issued the insurance policies to Plaintiffs and was the only statutory taker of any adverse actions under FCRA. *Ashby v. Farmers Group, Inc.,* 261 F. Supp. 2d 1213, 1226 (2003)*, abrogated by Reynolds v. Hartford Fin. Svcs. Group.,* 435 F.3d 1081 (9th Cir. 2006).

FICO is not a subsidiary of FGI.  FGI has no ownership interest in FICO; is not authorized to underwrite insurance policies; and, as noted, did not issue any insurance policies to Plaintiffs.  FICO and FGI, however, are affiliated companies. FGI acts as FICO's attorney-in-fact and provides management services relating to policies issued by FICO, including:

> setting rate structures for policies,
> reviewing applications for insurance,
> performing functions relating to
> underwriting, setting policy terms,
> physically issuing the policies, mailing
> invoices, and collecting premiums.

*Ashby*, 261 F. Supp. 2d at 1219.

On February 26, 2003, Plaintiffs filed a Second Amended Complaint consistent with this Court's ruling and alleged FICO issued the insurance policies and, therefore, was the statutory taker of adverse actions against Plaintiffs.

In January 2006, the Ninth Circuit in *Reynolds* held FCRA "imposes the obligation on all of the affiliated companies

10 - OPINION AND ORDER

responsible for taking an adverse action to ensure that the affected consumer receives a statutory [adverse-action] notice." 435 F.3d at 1097.  The Supreme Court's decision in *Safeco v. Burr* did not disturb this holding.  Accordingly, FGI and FICO are "jointly and severally liable" as affiliated companies for failing to issue adequate adverse-action notices to FICO's insureds.  *Id.*

On June 15, 2006, based on *Reynolds*,, Plaintiffs filed a Third Amended Complaint in which Plaintiffs reinstated FGI as a Defendant.

On September 27, 2007, Plaintiffs filed a Fourth Amended Complaint that added Plaintiffs Broeffle and Newberry and conformed their pleadings to the Supreme Court's *Safeco v. Burr* decision.

## Discussion

The ultimate issue is whether Defendants took an adverse action against each Plaintiff after the applicable class period starting date.  Plaintiffs contend the class period starting date against both FGI and FICO is October 28, 1999, based on the allegations in their original Complaint against FGI filed in September 2001.  Defendants assert the class period starting date for FICO should be February 26, 2001, two years before Plaintiffs first asserted a claim against FICO.

## I.    Statute of Limitations.

11 - OPINION AND ORDER

For purposes of this Motion, the parties agree a FCRA claim must be brought "within two years from the date the liability arises." *See* 15 U.S.C. § 1681p.[2]  Plaintiffs contend the statute of limitations was tolled as of September 28, 2001, which is the date Plaintiff Ashby first filed his claim against FGI. Defendants contend the statute of limitations was tolled as of February 26, 2003, which is the date Plaintiffs first joined FICO in this action.

**A. FGI**.

In their original and First Amended Complaints, Plaintiffs misidentified the issuers of their insurance policies as "subsidiaries" of FGI and did not refer to FICO by name. In fact, FICO, the Oregon insurer that actually issued the insurance policies, is an affiliate company of FGI rather than a subsidiary.  A "subsidiary" company is generally owned by a "parent" company that controls more than 50% of the voting shares.  An "affiliate" company is effectively controlled by another company. *See Black's Law Dictionary* 58, 1428 (6th ed. 1990).  Defendants, therefore, argue Plaintiffs did not satisfy the "short and plain statement of the claim" requirement of Federal Rule of Civil Procedure 8 because Plaintiffs failed to identify the class of plaintiffs as FICO insureds.  Plaintiffs

---

[2] Although FCRA's statute-of-limitations provision was amended in FACTA, the amendment does not have a bearing on the issues before this Court.

assert Defendants' argument is based on a "minor pleading technicality" because, *inter alia,* the original pleadings gave Defendants ample notice that Plaintiffs were FICO insureds.

The Court agrees with Plaintiffs that FGI, FICO's attorney-in-fact that operated as the management company for all of FICO's relevant insurance business, knew the class of insureds, located as they are in Oregon, were FICO insureds.  The notice-pleading requirement embodied in Rule 8 rejects "the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome." *Conley v. Gibson,* 355 U.S. 41, 48 (1957).  In light of FGI's management role in FICO's insurance business, FGI has not established it was in any way prejudiced by Plaintiffs' mislabeling of the legal relationship between the companies.

For these reasons, the Court concludes the appropriate tolling date for the statute of limitations as to FGI is September 28, 2001, which is the date Plaintiffs filed their original Complaint.  As it pertains to FGI, therefore, the starting date for the class period alleged by Plaintiffs is October 28, 1999, which is the first date any Plaintiff purchased insurance policies from Defendants.

**B. FICO.**

In its Order issued January 5, 2004, the Court found Plaintiffs chose not to assert a claim against FICO in their

original Complaint for strategic reasons.  Accordingly, the Court ruled for purposes of seeking discovery, Plaintiffs' claims against FICO would not relate back to the original filing date of this action against FGI but only to the two years preceding the filing of the Second Amended Complaint in which Plaintiffs first asserted a claim against FICO.  The Court's ruling also applies to the starting date for the class period as to claims against FICO as an affiliate company.

Accordingly, the Court concludes the starting date for the class period as to Plaintiffs' claims against FICO is February 26, 2001.

## II.  **Adverse Actions**.

FCRA requires the insurer to send an adverse-action notice to a new insurance applicant or to a "renewal insured" who suffers an adverse action "based in whole or in part on any information contained in a consumer report."  15 U.S.C. § 1681m(a).  *See also Safeco v. Burr,* 127 S. Ct. at 2212.

An adverse action taken by an insurer is a "denial or cancellation of, an increase in any charge for, or a reduction or other adverse or unfavorable change in the terms of coverage or amount of any insurance, existing or applied for, in connection with the underwriting of insurance."  15 U.S.C. § 1681a(k)(1)(b).  The consumer credit report must be "a necessary condition of the increase."  *Safeco v. Burr*, 127 S. Ct. at 2212.  Consideration of

14 - OPINION AND ORDER

a consumer credit report does not result in an adverse action if there is "no identifiable effect" on the premium charged for the insurance or the amount of the coverage afforded by the insurance.  *Id*.  Thus, there must be a causal relationship between the information in the consumer credit report and the adverse action.

### A.  Defendants' Credit-Based, Premium-Rating Programs.

William A. Redding, an employee of FGI involved in implementing Defendants' "risk-based pricing-program" that used an insured's credit rating to set premium rates, described the program in detail.  When determining the premium to be charged for a particular class of insurance, Defendants had several "Rating Plans" with independent base premium rates.  Noncredit factors such as driving history, claim history, age, and gender were considered when determining the rating plan into which new insurance applicants were placed.

In Oregon Defendants implemented an Automobile Risk Assessment (FARA) program for auto insurance in March 2000 and a Property Risk Assessment (FPRA) program for homeowners and renters insurance in March 2001 as a means for determining the premium rate to be charged for both new insurance and renewal insurance.  The program incorporated a "discount" formula to determine the premium charged for both types of insurance.  Defendants assigned all insureds a letter code on a scale from

15 - OPINION AND ORDER

A-Z that corresponded to the insured's consumer credit score.

> Once a policy was assigned a base premium rate
> (the beginning premium before any factors are
> applied) within a rating plan, Farmers applied a
> FARA or FPRA code discount to the base premium
> rate, derived from the insured's credit-based
> insurance score.  The FARA or FPRA discount code
> could only improve an insured's premium.  Those
> insureds with higher credit-based insurance scores
> (lowest insurance risks) received discounts off
> the base premium rate, with the discount declining
> in relation to the FARA or FPRA code.  Those
> insureds with the lowest credit-based insurance
> scores (riskiest) received no discount off
> the base rate.  No insureds' premiums were
> increased or surcharged above the base
> premium rate because of their FARA or FPRA
> code.

Defs.' Mem. in Support of Mot. for Partial Summary J., Redding
Aff. ¶¶ 4, 5, and 7.

     1.  <u>Defendants' FARA Codes</u>.

     In March 2000 when Defendants first used FARA codes in

Oregon, an applicant for automobile insurance who applied for a

standard policy and who did not have a credit history was rated

at "N" on the scale.  Defendants assigned a factor of 1.00 to

these applicants, which meant they would pay 100% of the base

premium rate.  Unlike GEICO's "N" rating, which reflected a

middling score, Defendants' "N" factor resulted in a premium

charged at the base rate without discount, which was, in effect,

the highest (worst) rate available.  Insureds with more favorable

credit scores who applied for standard policies received ratings

of A-D and F-H, which resulted in discounts from the base premium

rate on a sliding scale.  For example, insureds rated from A-C

16 - OPINION AND ORDER

were assigned a factor of .85, which resulted in a 15% discount off of the base premium rate.  Those rated from F-H received lesser discounts.  Those insureds rated from I-Z were charged the base premium rate without a discount.

In April 2001 Defendants adjusted the FARA rating system by increasing the number of insureds who received some discount based on their credit score.  For example, insureds with favorable credit scores who received ratings of A-L and O-Q received discounts resulting in premiums ranging from 64% to 96% of the base premium rate.  Insureds assigned the "N" factor continued to pay the nondiscounted base premium rate.  An insured who had a credit history who was rated at E, M, or R-Z also continued to pay 100% of the premium without discount.  In May 2002 Defendants again revised the factors and discounted by 19% the premiums of those insureds who were assigned the "N" code, which resulted in a FARA factor of .81.  By then the average discount factor for all insureds was .76.

2.  <u>Defendants' FPRA Codes</u>.

In February 2002 applicants for homeowners or renters insurance in Oregon who were assigned "N" codes paid 48% of the base premium price for such insurance.  Applicants assigned codes V-Z paid 100% of the base premium rate, and those assigned codes D-M and O-U paid premiums ranging from 46%-85% of the base premium rate.

17 - OPINION AND ORDER

In summary, Defendants' base premium rate represented the highest possible premium charged by Defendants within each rating plan and was based solely on noncredit factors.  The assignment of a FARA or FPRA Code by which the amount of the premium was determined was a credit-based decision.  The assignment of the "N" code was also credit-based insofar as it reflected an insured's lack of credit.

**B.  Baseline for New Insureds under *Safeco v. Burr*.**

A "baseline" must be established by which it can be determined whether the premium charged for the insurance was "disadvantageous."  *Safeco v. Burr*, 127 S. Ct. at 2213.  The baseline is different for those who have not had any prior dealings (new insureds) and those who have (renewal insureds). In the absence of prior dealing, there is no obvious baseline by which an insurer can determine whether there is an "increase" in the premium to be charged to a new applicant for insurance.

In *Safeco v. Burr,* the Supreme Court addressed the baseline as to new insureds at some length.  In that case, the insureds, joined by the government in an *amicus* brief, urged the Supreme Court to adopt a baseline that would require an adverse-action notice to be sent to all new insureds who do not have the best credit score.  GEICO, one of the insurance groups in the case, urged the Court, however, to adopt its "neutral score," which represented the score the insured would have received if GEICO

had not taken his consumer credit report into account; *i.e.*, an
insured without a credit history.  An applicant who was assigned
GEICO's neutral score paid a premium that was neither the best
nor the worst available.  The Supreme Court stated:

> We think GEICO has *the better position*,
> primarily because its "increase" baseline is
> more comfortable with the understanding of
> causation just discussed, which requires
> notice under § 1681m(a) only when the effect
> of the credit report on the New rate offered
> is necessary to put the consumer in a worse
> position than other relevant facts would have
> decreed anyway.

126 S. Ct. at 2213 (emphasis added).

Although the Supreme Court rejected an "all but the best"
baseline proposed by the insureds and the government and
concluded GEICO's "neutral" baseline was "a more comfortable" fit
with FCRA's purpose, the tenor of the Court's language also
suggests the insureds' reading of the statute was not necessarily
unreasonable.  In particular, the Supreme Court noted "there are
textual arguments pointing [to] another way" than GEICO's
baseline.  *Id.*  Nevertheless, the Court found GEICO's "way" was
a more reasonable approach than the baseline proposed by the
plaintiffs and the government.

**C.  Defendants' Adverse-Action Baseline for New Insureds.**

Defendants assigned a neutral "N" Factor to all new
insurance applicants without a credit history.  In the original
FARA codes, such an applicant paid 100% of the base premium rate;

19 - OPINION AND ORDER

*i.e.*, the highest possible premium within the particular rating plan.  In May 2002 Defendants reduced the "N" Factor by applying a rating factor of .81.  The logical, if not the actual, effect of Defendants' original FARA and FPRA programs was to eliminate the requirement for Defendants to send adverse-action notices to all but those insureds with the worst credit histories.  For reasons that are unclear, Defendants, nevertheless, sent their adverse-action notices to almost all new and renewal insureds.

Plaintiffs contend Defendants' bottom-up discount-oriented baseline for determining who suffered adverse actions was flawed because it eliminated the requirement for sending a notice to all but those applicants with the very worst consumer credit scores. Instead Plaintiffs urge the Court to consider as reasonable a top-down requirement that would mandate Defendants to send adverse-action notices to all applicants except those with the very best consumer credit scores.  In the alternative, Plaintiffs suggest a baseline that reflects an "average" discount from the full premium price; *i.e.*, new applicants whose premium was greater than 76% (a 76 FARA factor) of the base premium price must receive an adverse-action notice.

As noted, the Supreme Court rejected a baseline that requires adverse-action notices to be sent to all new applicants who did not receive the best premium available based on information in their consumer credit reports as it would cause

"hypernotification"; *i.e.*, adverse-action notices required to be sent to "slews" of insureds who did not have "gilt-edged" credit histories. *Safeco v. Burr*, 127 S. Ct. at 2214. On the other end of the spectrum, Defendants' discount-oriented baseline would normally result in hyponotification; *i.e.*, adverse-action notices being sent only to those relatively few new applicants who had the poorest credit histories.

In light of *Safeco v. Burr*, a more reasonable baseline would likely require adverse-action notices to be sent to applicants who had neither the best nor the worst consumer credit scores; *i.e.,* scores similar to GEICO's neutral baseline. Defendants, however, did not have the benefit of the Supreme Court's guidance when they initiated their FARA and FPRA programs.

Consistent with *Safeco,* this Court concludes Defendants' conduct in these circumstances was not objectively unreasonable as a matter of law as to those new applicants who did not receive an adverse-action notice. *Safeco v. Burr*, 127 S. Ct. at 2216. Although Defendants' baseline choice may have been flawed, the Court also concludes on this record that Defendants are not liable under FCRA for failing to send adverse-action notices to some new applicants for insurance when, at the time the adverse-action notices were sent, there was no clearly defined baseline by which to determine whether new insurance applicants suffered adverse actions that warranted notices. While an issue of fact

21 - OPINION AND ORDER

may exist as to whether the baseline selected by Defendants was objectively unreasonable, the Court, nonetheless, concludes under these circumstances that Defendants' choice, as a matter of law, was based at worst on a "merely careless" reading of FCRA's requirements in this regard.

### D. Defendants' Adverse-Action Baseline for Renewal Insureds.

In *Safeco v. Burr,* the Supreme Court stated "after initial dealing between the consumer and the insurer, the baseline for 'increase' is the previous rate or charge, not the 'neutral baseline' that applies at the start."  127 S. Ct. at 2214.  The Supreme Court also held an "increase" does not occur on successive renewals unless there has been a "change" in the cost of the insurance.  As with premiums for new insurance, the "increase" on renewal must result in whole or in part from information in the insured's consumer credit report.

Plaintiffs contend under Defendants' discount-oriented FARA and FPRA programs, an adverse action occurs on renewal of an insurance premium if the "discount" on the premium charged to insureds who were assigned the most favorable FARA or FPRA code is greater than the discount offered to insureds who have a less favorable FARA or FPRA code.  Plaintiffs rely on this Court's *pre-Safeco* opinion that

> the increase in the premium charged to an
> insured with a higher letter grade based on
> information in a consumer report will always

22 - OPINION AND ORDER

> be greater than the increase charged to an
> insured with a lower letter grade because the
> former will always pay a higher percentage of
> the base premium rate.

*Ashby v. FICO*, No. 01-CV-1446-BR, 2004 WL 2359968, at *4 (Oct. 7,

2004).

Defendants point out that this Court did not have the

benefit of the Supreme Court's conclusion in *Safeco v. Burr* that

"an increased premium is not 'based on' a consumer report merely

because a report is considered in the rate-setting process;

rather the credit report must be a necessary condition for the

premium increase." *See Safeco v. Burr*, 127 S. Ct. at 2212.

Thus, Defendants assert under *Safeco v. Burr* that information in

a consumer credit report results in an adverse action only if the

renewal premium increase is caused by "a worsening of the

insured's FARA or FPRA factor," which is self-explanatory or "is

[not] attributable to . . . [an] overall [base] premium rate

increase[]." *See id.*

On this record, the Court concludes Defendants'

position is consistent with the Supreme Court's reasoning;

*i.e.*, there is not an adverse action under *Safeco v. Burr* if the

cost of the renewal premium does not actually increase.

Moreover, any increase must be caused in part by the insured's

consumer credit score.  Under Defendants' program, if an

insured's FARA or FPRA code changes for the worse because of

credit-related factors at the time the policy is renewed (*i.e.*,

23 - OPINION AND ORDER

the discount from the base premium rate is decreased), an adverse action has occurred because the insured will pay a higher premium because of the credit-related factors.  Similarly, because Defendants' base premium rate only incorporates noncredit factors, an actual increase in the premium charged on renewal that is less than or equal to the increase in the base premium rate cannot be attributable to credit factors and, therefore, is not an adverse action.  On the other hand, if there is an increase in the base premium rate on renewal and the premium on renewal is proportionately greater than the increase in the base premium rate, the premium increase can only be attributed to the insured's consumer credit score.  The Court, therefore, applies this standard when determining whether Defendants are entitled to summary judgment on the basis that none of the named insureds suffered adverse actions.

  1.  <u>Douglas Ashby</u>.

  Ashby first applied for automobile insurance with Defendants in April 2001 and renewed it in October 2001 and April 2002.  Ashby was assigned a FARA code "S" on his new application and on each renewal.  Ashby always paid the base premium rate without a discount because he was assigned a FARA Factor of 1.0.  Although Defendants sent Ashby an adverse-action notice on each occasion, Defendants never increased his premium on the renewal of his policy.  In fact, Ashby's premium on the last renewal

24 - OPINION AND ORDER

decreased solely because the base premium rate in the plan to which he was assigned also decreased.

Accordingly, on this record, the Court concludes Ashby did not suffer an adverse action on renewal of his automobile insurance policy based on information in his consumer credit report even though Defendants sent him an adverse-action notice.

2.   Carol Porto.

Porto purchased both automobile and homeowners insurance from Defendants.

a.   Automobile Insurance.

On Porto's first renewal of her automobile policy under the FARA program in May 2000, she was assigned FARA code "G," which provided for a 2% discount off of the base premium rate.  On renewal in November 2000, the base premium rate charged by Defendants increased by approximately 8%.  Porto's actual premium, however, increased by only 4.5% because her FARA discount rate improved to 5%.  Thus, the increase in her premium was attributable solely to noncredit factors incorporated in the base premium rate.  On two subsequent renewals up to May 2002, the base premium rate charged by Defendants increased by approximately 15%, but Porto received discounts of 25% from that rate, which resulted in an actual decrease in her premium.  In May 2002 the base premium rate in Porto's rating plan increased by 4%, but her premium increased by only 1.5%.  On these facts,

Porto did not suffer an adverse action that could be attributed to information in her consumer credit report.

Plaintiffs understandably point out that before the Supreme Court issued its ruling in *Safeco v. Burr*, this Court held the same record "would support a finding that Porto suffered an adverse action in connection with the renewal of her automobile insurance policy in May 2002" because the increase in her premium was greater than the increase in the premium charged to other insureds with more favorable consumer credit scores. *See Ashby,* Opin. and Order at 9-10 (issued Oct. 12, 2004). As noted, however, the Court did not then have the Supreme Court's guidance that there must be an actual increase in the cost of the premium on renewal and that at least part of the increase must be caused by the insured's consumer credit score. Under *Safeco,* the fact that Porto received less of a discount on the premium than other insureds with better credit scores is not relevant because her premium increased less than the amount of the increase in her base premium rate.

On this record, the Court concludes the premiums paid by Porto on each occasion that she renewed her automobile insurance did not increase based on information in her consumer credit report, and, thus, she did not suffer any adverse action in the assessment of premiums for that policy.

b.   Homeowners Policy.

In November 2001, Defendants charged Porto a premium of $872.05 to renew her homeowners policy, which was an increase of $102.62 over the prior premium.  Defendants assert the amount of the original premium charged was erroneous, and the error was subsequently corrected.  They concede, however, the erroneous increase was based in part on information in Porto's consumer credit report.

On this record, the Court concludes Porto suffered an adverse action because the premium she paid for her homeowners policy increased at the time of renewal based on information in her consumer credit report.  Defendants, therefore, were required to send Porto an adverse-action notice in compliance with FCRA.  The fact that Defendants subsequently changed the premium did not obviate their statutory obligation when the premium was originally set.  Thus, Porto's claim as to this adverse action is not time-barred against either FGI or FICO because it took place after October 28, 1999 (as to FGI) and after February 26, 2001 (as to FICO).

3.  <u>Grant Wenzlick</u>.

In January 2001 before Defendants initiated their FPRA credit-rating system as to property insurance, Wenzlick was charged a new premium of $161.01 on his homeowners policy. Before Wenzlick renewed this policy in January 2002, Defendants received permission from the Oregon Insurance Division to

27 - OPINION AND ORDER

increase the rates they charged for homeowners insurance and renters insurance by 7.1% and 5% based entirely on noncredit factors.

In January 2002 Defendants increased Wenzlick's renewal premium to $179.05, which was less than the maximum amount he could have been charged based on the rate increases allowed by the State of Oregon.[3]

On this record, the Court concludes the increase in the premium charged by Defendants on renewal of Wenzlick's homeowners policy in January 2002 was not based on information in Wenzlick's consumer credit report.

4.  Leo Newberry.

During the relevant period after October 28, 1999, Defendants issued a "New Business Automobile Policy" to Newberry and renewed his "Automobile Policy."  Newberry's "New Business Automobile Policy," however, was a new policy and is not actionable in a claim for statutory damages in light of the Court's ruling that Defendants did not willfully violate FCRA when they established the baseline for determining whether there

---

[3] Defendants concede under a convoluted "transition renewal" analysis (the first renewal after Defendants initiated their FARA/FPRA programs), some insureds would be deemed to have suffered adverse actions if the increase in their premiums were compared to the "N" factor (the premium charged to an insured without a credit history).  The Court agrees with Defendants, however, that such an analysis is inconsistent with *Safeco v. Burr.*

was an "increase" in the premium charged for new insurance
policies.

Newberry's Automobile Policy was renewed every
six months from January 2000 through December 2002. Defendants
first used its FARA Factor system on the July 2000 renewal.
From that date forward, Newberry was always assigned FARA code
"L." Newberry's discount ranged from none (FARA factor 1.0) in
July 2000 and January 2001, 14% (FARA factor .86) in July 2001
and January 2002, and 15% (.85 factor) in June 2002.

Defendants concede Newberry's premium increased by
$25.50 based on information in his consumer credit report on the
first renewal of this policy in July 2000 when Defendants first
introduced their FARA program. Defendants, however, contend
Newberry's claim as to the July 2000 renewal is barred by the
statute of limitations because the renewal occurred before
February 26, 2001, which Defendants argue is the appropriate
class period starting date for purposes of the statute of
limitations. As set forth above, however, the Court has
concluded the class period starting date applicable to
Plaintiffs' claims against FGI relates back to October 28, 1999.
Thus, Newberry's claim is time-barred as to FICO because the
class period starting date as to FICO is February 26, 2001, which
pre-dates such a claim, but it is not time-barred against FGI
because the renewal occurred after the October 28, 1999 class-

29 - OPINION AND ORDER

period starting date as to FGI.

Plaintiffs, however, also argue Defendants increased the premium they charged Newberry on each renewal of his Automobile Policy from January 2001 forward based on information in his consumer credit report because, like the premium increases for Porto, the increase in Newberry's premium was greater than the increase in the premium charged to other insureds with more favorable consumer credit scores.  The Court, however, rejects Plaintiffs' arguments as to Newberry's renewals after July 2000 for the same reasons it rejected those arguments by Porto.

On this record, the Court concludes there is not any issue of material fact as to whether the increase in the premium charged by Defendants on renewal of Newberry's automobile policy in July 2000 was based on information in Newberry's consumer credit report.  Newberry's claim against FGI as to that renewal policy is not time-barred.  Newberry's claim, however, is time-barred as to FICO because it arose before February 26, 2001, which is the class period starting date as to FICO.  The increases in the premiums charged on subsequent renewals of Newberry's automobile policy were not based on information in his consumer credit report.

     5.  <u>Evelyn Broeffle</u>.

Evelyn Broeffle is one of the named Plaintiffs

30 - OPINION AND ORDER

representing a class of insureds in this action.  Evelyn Broeffle
and her husband Ross Broeffle as co-insureds renewed automobile
insurance policies with Defendants for one automobile on an
annual basis from June 2000 through June 2003 and for a second
automobile in October 2000 and April 2001.  They also renewed
their homeowners policy with Defendants in April 2001 and April
2002.

        a.  <u>Standing</u>.

        Defendants assert Plaintiff Evelyn Broeffle
does not have standing to bring a FCRA claim because the premiums
on the applicable policies were rated based on information in her
husband's consumer credit report.[4]

        The standing of a spouse to bring a FCRA
claim depends on whether the information in the consumer credit
report "relates or refers to both [spouses]." *Conley v. TRW
Credit Data,* 381 F. Supp. 473, 474 (N.D. Ill. 1974).  A plaintiff
has standing to assert a FCRA claim if the information in the
husband's credit report references "joint accounts" because such
information relates to creditworthiness.  *Soghomonian v. U.S.,*
278 F. Supp. 1151, 1167 (E.D. Cal. 2003).

        Defendants concede Ross Broeffle "may have

---

[4] Defendants also assert any claim by Broeffle as to
policies renewed before February 26, 2001, is time-barred.  As
set forth above, the Court has rejected Defendants' statute-of-
limitations date.

31 - OPINION AND ORDER

standing to pursue claims against Defendants on behalf of the
Broeffle household."  Nevertheless, they argue Plaintiff Evelyn
Broeffle has failed to present any evidence the consumer credit
report(s) that Defendants used to rate the premiums on the
Broeffle policies and renewed as to the Broeffles contained
creditworthiness information on Evelyn Broeffle.  The Court
disagrees.  Evelyn Broeffle has submitted a Declaration in which
she avers, *inter alia,* that she and her husband jointly owned a
house insured by Defendants from 1999 until 2002, have joint bank
accounts at Bank of America, have a joint credit card at Sears,
and filed a joint bankruptcy that was discharged in 2002.  The
Court, in its discretion, takes judicial notice under Federal
Rule of Evidence 201(b) and ©) that the information in the
consumer credit report of Ross Broeffle would necessarily relate
to and include credit information regarding Evelyn Broeffle
because the report would at a minimum reference the joint
accounts and the joint bankruptcy.

On this record, the Court concludes Plaintiff
Evelyn Broeffle has standing to act as a class representative in
this case.

b.  <u>Automobile Insurance Policies</u>.

Based on information in Ross Broeffle's
consumer credit report, Defendants first used FARA code "K" to
determine the premium to be charged on Broeffle's automobile

insurance policies in April 2000 (Policy 151204011) and June 2000 (Policy 153581618).  Neither premium included a discount from the base premium rates applied to each policy.

Defendants concede they increased the premium charged on Policy 153581618 on renewal in June 2000 by $19.40 based on information in Ross Broeffle's consumer credit report. The record reflects Broeffle's premiums as to both policies increased on subsequent renewals in amounts that were substantially proportionate to the increase in the respective base premium rates, which indicates the increases were not based on information in Ross Broeffle's consumer credit report.

On this record, the Court concludes the premium charged by Defendants on the renewal of automobile insurance Policy 153581618 issued to Evelyn Broeffle and her husband Ross in June 2000 increased based on information in Ross Broeffle's consumer credit report.  On subsequent renewals, however, the premiums did not increase based on such information.

In any event, Defendants assert any FCRA claim based on the June 2000 renewal of Broeffle's automobile policy is time-barred because it is beyond the February 26, 2001, limitations date asserted by Defendants.  The Court again rejects that assertion as to FGI because the appropriate class period starting date for statute-of-limitations purposes is October 28, 1999.  The claim as to FICO, however, arose before

33 - OPINION AND ORDER

the February 26, 2001, class period starting date and, therefore, is time-barred.

        c.   <u>Homeowners Insurance Policy</u>.[5]

In April 2000, the Broeffles applied for Homeowners Policy 918607881.  Defendants concede that on the renewal of that policy in April 2001 after they first started using the FPRA codes, Defendants increased the premium by $11.99 based on information in Ross Broeffle's consumer credit report.

On this record, the Court finds the premium charged by Defendants on renewal of Evelyn Broeffle's homeowners policy in April 2001 increased based on information in Ross Broeffle's consumer credit report.

        d.   <u>Renters Insurance Policy</u>.

In July 2002, Defendants issued a new renters insurance policy to the Broeffles.  Evelyn Broeffle asserts Defendants relied on information in her husband's consumer credit report to increase the premium charged for this new policy because the FPRA factor assigned to the policy resulted in a premium that was higher than the premium offered to new applicants without a credit history.

The Court concludes Evelyn Broeffle's claim for statutory damages as to the increase in the premium charged

_____

[5] Defendants issued homeowners policies to the Broeffles in April 1999 and April 2000.  Evelyn Broeffle does not assert a claim on the April 1999 policy.

on this policy is not actionable in light of the Court's ruling that Defendants did not act willfully in establishing the baseline for determining whether there was an "increase" in the premium charged for new insurance policies.

In summary, the Court concludes as follows:

(1) the class period starting date for the FCRA claims of all Plaintiffs is October 28, 1999 as to claims against FGI,

(2) none of the Plaintiffs' actionable claims are time-barred as to FGI and otherwise time-barred claims against FICO may still be asserted against FGI based on joint and several liability,

(3) Plaintiffs Douglas Ashby, Leo Newberry, and Evelyn Broeffle are not entitled to maintain an action for statutory damages against Defendants arising from alleged adverse actions taken on their new insurance policies,

(4) Defendants did not take adverse actions against Ashby based on information in his consumer credit report as to any relevant renewal insurance policies issued to Ashby,

(5) Defendants did not take adverse actions against Plaintiff Carol Porto on any renewal of her automobile insurance policy based on information in her consumer credit report,

(6) Defendants took an adverse action against Porto on the renewal of her homeowners policy in November 2001 based on information in her consumer credit report,

35 - OPINION AND ORDER

(7) Defendants did not take an adverse action against
Plaintiff Grant Wenzlick on the renewal of his homeowners
policy in January 2002 based on information in his consumer
credit report,

(8) Defendants took an adverse action against Newberry on
the renewal of his automobile insurance policy in July 2000 based
on information in his consumer credit report,

(9) Defendants did not take adverse actions against Newberry
on the subsequent renewals of his automobile insurance policy,

(10) Evelyn Broeffle has standing to bring a FCRA claim, and

(11) Defendants took adverse actions against Evelyn Broeffle
on the renewal of her automobile insurance policy in June 2000
and on the renewal of her homeowners policy in April 2001.

Accordingly, the Court **GRANTS in part** and **DENIES in part**
Defendants' Motion for Partial Summary Judgment.


## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (#402) AS TO WILLFULNESS

Plaintiffs seek statutory damages on behalf of the class
they represent.  FCRA requires Plaintiffs to prove Defendants
violated FCRA willfully as a predicate to any award of statutory
damages:

> FCRA provides a private right of action
> against businesses that use consumer credit
> reports but fail to comply [with FCRA's
> adverse-action notification requirements].
> If a violation is negligent, the affected

36 - OPINION AND ORDER

consumer is entitled to actual damages.  §
1681o(a)
. . . .  If willful, however, the consumer may have
actual damages, or statutory damages ranging
from $100 to $1,000, and even punitive
damages.  § 1681n(a).

*Safeco v. Burr*, 127 S. Ct. at 2206.

Defendants move for summary judgment that they did not
willfully violate FCRA's adverse-action notice requirements.
Defendants argue their interpretation of FCRA's adverse-action
notice requirements was objectively reasonable, and, even if it
was not, it did not constitute a willful FCRA violation as a
matter of law.  Plaintiffs contend Defendants' interpretation of
the FCRA notice requirements was objectively unreasonable, that
genuine issues of material fact exist as to whether Defendants
acted willfully, and that those facts must be determined by a
jury.

**I.    <u>FCRA'S Willfulness Requirement</u>.**

In *Safeco v. Burr,* the Supreme Court affirmed the Ninth
Circuit's holding in *Reynolds* that a FCRA violation is "willful"
if it arises from a "reckless disregard" of a consumer's right to
an adequate adverse-action notice.  *Safeco v. Burr,* 127 S. Ct. at
2209-2210.  The Supreme Court also stated:

> [A] company subject to FCRA does not act in
> reckless disregard of it unless the action is
> not only a violation under a reasonable
> reading of the statute's terms, but shows
> that the company ran a risk of violating the
> law substantially greater than the risk
> associated with a reading that was merely

37 - OPINION AND ORDER

careless.

127 S. Ct. at 2215.

Thus, to recover statutory damages as to the claims Plaintiffs seek to prosecute, Plaintiffs ultimately must prove all of the following elements:

A.  1.  As to new insureds, Defendants established an objectively unreasonable baseline for determining whether such insureds suffered increases in the initial premiums charged for automobile and/or homeowners insurance based on information in their consumer credit reports and the initial premiums for such insureds actually increased based on information in their consumer credit reports, and

2.  As to renewal insureds, the renewal premiums that Defendants charged for their automobile and/or homeowners insurance increased based on information in their consumer credit reports;

B.  Defendants failed adequately to disclose that the increases were based in whole or in part on information in the consumer credit reports of the insured;

C.  Defendants' adverse-action notices were based on an objectively unreasonable interpretation of FCRA's adverse-action notice requirements; and

D.  Defendants' objectively unreasonable interpretation of FCRA's adverse-action notice requirements "ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."

38 - OPINION AND ORDER

Before reaching the merits of Defendant's Motion, the Court addresses a threshold issue raised by Defendants as to whether the objective reasonableness and/or willfulness of Defendants' interpretation of FCRA's adverse-action notice requirements should be decided by the Court or a jury.

In *Safeco v. Burr*, the Supreme Court differentiated between objective unreasonableness and willful misconduct. If the Court concludes Defendants' interpretation is objectively reasonable as a matter of law, the case ends. *See, e.g.*, *Johnson v. Juniper Bank,* No. 06-C-13, 2007 WL 4219431, at *3-4 (E.D. Wis., Nov. 28, 2007)("There can be no willful [FCRA] violation if the defendant's "reading of the statute, albeit erroneous, was not objectively unreasonable."); *Klutho v. Home Loan Ctr., Inc.,* No. 4:06CV1212 CDP, 2007 WL41919733, at *2-3 (E.D. Mo. Nov. 21, 2007)(summary judgment on issue of willfulness was appropriate because the defendants' interpretation of FCRA was objectively reasonable). If, however, the Court concludes Defendants' interpretation of FCRA's adverse-action notice requirements was objectively unreasonable as a matter of law, the issue is whether Defendants' interpretation was merely careless or was sufficiently reckless to amount to a willful violation.

Courts that have addressed the issue have held uniformly that whether a FCRA violation is willful is a matter for the jury. *See, e.g., Whitfield v. Radian Guar.*, 501 F.3d 262, 270-71

39 - OPINION AND ORDER

(3rd Cir. 2007)("[W]hether it was [a reckless misreading of FCRA] is a factual issue, not a question of law" and it "cannot be decided . . . by [this] Court as a matter of law."); *Edwards v. Toys "R" US*, 527 F. Supp. 2d 1197, 1210 (C.D. Cal 2007)(willfulness under FCRA is generally a question of fact for the jury); *Lenox v. Equifax Info. Serv. LLC*, No. 05-01501-AA, 2007 WL 1406914, at *6 (D. Or. May 7, 2007)("[W]hether defendant's action or inaction rises to the level of willfulness so as to violate the statutory obligations of the FCRA is also a question of fact.").

This Court agrees and, accordingly, concludes elements 1, 2, and 3 are to be resolved by the jury if there are genuine issues of material fact. Element 4 is an issue of law to be decided by the Court.

## II.  **Willfulness as to New Insureds**.

Defendants contend even if this Court concludes Defendants willfully violated FCRA as to the content of their adverse-action notices, such a violation should not result in liability as to those notices sent to new insureds as opposed to those insureds whose policies were renewed.

In *Reynolds,* the Ninth Circuit reversed this Court's holding that the premium set for new applicants for insurance could not be "increased" because there were not any prior dealings between the parties.  435 F.3d at 1091-92, *rev'g Spano v. Safeco,* CV 01-

40 - OPINION AND ORDER

1464-BR, Am. Opin. and Order (issued Mar. 3, 2004).  In *Safeco v. Burr,* the Supreme Court upheld the Ninth Circuit's holding.  127 S. Ct. at 2210-14.  Accordingl*y*, a FCRA adverse-action notice must be sent in appropriate cases to both new insureds and to those who are renewing their insurance.  Although the Supreme Court held an interpretation of FCRA that adverse-action notices need not be sent to new insureds was incorrect, that interpretation was not objectively unreasonable as a matter of law.  The Supreme Court stated:

> Given the dearth of guidance and the less-than-pellucid statutory text, Safeco's reading was not objectively unreasonable, and so falls well short of raising the "unjustifiably high risk" of violating the statute necessary for reckless liability.

127 S. Ct. at 2216.  Accordingly, the failure to send an adverse-action notice to a new insured does not constitute a willful violation of FCRA.

In light of *Safeco v. Burr,* Defendants assert "as a matter of law and logic" that it "would be a perverse outcome" for this Court to allow Plaintiffs to seek millions of dollars in damages against Defendants who "overnotified insurance customers of [Defendants'] use of consumer credit reports" whereas the insurer in *Safeco v. Burr* had no liability under FCRA even though it did not send adverse-action notices to any new insureds.

The Court notes the irony of this circumstance but rejects the premise of Defendants' argument.  In essence, Defendants

41 - OPINION AND ORDER

assert they correctly interpreted FCRA's requirement that adverse-action notices must be sent to some new insureds, and, therefore, they should be absolved from liability for sending insufficient notices to those insureds.  Although Defendants conflate the Supreme Court's conclusion as to FCRA's ambiguity in identifying those new insureds who must receive adverse-action notices with FCRA's requirements as to the necessary content of such notices, the Court, nevertheless, concludes the absence of a clearly established baseline for determining which new insureds must receive such notices necessarily precludes a jury finding that Defendants willfully violated FCRA's adverse-action notice requirements as to any particular new insured.  The Court, therefore, concludes Defendants are entitled to partial summary judgment as to the willfulness issue applicable to new insureds.

III. **Willfulness as to Content of Written Adverse-Action Notices**.

Defendants contend the written adverse-action notices they sent to their insureds represented an objectively reasonable effort to comply with FCRA in light of the legal rules that were "clearly established at the time." *See Saucier v. Katz*, 533 U.S. 194, 202 (2001).  In the alternative, Defendants contend the notices did not constitute a willful FCRA violation as a matter of law even if the notices were objectively unreasonable.


**A.  Defendants' Adverse-Action Notices.**


42 - OPINION AND ORDER

Defendants sent the following written Notice to each

Plaintiff:

### Fair Credit Reporting Act Notification

To underwrite your policy, various consumer credit reports were used.  These reports provide information to assist with risk evaluation and risk placement.  Your premiums were also determined, in part, from the information contained in these reports.  A consumer credit report was furnished by the consumer credit reporting agency listed below at our request for insurance underwriting purposes.

You have the right, under the Fair Credit Reporting Act, to obtain a free copy of your consumer credit report from the consumer credit reporting agency listed below.  The request must be made no later than 60 days after you have received this notice.  In addition, if you find that any information contained in the report you receive is incomplete, you have the right to dispute the matter with the consumer credit reporting agency.  The consumer credit reporting agency did not make the decision regarding your policy and is unable to explain why the decision was made.  If you have any questions, please contact your Farmers® agent.

Pls.' Mot. for Partial Summary J., Rees Decl., Ex. 92.

The Notice also identifies the name, address, and telephone

number of the credit-reporting agency used by Defendants.  In

previous arguments to this Court, Defendants assert the above

Notice complied with FCRA when considered in conjunction with a

separate notice advising insureds of the amount of the premium

charged for the insurance.

43 - OPINION AND ORDER

**B.  Sufficiency of Defendant's Adverse-Action Notices.**

In its Opinion and Order issued October 7, 2004, the Court rejected Defendants' arguments that their adverse-action notices were an objectively reasonable interpretation of FCRA's written adverse-action notice requirements:

> The Court disagrees with FICO that the FCRA Notices sent to Porto and Wenzlick were adequate under § 1681m(a)(1-3).  This Court previously held the following FCRA Notice was inadequate because of the manner in which it described the adverse action taken by the insurer:
>
>> Thank you for choosing Allied for your insurance needs.  The premium for your policy will be adjusted as a result of information we have received from a consumer credit report.
>
> *Razilov v. Nationwide Mut. Ins. Co.*, CV-01-1446 (Opin. and Order issued March 3, 2004). The Court stated, "the Notice, however, does not give any indication that an adverse action was taken against Razilov.  At a minimum, the Notice should have reflected Razilov's premium was increased.  [The] . . . Notice does not even meet that minimum standard."  *Id.* at 11.
>
> The *Razilov* FCRA Notice at least indicates an adjustment was made in the premium because of information in a consumer credit report. Here the FCRA Notice requires the insured to inspect two separate documents and then to deduce that something negative in a consumer credit report caused the insurer to increase the premium charged on renewal.

*Ashby v. Farmers Ins. Co. of OR.*, CV01-1446-BR, 2004 WL 2297468, at *4 (D. Or. Oct. 7, 2004).

Notwithstanding this Court's prior Opinion, Defendants assert "it was reasonable to construe an insurers' [notice] obligation to be satisfied by informing the consumer of the fact that a *certain action* was taken (*i.e.,* the premium was determined)" and that the content of Defendants' adverse-action notices met this standard.  Defendants argue the factors set forth below justify their interpretation of FCRA's notice requirements, and, therefore, this Court should revisit its prior Opinion to conclude that the content of Defendants' adverse-action notices were objectively reasonable.  In the alternative, Defendants move the Court to conclude that even if Defendants' interpretation was objectively unreasonable, Defendants' interpretation of FCRA's adverse-action notice requirements did not constitute a willful FCRA violation as a matter of law.

    1.    <u>FCRA's Notice Requirements</u>.

Defendants contend FCRA does not specifically include a requirement that an adverse-action notice include the words "adverse" or "unfavorable."  Defendants argue, therefore, it was not unreasonable for Defendants to exclude those words from their adverse-action notices.

Section 1861m(a) of FCRA sets out the duties of insurers who use consumer credit reports:

> If any person takes any *adverse action* with respect to any consumer that is based in whole or in part on any information contained in a consumer credit report, the person *shall* -

> (1) provide oral, written, or
> electronic notice of the *adverse
> action* to the consumer.

(Emphasis added.)  The statute does not prescribe the exact

wording to be used in the "notice of the adverse action."  The

statute, however, "is a consumer protection statute that must be

construed to further its objectives."  *Reynolds*, 435 F.3d at

1092.  In *Mathiessen v. Banc One Mortgage Corporation,* the Tenth

Circuit explained the purpose of FCRA:

> The purpose of FCRA is to ensure accuracy and
> fairness in credit reporting and to require
> that such reporting is confidential,
> accurate, relevant and proper. See 15 U.S.C.
> § 1681.  FCRA enables consumers to protect
> their reputations, *see Ackerley v. Credit
> Bureau of Sheridan, Inc*., 385 F. Supp. 658,
> 659 (D. Wyo. 1974), and to protect themselves
> against the dissemination of false or
> misleading credit information, see *Conley v.
> TRW Credit Data*, 381 F. Supp. 473, 474 (N.D.
> Ill. 1974)

173 F.3d 1242, 1244 (10th Cir. 1999).

The Court concludes Defendants' construction of FCRA's

adverse-action notice requirements at best frustrates FCRA's

objective.  The purpose of the FCRA notice is to alert the

insured that something negative in his consumer credit report may

have caused an increase in his premium.  Defendants' notice,

standing alone, does not indicate anything of that kind.  In

fact, an insured must be particularly astute and read both

Defendants' "Fair Credit Reporting Act Notification" and a

separate document that indicates the amount of the premium to be
charged for the insurance before the insured could glean that an
"adverse" action has occurred and that the adverse action is
connected to his consumer credit score.  The text of Defendants'
notice alone does not suggest even to the most careful reader
that an "adverse action" has occurred or, if so, the reason for
the adverse action.

    2.  <u>Possibility of Confusion</u>.

      Defendants contend using the word "adverse" could
have led to confusion in this instance because the "Factor"
codes they used to set premium rates operated as a "discount
factor to the base premium rate, derived from the insured's
credit-based insurance score."  Defs.' Mem. in Support of Mot.
for Summary J. at 7 (emphasis in original).  Thus, here an
insured paying the base premium rate effectively paid the highest
premium rate charged by Defendants; *i.e.*, "all but the lowest-
scoring consumers received a *discount* off the base rate, not a
surcharge."  Although Federal Trade Commission (FTC) staff
advised Defendants that "such determinations" triggered a "notice
obligation as to an 'adverse action,'" Defendants reasoned that
calling the action "adverse" would "not have been accurate and
would have been potentially misleading."

      In any event, Defendants considered the so-called
"discount" premium rates (*i.e.,* all but the very worst rates

47 - OPINION AND ORDER

available) as adverse actions as indicated by the fact that
Defendants sent adverse-action notices to those insureds.
Defendants merely omitted the word "adverse" from the notice.
If Defendants reasonably believed they were not taking adverse
actions against their insureds based in whole or in part on
information in the insureds' consumer credit reports, Defendants
would not have had any reason to send the notices in the first
place.  In fact, by failing to use the term "adverse," Defendants
left consumers in the dark as to what caused the cost of their
insurance to increase.

Thus, the Court concludes Defendants' argument that
the use of the term "adverse" in the notice would be confusing
to consumers is at best unpersuasive.

    3.  <u>FTC Staff Attorney Guidance</u>.

Defendants rely on deposition testimony of the FTC's
"leading staff attorney," Clarke Brinckerhoff, to support their
position that their interpretation of the adverse-action notice
requirement was reasonable.  Brinckerhoff testified he recognized
the "difficulty of the problem."  After "conversations with
people," he concluded Defendants "didn't have to use the word bad
or adverse" in their adverse-action notices.  Brinckerhoff,
however, also testified FCRA requires the notice "to give the
consumer a hint that something less than optimal happened."

The suggestion that the adverse-action notice must

48 - OPINION AND ORDER

only give a "hint" of any adverse action taken, however, disregards the purposes and objectives of FCRA as well as the plain language of the statute.  Moreover, the Court finds the FTC attorney's statement that it was up "to insurance lawyers to figure out what to do" in light of the "difficult problem" is tantamount to an abdication of the FTC's role of "protecting America's consumers."[6]

In *Safeco v. Burr,* the Supreme Court gave little weight to a similar "informal staff opinion" by an FTC staff member that "did not canvas the issue" as to whether a FCRA notice is required for new applications for insurance.  127 S. Ct at 2216 n.19.  Similarly, this Court does not find any reason to defer to the FTC staff lawyer's opinion or to give it significant weight on this issue.  *See Fox v. Citicorp Cred. Svcs., Inc.,* 15 F.3d 1507, 1513 (9th Cir. 1994)(FTC staff's statement conflicts with FCRA's plain language and, therefore, is not entitled to deference).  The Court rejects in particular the notion that FCRA's requirements and its underlying purpose can be satisfied if "an adverse-action notice" merely "hints" at the nature of the adverse action.  In any event, the Court concludes Defendants' notice failed to meet even the minimal goal suggested by Brinckerhoff because their notices, standing alone, do not

---

[6]  *See Federal Trade Commission:* Protecting America's Consumers, http://www.ftc/history/ftchistory.shtm.

even "hint" that anything adverse has occurred.

    4.   <u>Guidance of *Safeco v. Burr*</u>.

      Defendants assert the Supreme Court's statement in *Safeco v. Burr* that the term "adverse action" under FCRA is subject to more than one reasonable interpretation compels the conclusion that "[Defendants'] alleged failure to provide 'notice of the adverse action' . . . cannot be deemed a willful FCRA violation." 127 S. Ct. at 2206-08, 2210-14. As noted, however, the Supreme Court's focus was on determining who should receive notice rather than determining the appropriate content of the notice.

      Defendants also assert their "adverse-action notice" satisfies the goal, as enunciated by the Supreme Court, of "piquing an applicant's interest about the accuracy of his credit report." *See id.* at 2214. The Supreme Court, however, made that statement in the context of "hypernotification"; *i.e.*, who should get the notice and how often it should be sent. The Supreme Court also emphasized that "Congress meant a notice of adverse action to get some attention" and not to be treated as "junk mail." *Id.* Based on the record in this case, however, it appears Defendants may have wanted to avoid drawing "attention" to anything "adverse" in their adverse-action notice.

    5.   <u>Other FCRA Notice Provisions</u>.

50 - OPINION AND ORDER

Defendants argue the statutory language in other FCRA sections supports their contention that their adverse-action notice was objectively reasonable because, unlike Section 1681m which pertains to Plaintiffs, other FCRA provisions are more explicit in referring to the "adverse" nature of a particular action.

a. <u>Section 1681j(b)</u>.

Under FCRA, the consumer reporting agencies with whom insureds may check the accuracy of their consumer credit reports must provide such reports free of charge if a timely request is made:

> **Free disclosure after *adverse notice* to consumer**
>
> Each consumer credit reporting agency that maintains a file on a consumer shall make all disclosures pursuant to Section 1681(g) of this title free of charge to the consumer *if, not later than 60 days after receipt by such consumer of a notification pursuant to section 1681m of this title*, or of a notification from a debt collection agency affiliated with that consumer credit reporting agency *stating that the consumer's credit rating may have been adversely affected,* the consumer makes a request under section 1681g of this title. . . .

15 U.S.C. § 1681j(b)(emphasis added).

According to Defendants, the words "adversely affected" apply only to notifications from debt-collection agencies and not to adverse-action notices from insurers who must comply with Section 1681m. Defendants argue if Congress intended

to apply the term "adversely affected" to notices under Section
1681m in the same manner as to notices from debt-collection
agencies, Congress would have explicitly done so.  The Court
disagrees.  Defendants' focus on the term "adversely affected" as
it applies to consumer credit agencies ignores the specific
reference to Section 1681m, which is the section governing
"adverse actions" taken by "users of consumer credit reports"
such as Defendants.  Defendants also ignore the fact that the
purpose of Section 1681j(b) as indicated in its title is to
ensure that consumers such as insureds who receive an "adverse
notice" are able to obtain a free credit report.

        The Court, therefore, concludes the statutory
language in Section 1681j(b) fails to support Defendants'
interpretation that a Section 1681m adverse-action notice need
not explicitly refer to an "adverse" action.

        b.  <u>Oral Notice by Insurers</u>.

        Defendants contend FCRA allows insurers to provide
oral adverse-action notices to insureds, which, according to
Defendants, is "a clear indication that Congress intended to
allow flexibility with respect to the means *and wording* of the
notice."[7]  Allowing oral notification may reflect flexibility as
to the means of providing notice, but it does not govern the

_____

        [7] The Court also addresses Defendants' "oral notification
program" in its discussion of Plaintiffs' Motion for Partial
Summary Judgment (#412).

wording of the notice.  Defendants' wording of their adverse-action notices, whether written or oral, must clearly describe to insureds the action that was taken and the fact that it adversely affected the cost of their insurance.  Defendants, however, recommended to agents who provided adverse-action notices to insureds to respond as follows if asked what the notices meant:

> As we discussed, during the underwriting process, consumer credit reports are used. This form provides you with the name, address, and phone number of the consumer credit reporting agenc(ies) that provided the information that we use.  If you have any questions, please let me know.

Pls.' Mem. in Support of Mot. for Summary J., Rees Decl., Ex. 33.

In addition, Defendants did not have any program to supplement written notice of an "adverse action" with oral notification.  Moreover, there is not any evidence in the record that Defendants intended their agents to have the "flexibility" to delve into details of any adverse actions that were not contained in the written notice.  The Court notes FCRA does not provide that insureds must participate in the process of determining whether and why they suffered adverse actions when they first applied for or renewed their insurance policies.

c.  <u>Other FCRA Notice Provisions</u>.

Defendants also argue Congress expressly provides the specific language to be used in other statutory contexts, but Congress chose not to do so with FCRA.  To support their

53 - OPINION AND ORDER

position, Defendants cite other FCRA provisions that include
specific language to describe the quality of the disclosure
required:  for example, "clear and conspicuous disclosure,"
"clearly and accurately disclose," and "readily understandable
language."

The Court, however, is unpersuaded by Defendants'
argument. In the first substantive provision of Section 1681m(a),
Congress specifically provided "any person tak[ing] any adverse
action . . . shall (1) provide oral, written, or electronic
notice of the adverse action to the consumer."  Defendants did
not meet that specific requirement in their "Fair Credit Report
Notification."

d.  <u>FACTA</u>.

Defendants assert FACTA, which amended FCRA,
prescribes the "minimum" requirements for the notice to be given
to a consumer, and it does not include any reference to an
"adverse action." *See* 15 U.S.C. § 1681m(h)(5).  Defendants
contend their FCRA notice, therefore, satisfied FACTA's minimum
requirements.  The Court disagrees.

As noted, FACTA is not applied retroactively.  In
addition, FACTA authorizes the FTC to adopt rules prescribing the
"minimum" contents of adverse-action notices related to credit
transactions rather than to the rating of premiums for insurance
policies. 15 U.S.C. § 1681m(h)(5) and (6)(A) and (B).  Indeed,

54 - OPINION AND ORDER

FACTA specifically prohibits insurers from relying on FACTA's notice provisions to satisfy their FCRA notice obligations: "A person that is required to provide a notice under subsection [§ 1681m(a)] of this section cannot meet that requirement by providing a notice under [§ 1681m(h)]." 42 U.S.C. § 1681m(h)(4).

On this record, the Court concludes the notice requirements set forth in FACTA are not relevant to this matter.

In summary, the Court rejects Defendants' arguments that other FCRA provisions support the reasonableness of their interpretation of FCRA's requirements as to the content of an adverse-action notice.

6.  <u>FTC Guidance as to FCRA Notice Requirements</u>.

Defendants assert their adverse-action notice met FTC guidelines promulgated in 1997 regarding the FCRA notice obligations of Credit Reporting Agencies (CRAs):

> If a user takes any type of *adverse action* that is based at least in part on information contained in a consumer credit report, the user is required by [§ 1681m] of the FCRA to notify the consumer. The notification may be done in writing, orally, or by electronic means. *It must include the following:*
>
> - The name, address, and telephone number of the CRA (including a toll-free telephone number, if it is a nationwide CRA) that provided the report.
>
> - A statement that the CRA did not make the *adverse decision* and is not able to explain why the decision was made.
>
> - A statement setting forth the consumer's

55 - OPINION AND ORDER

> right to obtain a free disclosure of the consumer's file from the CRA if the consumer requests the report within 60 days.
>
> • A statement setting forth the consumer's right to dispute directly with the CRA the accuracy or completeness of any information provided by the CRA.

62 Fed. Reg. 35,586, 35,596-97 (July 1, 1997)(emphasis added).

The FTC guidelines specifically require the insurer who takes the "adverse action" to include a statement that the credit-reporting agency "did not make the adverse decision."  As is clear from the notification provided by Defendants, the absence of any reference to an "adverse action" or "adverse decision" leaves the recipient of the notice clueless as to whether an adverse action has occurred.

It is at least arguable from the record as a whole that one of Defendants' goals in drafting their FCRA notices was to avoid alerting their insureds to the fact that their consumer credit-report scores adversely affected the cost of their insurance.  Instead it seems Defendants wanted their insureds to notice that they received a "discount" on the premium they paid, albeit a discount from the worst possible premium rate available to any insured.  As such, Defendants' notices frustrated rather than promoted the purposes of FCRA's adverse-action notice requirement.

7.  <u>Other FTC and Federal Reserve Board Guidance</u>.

56 - OPINION AND ORDER

Defendants also rely on guidance from the FTC and the Federal Reserve Board (FRB) to support their argument that notices in related contexts are only required to describe the action taken rather than to identify whether the action was adverse. For instance, under the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691, creditors are generally not allowed to discriminate against credit applicants based on, *inter alia,* age, race, or sex. Creditors may, however, consider nondiscriminatory factors such as an applicant's credit history and creditworthiness when making a credit decision. 15 U.S.C. § 1691(b) and (c). If a creditor takes an "adverse action," the creditor must inform the applicant of the action taken and provide a "statement of reasons for such action." 15 U.S.C. § 1691(d). The statement of reasons for the action must be specific. 12 C.F.R. § 202.9 (a)(2)(I).

To justify the adequacy of their FCRA notices, Defendants cite an "official staff interpretation" of ECOA in which the FRB states the credit applicant need not be told that the action is "adverse" and the creditor "may use any words or phrases that describe the action taken on the application." *See* 12 C.F.R. pt. 202, supp. 1 (§ 202.9 - Notifications).

Although the FRB concluded the word "adverse" need not be included in the notification, the FRB required the notification to be specific as to why an adverse decision on a

57 - OPINION AND ORDER

credit application was taken.  The FRB, in fact, included in its
interpretative regulations specific examples of notices that
would satisfy ECOA.  In cases of denials to extend credit,
termination of credit, or changes in the terms of credit, the
approved notices must include checklists that identify the
specific reasons for the action taken; for example, "unable
to verify employment," "limited credit experience," and "poor
credit."  Moreover, the FRB recommends letter-notification forms
include words that plainly signify the action taken was
unfavorable; for example, "we regret . . .," "we are unable
to offer you . . .," and "we are sorry to advise you . . . ."
*See* 12 C.F.R. pt. 202, app. C.  Defendants' notices standing
alone do not include any words or phrases that would indicate to
the insured or by which the insured could reasonably infer that
an adverse, unfavorable, or disadvantageous decision was made by
Defendants.

On this record, the Court concludes the FRB guidance as
to ECOA adverse-action notices highlights the inadequacy of
Defendants' notices.

8.  Advice of FTC Counsel.

Defendants again assert they relied on informal staff
advice from FTC counsel to establish that their interpretation
of FCRA's adverse-action notice requirements was "reasonable"
As noted, FTC staff attorney, Clarke Brinckerhoff, advised

58 - OPINION AND ORDER

Defendants that they did not have to use the words "bad" or
"adverse" in their notices but only needed to provide a "hint"
that something adverse had occurred.  The Court has previously
rejected Defendants' contention that their adverse-action notice
was objectively reasonable based on Brinckerhoff's advice and
that it actually satisfied even a minimal requirement of a "hint"
that something adverse had occurred.  Moreover, the Court is not
persuaded Defendants' reliance on Brinckerhoff's advice is
validated in light of the fact that their attorneys, Leonard
Chanin and L. Richard Fischer of the law firm Morrison &
Foerster, gave them the same advice after they had talked to
Brinckerhoff.

Chanin testified as follows at his deposition regarding
the purpose of the FCRA adverse-action notice provision:

> I've dealt with this statute for many years.
> I'm not sure, you know, how to phrase the
> purpose of it.  It's to tell the consumer
> that I, as an entity, have used a consumer
> credit report, and *implicitly*, I think, that
> there is something in that consumer credit
> report that, you, the consumer, may want to
> look at because it was relevant to my
> decision.

Defs.' Mem in Support of Mot. for Summary J., Snider Aff.,
Ex. W at 14 (emphasis added). The Court, however, rejects as
unreasonable the notion that an adverse-action notice require-
ment is adequate if that message in the notice can only be
"implicitly" understood by the consumer.

59 - OPINION AND ORDER

The Court also rejects Defendants' contention that they can insulate themselves from liability under FCRA by relying on informal FTC advice or advice of counsel when such advice factually and legally ignores both the plain language of the statute and the principal function of the statute (*i.e.*, to give the insured notice of an adverse action coupled with sufficient information to allow the insured to correct inaccuracies in his or her consumer credit report that may have contributed to the adverse action).

9.  <u>Absence of Explanatory Appellate Decisions</u>.

Until *Reynolds* and *Safeco v. Burr,* there had not been any specific guidance from appellate courts regarding FCRA's notice requirements as to the contents of an adverse-action notice.  While this factor might be relevant when determining the objective reasonableness of Defendants' interpretation of FCRA's notice requirements, the Court concludes it is outweighed on balance by all of the factors discussed above, which, contrary to Defendants' arguments, reflect Defendants' interpretation of FCRA's notice requirements was objectively unreasonable.

10.  <u>Advice of Experienced FCRA Attorneys</u>.

The Court has previously addressed the weight to be given to advice proffered by Defendants' attorneys regarding the

contents of Defendants' adverse-action notices.  For the reasons
stated, the Court concludes that advice may strengthen
Defendants' position that their adverse-action notice was
objectively reasonable.

  11.  <u>The Practice in the Industry</u>.

  Like Defendants, other insurance companies concluded
the word "adverse" was not required in adverse-action notices
and a notice was sufficient even if it did not inform the insured
specifically of the consequences of the adverse action.  If
the practice in the industry to avoid specifically informing
the insured that an adverse action had occurred was reasonable,
the Court might give this factor some weight.  Under these
circumstances, however, the Court finds this factor is entitled
to little weight.  The defense that "everyone did it" is not an
acceptable ground to absolve Defendants from liability in the
absence of a reasonable justification for Defendants' conduct or
for the conduct of similarly-situated insurers.

 Having considered all these factors, the Court concludes
Defendants' notices of adverse action that were sent to renewal
insureds were objectively unreasonable as a matter of law because
Defendants consistently chose not to identify that an adverse
action had been taken based in whole or in part on information in
a credit report or otherwise to state specifically the
consequences of the adverse action.

61 - OPINION AND ORDER

C.  **Evidence of Willfulness**.

Based on the Court's conclusion that Defendants' FCRA adverse-action notices were objectively unreasonable as a matter of law, the issue now to be resolved is whether Defendants' FCRA violation was willful and whether, as a result, Plaintiffs are entitled to statutory damages.  15 U.S.C. § 1681n(a)(1)(A).

On this record, the Court agrees with Plaintiffs that genuine issues of material fact exist as to whether Defendants' objectively unreasonable interpretation of FCRA's adverse-action notice requirements was also willful; *i.e.,* flowing from a reckless misreading of the statutory requirements.  The Court, therefore, concludes the ultimate issue of willfulness is a matter for the jury to decide.

Accordingly, for all of these reasons, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary Judgment (#402) on willfulness on the ground that genuine issues of material fact exist as to whether Defendants' objectively unreasonable interpretation of FCRA's requirements as to the contents of their adverse-action notices constituted a willful violation of FCRA.

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (#412)**

Plaintiffs' Motion for Partial Summary Judgment for the most part addresses the same issues raised by Defendants in their

62 - OPINION AND ORDER

Motions for Summary Judgment and Partial Summary Judgment.

**I.    <u>Adverse Actions</u>**.

Plaintiffs assert Defendants took adverse actions against each named Plaintiff.  For the reasons stated above, the Court concludes Defendants took adverse actions on the renewal of insurance policies issued by Defendants to Plaintiffs Porto, Newberry, and Evelyn Broeffle and did not take adverse actions as to Plaintiffs Ashby and Wenzlick.

**II.   <u>Statute of Limitations</u>**.

The Court has concluded the statute of limitations as to claims against FGI was tolled as of September 28, 2001, when Plaintiffs filed their original Complaint.  Defendants began taking the adverse actions alleged by Plaintiffs in October 1999, which is less than two years before the statute of limitations tolling date.  As noted, FICO is jointly and severally liable with FGI for any FCRA violations.  Thus, none of the surviving claims of Plaintiffs Porto, Newberry, and Evelyn Broeffle are time-barred.

**III. <u>Written Notice</u>**.

For the reasons stated above, the Court concludes the written adverse-action notices that Defendants sent to each Plaintiff were objectively unreasonable as a matter of law. Genuine issues of material fact exist as to whether the inadequacy of the content of Defendant's adverse-action notices

63 - OPINION AND ORDER

constitutes a willful violation of FCRA.

**IV.** **Oral Notice**.

For the reasons stated above, the Court finds Defendants had no formal program to provide oral notice to insureds that they had suffered adverse actions based on information in their consumer credit reports. Moreover, there is not any evidence that the *ad hoc* information occasionally provided by some agents to some insureds adequately apprised those insureds that the actions taken by Defendants were "adverse." It is clear from the depositions of agents that some provided more information on the subject than others, some provided information only if asked by the insured, and all were encouraged to stress the positive and avoid the negative aspects of Defendants' use of the insureds' consumer credit reports in setting the premiums to be charged for the insurance.

On this record, the Court concludes Defendants' occasional oral discussions with insureds regarding their consumer credit reports did not constitute an adequate substitute for written adverse action notices under FCRA.

**V.** **Electronic Notice**.

There is not any evidence that Defendants had a program or practice of informing insureds of adverse actions by electronic means.

Accordingly, for all the reasons stated in this Opinion and Order, the Court **GRANTS in part** and **DENIES in part** Plaintiffs' Motion for Partial Summary Judgment.

## CONCLUSION

For these reasons, the Court **DENIES** Defendants' Motion for Summary Judgment (#400), **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary Judgment (#402), **GRANTS in part** and **DENIES in part** Defendants' Motion for Partial Summary Judgment (#404), and **GRANTS in part** and **DENIES in part** Plaintiffs' Motion for Partial Summary Judgment (#412).

The Court directs counsel to confer and to submit no later than July 10, 2008, a joint proposed case-management plan for further proceedings.

IT IS SO ORDERED.

DATED this 20th day of June, 2008.


/s/ Anna J. Brown
_____
ANNA J. BROWN
United States District Judge


65 - OPINION AND ORDER