GREGORY G. KATSAS, Assistant Attorney General
EUGENE M. THIROLF, Director, Office of Consumer Litigation
   By: DANIEL K. CRANE-HIRSCH, daniel.crane-hirsch@usdoj.gov
U.S. Department of Justice, Office of Consumer Litigation
PO Box 386
Washington, DC  20044-0386
Telephone: 202-616-8242
Facsimile: 202-514-8742

KARIN J. IMMERGUT, United States Attorney
   By: KELLY ZUSMAN, Kelly.Zusman@usdoj.gov
U.S. Attorney's Office
Mark O. Hatfield U.S. Courthouse
1000 SW Third Ave., Suite 600
Portland, OR  97204
Telephone: 503-727-1009
Facsimile: 503-727-1117

Attorneys for Intervenor-Plaintiff the United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| DOUGLAS ASHBY, *et al.*, **Plaintiffs**, and | Case No. 01-1446-BR |
| UNITED STATES OF AMERICA, **Intervenor-Plaintiff**, | **UNITED STATES' REPLY BRIEF IN SUPPORT OF CONSTITUTIONALITY OF FCRA'S STATUTORY DAMAGES PROVISION** |
| v. | |
| FARMERS INSURANCE CO. OF OREGON, INC., *et al.*, **Defendants**. | Oral argument set for Oct. 6, 2008 |

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................... i

TABLE OF AUTHORITIES.............................................................. iii

INTRODUCTION......................................................................... 1

STATUTORY BACKGROUND.......................................................... 2

I.    Insurers' duties when taking adverse action based upon credit reports............... 2

II.   Methods available to enforce FCRA's requirements.............................. 3

ARGUMENT.............................................................................. 5

I.    FCRA is not "void for vagueness" because it does not identify criteria to
      determine statutory damages within the $100 to $1,000 statutory range.............. 5

II.   Defendants' "double punishment" arguments are unavailing...................... 10

      A.    "Multiple punishments" in a single suit, either criminal or civil, are
            constitutionally permissible.......................................... 11

      B.    Defendants misconstrue judicial decisions restricting the availability of
            multiple punitive damage awards in multiple actions to prohibit Congress
            from authorizing both statutory and punitive damages in one action. ......... 12

      C.    It is entirely permissible for statutory damages to deter illegal conduct by
            considering defendants' state of mind and economic motivations, as well
            as the mildness or severity of defendants' violations..................... 14

III.  FCRA's statutory damages provision does not violate due process merely because
      a jury might return a large statutory-damages verdict.......................... 17

      A.    Considering whether potential statutory damages under FCRA might be
            constitutionally excessive is premature................................ 17

      B.    Any due-process analysis of FCRA's statutory-damages provision would
            measure proportionality by considering the public interest as well as
            private injury...................................................... 19

      C.    FCRA statutory damages are not subject to, and in any event do not
            violate, constitutional limitations on punitive damages................... 24

1.  *Even in considering jury awards of punitive damages, courts must consider potential harm as well as actual harm.* . . . . . . . . . . . . . . . . . . 24

2.  *Statutory damage ranges enacted by Congress are not subject to the due process tests applied to jury awards of punitive damages.* . . . . . 25

D.  Due process does not require that substantial statutory-damage awards be supported by proof of "actual damages". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

E.  Defendants do not have greater due process rights in class-action cases than in individual party actions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

DECLARATION OF DANIEL K. CRANE-HIRSCH IN SUPPORT OF THE UNITED STATES' REPLY BRIEF IN SUPPORT OF CONSTITUTIONALITY OF FCRA'S STATUTORY DAMAGES PROVISION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Exhibits to Declaration:

1    S. Rep. No. 91-517 (1969)

2    115 Cong. Rec. 33,408-12 (1969) (comments of Sens. Proxmire and Williams)

3    Consumer Credit Reporting Reform Act of 1996 ("Reform Act"), Pub. L. No. 104-208, secs. 2401, 2411-2412, 110 Stat. 3009, 3009-426, 3009-443 to 3009-447 (codified as amended at 15 U.S.C. §§ 1681m–1681n)

4    Fair and Accurate Credit Transactions Act of 2003 (FACTA), Pub. L. No. 108-117, sec. 311(a), 117 Stat. 1952, 1988-89 (codified at 15 U.S.C. § 1681m(h)).

5    Credit and Debit Card Receipt Clarification Act of 2007 [sic] ("Clarification Act"), Pub. L. No. 110-241, 122 Stat. 1565-1566 (June 3, 2008)

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                                  **Pages**

*Accounting Outsourcing, LLC. v. Verizon Wireless Personnel Communications*,
    329 F. Supp. 2d 789 (M.D. La. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Albernaz v. United States*,
    450 U.S. 333 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Arcilla v. Adidas Promotional Retail Operations, Inc.*,
    488 F. Supp. 2d 965 (C.D. Cal. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Arrez v. Kelly Services, Inc.*,
    522 F. Supp. 2d 997 (N.D. Ill. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 28

*Ashby v. Farmers Insurance Co. of Oregon*,
    ___ F. Supp. 2d ___, No. 01-CV-1446-BR,
    2008 WL 2557982 (D. Or. June 20, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 18, 34

*Ashby v. Farmers Insurance Co. of Oregon*,
    No. CV 01-1446-BR, 2006 WL 6036462 (D. Or. Feb. 28, 2006). . . . . . . . . . . . . . . . . . 18

*Ashby v. Farmers Insurance Co. of Oregon*,
    No. CV 01-1446-BR, 2004 WL 2359968 (D. Or. Oct. 18, 2004),
    *mot. to amend denied*, 2004 WL 5622940 (D. Or. Nov. 5, 2004). . . . . . . . . . . . 15, 32-33

*Ashby v. Farmers Insurance Co. of Oregon*,
    No. CV 01-1446-BR, 2004 WL 5622940 (D. Or. Nov. 5, 2004). . . . . . . . . . . . . . . . . . 23

*Ashwander v. Tennessee Valley Authority*,
    297 U.S. 288 (1936). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*BMW of North America, Inc. v. Gore*,
    517 U.S. 559 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Braxton v. Farmer's Insurance Group*,
    209 F.R.D. 654 (N.D. Ala. 2002),
    *aff'd sub nom. Braxton v. Fire Insurance Exchange*,
    91 Fed. App'x 656 (11th Cir. 2003) (unpublished table decision). . . . . . . . . . . . . . . . . 33

*Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*,
    492 U.S. 257 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 30

*Califano v. Yamasaki*,
    442 U.S. 682 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Centerline Equipment Corp. v. Banner Personnel Services, Inc.*,
    545 F. Supp. 2d. 768 (N.D. Ill. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 23, 28

*Chair King, Inc. v. GTE Mobilnet of Houston, Inc.*,
    135 S.W.3d 365 (Tex. App. 2004), *rev'd in part*, 184 S.W.3d 707 (Tex.),
    *cert. denied sub nom. Kosoy v. GTE Mobilnet of Houston, Inc.*,
    548 U.S. ___, 126 S. Ct. 2941 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Cicilline v. Jewel Food Stores, Inc.*,
    542 F. Supp. 2d 831 (N.D. Ill. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Concrete Pipe & Products of California, Inc.*
    *v. Construction Laborers Pension Trust for Southern California*,
    508 U.S. 602 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Dang v. Cross*,
    422 F.3d 800 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Del Amora v. Metro Ford Sales & Service, Inc.*,
    206 F. Supp. 2d 947 (N.D. Ill. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Deposit Guarantee National Bank v. Roper*,
    445 U.S. 326 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*DirecTV, Inc. v. Cantu*,
    No. SA-04-CV-136-RF, 2004 WL 2623932 (W.D. Tex. Sept. 29, 2004). . . . . . . . . . . . 28

*DirecTV, Inc. v. Spillman*,
    No. Civ.A.SA-04-82-XR, 2004 WL 1875045 (W.D. Tex. Aug. 23, 2004). . . . . . . . . . . 19

*Douglas v. Cunningham*,
    294 U.S. 207 (1935). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 32

*Edwards v. Toys "R" Us*,
    527 F. Supp. 2d 1197 (C.D. Cal. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*ESI Ergonomic Solutions, LLC v. United Artists Theatre Circuit, Inc.*,
    50 P.3d 844 (Ariz. Ct. App. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 28

*Express Valet, Inc. v. City of Chicago*,
    869 N.E.2d 964 (Ill. App. Ct. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*F.W. Woolworth Co. v. Contemporary Arts, Inc.*,
    344 U.S. 228 (1952). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 23, 30

*Feltner v. Columbia Pictures Television, Inc.*,
    523 U.S. 340 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 30

*Follman v. Village Squire, Inc.*,
    542 F. Supp. 2d 816 (N.D. Ill. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Giaccio v. Pennsylvania*,
    382 U.S. 399 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Gore v. United States*,
    357 U.S. 386 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Griffin v. Oceanic Contractors, Inc.*,
    458 U.S. 564 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Grimes v. Rave Motion Pictures of Birmingham, LLC*,
    552 F. Supp. 2d 1302 (N.D. Ala. 2008), *appeals docketed*,
    Nos. 08-13510-BB, 08-136616-BB (11th Cir. June 20, 2008). . . . . . . . . . . . . . . . passim

*Guess?, Inc. v. Gold Center Jewelry*,
    997 F. Supp. 409 (S.D.N.Y. 1998),
    *rev'd in part sub nom. Gucci America, Inc. v. Gold Center Jewelry*,
    158 F.3d 631, 635 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Halperin v. Interpark, Inc.*,
    No. 07-CV-2161, 2007 WL 4219419 (N.D. Ill. Nov. 29, 2007). . . . . . . . . . . . . . . . . 19

*Harjoe v. Herz Financial*,
    108 S.W.3d 653 (Mo. 2003) (*per curiam*). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Honda Motor Co. v. Oberg*,
    512 U.S. 415 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Hudson v. United States*,
    522 U.S. 93 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14, 15

*In re Marriage of Chen & Ulner*,
    820 N.E.2d 1136 (Ill. App. Ct. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Italia Foods, Inc v. Marinov Enterprises, Inc.*,
    No. 07-C-2494, 2007 WL 4117626 (N.D. Ill. Nov. 16, 2007). . . . . . . . . . . . . . . . . . . . . 28

*Johnson v. Ford Motor Co.*,
    113 P.3d 82 (Cal. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Jones v. Federated Financial Reserve Corp.*,
    144 F.3d 961 (6th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Kaufman v. ACS Systems, Inc.*,
    2 Cal. Rptr. 3d 296 (Ct. App. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 28

*Kavu, Inc. v. Omnipak Corp.*,
    246 F.R.D. 642 (W.D. Wash. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 23

*Kenro, Inc. v. Fax Daily, Inc.*,
    962 F. Supp. 1162 (S.D. Ind. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Kesler v. Ikea U.S. Inc.*,
    No. SACV 07-568 JVS (RNBx), 2008 WL 413268 (C.D. Cal. Feb. 4, 2008). . . . . . . . . 18

*Klingensmith v. Max & Erma's Restaurants, Inc.*,
    No. 07-C-0318, 2007 WL 3118505 (W.D. Pa. Oct. 23, 2007). . . . . . . . . . . . . . . . . . . . 18

*Krey v. Castle Motor Sales, Inc.*,
    241 F.R.D. 608 (N.D. Ill. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 33

*L.A. Westermann Co. v. Dispatch Printing Co.*,
    249 U.S. 100, 106 (1919).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Los Angeles News Service v. Reuters Television International, Ltd.*,
    149 F.3d 987 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Louis Vuitton Malletier & Oakley, Inc. v. Veit*,
    211 F. Supp. 2d 567 (E.D. Pa. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Lowry's Reports, Inc. v. Legg Mason, Inc.*,
    302 F. Supp. 2d 455 (D. Md. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Martinez v. Shinn*,
    992 F.2d 997 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 31

*Matthews v. United Retail, Inc.*,
    248 F.R.D. 210 (N.D. Ill. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Microsoft Corp. v. Nop*,
    549 F. Supp. 2d 1233 (E.D. Cal. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Missouri v. Hunter*,
    459 U.S. 359 (1983).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 16

*Murray v. GMAC Mortgage Corp.*,
    434 F.3d 948 (7th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 23, 31

*Native American Arts, Inc. v. Bundy-Howard, Inc.*,
    168 F. Supp. 2d 905 (N.D. Ill. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Nintendo of America, Inc. v. Dragon Pacific International*,
    40 F.3d 1007 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Pacific Mutual Life Insurance Co. v. Haslip*,
    499 U.S. 1 (1991).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 22

*Peer International Corp. v. Pausa Records, Inc.*,
    909 F.2d 1332 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 32

*Philip Morris USA v. Williams*,
    549 U.S. ___, 127 S. Ct. 1057 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Phillips Randolph Enterprises, LLC v. Rice Fields*,
    No. 06-C-4968, 2007 WL 129052 (N.D. Ill. Jan. 11, 2007). . . . . . . . . . . . . . . . . . . 28

*Pirian v. In-N-Out Burgers*,
    No. SACV-06-1251 DOC (MLGx), 2007 WL 1040864 (C.D. Cal. Apr. 5, 2007). . . . . 18

*Ramirez v. Midwest Airlines, Inc.*,
    537 F. Supp. 2d 1161 (D. Kan. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Roberts v. United States Jaycees*,
    468 U.S. 609 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Sadowski v. Med1 Online, LLC*,
    No. 07-C-2973, 2008 WL489360 (N.D. Ill. Feb. 20, 2008). . . . . . . . . . . . . . . . . . . . 28

*Safeco Insurance Co. of America v. Burr*,
    551 U.S. ___, 127 S. Ct. 2201 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Santiago v. Tamarack Tree Co.*,
    No. 06-CV-1811-HU, 2007 WL 3171137 (D. Or. Oct. 24, 2007) (Brown, J.). . . . . . . . 16

*Six Mexican Workers v. Arizona Citrus Growers,*
    904 F.2d 1301 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 23, 31

*Smith v. Doe,*
    538 U.S. 84 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Smith v. NBC Universal,*
    No. 06-Civ.-5350(SAS), 2008 WL 483604 (S.D.N.Y. Feb. 22, 2008). . . . . . . . . . . . . . 16

*Smith v. Wade,*
    461 U.S. 30 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Solem v. Helm,*
    463 U.S. 277 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Spector Motor Service v. McLaughlin,*
    323 U.S. 101 (1944). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18

*St. Louis, Iron Mountain & Southern Railway Co. v. Williams,*
    251 U.S. 63 (1919). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*State Farm Mutual Automobile Insurance Co. v. Campbell,*
    538 U.S. 408 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 24

*Texas v. Am. Blastfax, Inc.,*
    121 F. Supp. 2d 1085 (W.D. Tex. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Troy v. Home Run Inn, Inc.,*
    No. 07-C-4331, 2008 WL 1766526 (N.D. Ill. Apr. 14, 2008). . . . . . . . . . . . . . . . . . 18

*Troy v. Red Lantern Inn, Inc.,*
    No. 07-CV-2418, 2007 WL 4293014 (N.D. Ill. Dec. 4, 2007). . . . . . . . . . . . . . . . . . 19

*Turner Broadcasting System, Inc. v. Federal Communications Commission,*
    520 U.S. 180 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22

*TXO Production Co. v. Alliance Resources Corp.,*
    509 U.S. 443 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States ex rel. Tyson v. Amerigroup Illinois, Inc.,*
    488 F. Supp. 2d 719 (N.D. Ill. 2007),
    *appeals dismissed per stipulation,*
    Nos. 07-2111 & 07-2113 (7th Cir. Sept. 12, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Bajakajian*,
   524 U.S. 321 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Batchelder*,
   442 U.S. 114 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 26, 29

*United States v. Evans*,
   333 U.S. 483 (1948). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Whalen v. United States*,
   445 U.S. 684 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Williams v. ConAgra Poultry Co.*,
   378 F.3d 790 (8th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Williamson v. Lee Optical of Oklahoma*,
   348 U.S. 483 (1955). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Yohay v. City of Alexandria Employees Credit Union, Inc.*,
   827 F.2d 967 (4th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Zomba Enterprises, Inc.* v. *Panorama Records, Inc.*,
   491 F.3d 574 (6th Cir. 2007), *reh'g en banc denied*,
   Nos. 06-5013 & 06-5266 (6th Cir. Oct. 5, 2007),
   *cert. denied*, 553 U.S. ___, 128 S. Ct. 2429 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**STATUTES**

7 U.S.C. § 2050a(b) (1976) (Farm Labor Contractor Registration Act (FLCRA))
   (repealed and replaced by the  Migrant and Seasonal Agricultural Worker
   Protection Act (AWPA)). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

12 U.S.C. § 3417(a)(1) (Right to Financial Privacy Act) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 34

15 U.S.C. § 1117(a) (Anticybersquatting Consumer Protection Act). . . . . . . . . . . . . . . . . . 9, 10

15 U.S.C. § 1117(c) (Anti-Counterfeiting Consumer Protection Act of 1996). . . . . . . 9, 10, 30, 34

15 U.S.C. § 1117(d) (Anticybersquatting Consumer Protection Act). . . . . . . . . . . . . . . . . . 10, 34

15 U.S.C. §§ 1681-1681x (Fair Credit Reporting Act (FCRA)). . . . . . . . . . . . . . . . . . . . . . . . 2

15 U.S.C. § 1681. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

15 U.S.C. § 1681 (b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

15 U.S.C. § 1681m. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

15 U.S.C. § 1681m (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

15 U.S.C. § 1681m (a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

15 U.S.C. § 1681m (g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

15 U.S.C. § 1681m (h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

15 U.S.C. § 1681m (h)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

15 U.S.C. § 1681m (h)(8)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

15 U.S.C. § 1681n . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

15 U.S.C. § 1681n (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

15 U.S.C. § 1681n (a)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

15 U.S.C. § 1681n (a)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 15

15 U.S.C. § 1681n (a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

15 U.S.C. § 1681n (1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

15 U.S.C. § 1681n (2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

15 U.S.C. § 1681o. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

15 U.S.C. § 1681p . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

15 U.S.C. § 1681s (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

15 U.S.C. § 1681s (b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

15 U.S.C. § 1681s (c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

17 U.S.C. § 504(c) (Copyright Act). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

17 U.S.C. § 1203(c)(3) (Digital Millennium Copyright Act). . . . . . . . . . . . . . . . . . . . . . . . 10, 34

18 U.S.C. § 2318(f)(4) (Intellectual Property Protection and Courts Amendments Act of 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

18 U.S.C. § 248(c)(1)(B) (Freedom of Access to Clinic Entrances Act of 1994). . . . . . . . . . . . 34

18 U.S.C. § 2520(b)(2) (Electronic Communications Privacy Act of 1986). . . . . . . . . . 10, 17, 34

18 U.S.C. § 2520(c)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 17

18 USCA § 2710(c)(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

28 U.S.C. § 2403(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

29 U.S.C. § 1854(c) (Migrant and Seasonal Agricultural Worker Protection Act (AWPA)). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

35 U.S.C. § 297(b)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

47 U.S.C. § 227(b)(3)(B) (Telephone Consumer Protection Act (TCPA)). . . . . . . . . . . . . . 19, 28

47 U.S.C. § 605(e)(3)(B)(iii) (Cable Communications Policy Act of 1984). . . . . . . . . . . . 10, 17

47 U.S.C. § 605(e)(3)(C)(i)(II). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 17

47 U.S.C. § 605(e)(3)(C)(ii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 17

Consumer Credit Reporting Reform Act of 1996 (CCRRA), Pub. L. No. 104-208, secs. 2401-2422, 110 Stat. 3009-426 to 3009-454 (codified as amended at 15 U.S.C. §§ 1681-1681v). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

Credit and Debit Card Receipt Clarification Act of 2007 [*sic*] ("Clarification Act"), Pub. L. No. 110-241, 122 Stat. 1565 (June 3, 2008) . . . . . . . . . . . . . . . . . . . . . . . . 5, 34

Or. Stat. Rev. Ann. 97.760(3)(b), (c) (West 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**FEDERAL RULES**

Fed. R. Civ. P. 23. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**OTHER AUTHORITIES**

115 Cong. Rec. 33,408-09 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

S. Rep. No. 91-517 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 21

U.S. Const. amend. V, Double Jeopardy Clause. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 11

U.S. Const. amend. V, Due Process Clause. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

U.S. Const. amend. VIII, Excessive Fines Clause. . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 27

U.S. Sentencing Guidelines Manual ch. 5, pts. C-E (2007). . . . . . . . . . . . . . . . . . . . . 12, 14

U.S. Sentencing Guidelines Manual § 5F1.6 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

## INTRODUCTION

The Court has already determined that defendants did not give certain policy-holders required notifications that they were raising their insurance premiums because of negative information in the policy-holders' credit reports. *Ashby v. Farmers Ins. Co. of Or.*, ___ F. Supp. 2d ___, No. 01-CV-1446-BR, 2008 WL 2557982 (D. Or. June 20, 2008). If defendants are found at trial to have done so "willfully," they would be liable for $100 to $1,000 in statutory damages per violation. Defendants are challenging the statute on multiple constitutional grounds. They claim that the $100 to $1,000 range of statutory damages is unconstitutionally "vague"; that the Double Jeopardy Clause's prohibition against multiple criminal punishments forbids Congress to authorize both punitive damages (which are not sought here) and statutory damages as relief in a civil suit between private parties; that they are not subject to statutory damages because of various judicial decisions that caution against the possibility of multiple punitive damage awards in multiple actions based upon wrongs done to absent parties; and that, even though statutory damages do not require pleading or proving actual damages, anything larger than the minimum possible statutory damages would be unconstitutional unless the plaintiffs do plead and prove actual individual losses.

The Court authorized the United States of America to intervene to defend the constitutionality of the challenged statute under 28 U.S.C. § 2403(a). We argue here that (1) the Constitution does not require statutes to identify criteria for fact-finders to apply in imposing a criminal sentence, much less in setting civil damages; (2) "multiple punishments" in a single action are permissible, and in any event, FCRA's statutory damages scheme does not involve multiple "punishments"; (3) it is premature for the Court to decide whether a potential statutory-damages verdict might be constitutionally excessive, and in any event, FCRA's range of

statutory damages withstands due-process scrutiny; and (4) due process does not require that an award of greater than minimal statutory damages be supported by proof of actual harm.

## STATUTORY BACKGROUND

This case arises under the Fair Credit Reporting Act (FCRA), 15 U.S.C. §§ 1681-1681x. Originally enacted in 1970, the statute has been amended several times. We first summarize the pertinent duties of insurers using credit reports; and then enforcement measures.

### I.    INSURERS' DUTIES WHEN TAKING ADVERSE ACTION BASED UPON CREDIT REPORTS

Congress enacted the Fair Credit Reporting Act in 1970 "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. ___, 127 S. Ct. 2201, 2205-06 (2007) (citing 15 U.S.C. § 1681 (Congressional findings and statement of purpose)). In general terms, FCRA seeks to protect "the confidentiality, accuracy, relevancy, and proper utilization" of consumer credit, personnel, insurance, and other consumer information. 15 U.S.C. § 1681(b). Toward those ends, the FCRA regulates the contents, dissemination, and use of consumer reports; gives consumers the right to review the contents of their files and dispute information believed to be inaccurate; and provides consumers with notice when adverse actions are taken on the basis of their consumer reports. The purpose of FCRA, as further elaborated in its legislative history, is "to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report." S. Rep. No. 91-517, at 1 (1969) (copy attached as Ex. 1). The statute was designed to address "the inability at times of the consumer to know he is being damaged by an adverse credit report. . . . Unless a person knows he is being rejected for credit or insurance or employment because of a credit report, he has no opportunity to be confronted with the charges against him and tell his side of the story." *Id*. at 3. As Senator William

Proxmire explained when the Senate first passed FCRA, "[f]ew individuals realize that these credit [reporting] files are in existence.  However, such a file can have a serious effect on whether a man gets employment or insurance."  115 Cong. Rec. 33,408-09 (1969) (copy attached as Ex. 2).

The FCRA provision that plaintiffs allege defendants violated, requiring credit-report users to notify consumers of adverse actions, is codified at 15 U.S.C. § 1681m(a).  In 1996, Congress amended this and many other portions of FCRA to increase consumer privacy and enhance the accuracy of credit reporting.  Consumer Credit Reporting Reform Act of 1996 ("Reform Act"), Pub. L. No. 104-208, secs. 2401-2422, 110 Stat. 3009-426 to 3009-454 (codified as amended at 15 U.S.C. §§ 1681-1681v) (copy attached as Ex. 3).  As amended by the Reform Act, § 1681m(a) provides, "If any person takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report, the person shall—(1) provide oral, written, or electronic notice of the adverse action to the consumer . . ."

## II.    METHODS AVAILABLE TO ENFORCE FCRA'S REQUIREMENTS

FCRA is subject to enforcement by several federal agencies, chief among them the Federal Trade Commission, as well as by State Attorneys General.  *See* 15 U.S.C. § 1681s(a)-(c). In addition, FCRA authorizes consumers to bring private suits for violations of the Act and its implementing regulations.  *Id.* §§ 1681n-1681p.  Section 1681n prescribes private remedies for willful violations, while § 1681*o* specifies private remedies for negligent violations.

As originally enacted in 1970, FCRA enabled consumers to recover two kinds of damages for willful violations: actual damages and punitive damages.  15 U.S.C. § 1681n(1)-(2) (1970).  The Reform Act of 1996 amended § 1681n to provide the additional remedy of statutory

damages.  See Pub. L. No. 104-208, § 2412(a)-(c), 110 Stat. 3009-426, 3009-446 (copy attached

as Ex. 3) (codified at 15 U.S.C. § 1681n(a)).  In its amended form, § 1681n(a) provides:

> Any person who willfully fails to comply with any requirement imposed under
> this subchapter with respect to any consumer is liable to that consumer in an
> amount equal to the sum of—
>> (1) (A) any actual damages sustained by the consumer as a result of the failure *or
>> damages of not less than $100 and not more than $1,000*; or
>>> (B) in the case of liability of a natural person for obtaining a consumer
>> report under false pretenses or knowingly without a permissible purpose, actual damages
>> sustained by the consumer as a result of the failure or $1,000, whichever is greater;
>> (2) such amount of punitive damages as the court may allow; and
>> (3) in the case of any successful action to enforce any liability under this
>> section, the costs of the action together with reasonable attorney's fees as
>> determined by the court.

15 U.S.C. § 1681n(a)(1)-(3) (emphasis added).

Congress further modified FCRA in 2003 when it adopted the Fair and Accurate Credit

Transactions Act.  One portion of FACTA created a new subsection of § 1681m, by adding new

consumer protections at the end relating to the use of credit reports in particular credit

transactions.  Fair and Accurate Credit Transactions Act of 2003 (FACTA), Pub. L. No. 108-

117, sec. 311(a), 117 Stat. 1952, 1988-89 (copy attached as Ex. 4) (codified at 15 U.S.C.

§ 1681m(h)).  The final paragraph of the new subsection provided that violations of "this

section"—read literally, the *entirety* of § 1681m, including § 1681m(a) through § 1681m(g), as

well as the new protections that FACTA added as new § 1681m(h)—were not subject to private

causes of action under §§ 1681n and 1681*o*.  15 U.S.C. § 1681m(h)(8)(A) ("Sections 1681n and

1681*o* of this title shall not apply to any failure by any person to comply with this section.").

The adverse-notification requirement that plaintiffs contend defendants violated,

§ 1681m(a), is subsumed within § 1681m.  Defendants therefore previously argued that FACTA

retroactively eliminated plaintiffs' private cause of action under § 1681n.  The Court rejected

this view and held that, because the FACTA provision did not express a retroactive intent, it did not apply to pre-FACTA violations. *Ashby v. Farmers Ins. Co. of Or.*, ___ F. Supp. 2d ___, No. 01-CV-1446-BR, 2008 WL 2557982, at *2-*3 (D. Or. June 20, 2008).

Finally, earlier this summer, Congress amended § 1681n for the first time since 1996. It did so in order to remove liability under § 1681n for certain previous violations of identity-theft requirements imposed by FACTA in 2003, relating to consumer credit-card receipts. Credit and Debit Card Receipt Clarification Act of 2007 [*sic*] ("Clarification Act"), Pub. L. No. 110-241, 122 Stat. 1565 (June 3, 2008) (copy attached as Ex. 5). This legislation, unlike FACTA, expressly stated that it would operate retroactively to eliminate already-pending actions for previous violations. *Id*. § 3(b), 122 Stat. at 1566.

## ARGUMENT

### I.    FCRA IS NOT "VOID FOR VAGUENESS" BECAUSE IT DOES NOT IDENTIFY CRITERIA TO DETERMINE STATUTORY DAMAGES WITHIN THE $100 TO $1,000 STATUTORY RANGE

Defendants' first argument is that FCRA's statutory damages provision is "void for vagueness" on grounds that it does not guide a court or jury on how to set damages *within* its statutory range of $100 to $1,000 per willful violation. Vagueness doctrine expresses the due process requirement that, to be enforceable, a statute must give adequate notice of the conduct it requires or prohibits. It condemns "a statute which either forbids or requires the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application." *Roberts v. United States Jaycees*, 468 U.S. 609, 629 (1984) (internal brackets, quotation marks and citation omitted).

While vagueness doctrine ensures that people can know what the law requires clearly enough to comply, it has never been held to require that someone intent upon *breaking* the law

must be able to calculate in advance precisely what the sanction will be.  The Supreme Court's

indeterminate-sentencing decisions dispose of defendants' vagueness arguments.  In *United*

*States v. Batchelder*, 442 U.S. 114 (1979), the Court rejected a vagueness challenge based upon

two federal criminal statutes that prescribed different ranges of penalties for the same criminal

conduct.  The first statute provided that the defendant "shall be fined not more than $5,000, or

imprisoned not more than five years, or both," while the second statute provided that the

defendant "shall be fined not more than $10,000 or imprisoned for not more than two years, or

both."  The defendant was charged, convicted, and sentenced to five years' imprisonment under

the first statute, and argued on appeal that, read together, the statutes were void for vagueness

because they failed to provide adequate notice of the penalties to which he was exposed.  The

Supreme Court rejected the vagueness claim, holding that "[s]o long as overlapping criminal

provisions clearly define the conduct prohibited and the punishment authorized, the notice

requirements of the Due Process Clause are satisfied."  *Batchelder*, 442 U.S. at 123 (emphasis

added).  That standard was met because "[t]he provisions in issue here . . . unambiguously

specify . . . the penalties available upon conviction."  *Id*.

　　　Like the statutes at issue in *Batchelder*, FCRA sets minimum and maximum levels for

statutory damages without specifying criteria for choosing within that range.  If a statute

requiring that a defendant "shall be fined not more than $5,000, or imprisoned not more than five

years, or both," provides criminal defendants constitutionally sufficient notice of the potential

magnitude of their liability, as the Court held in *Batchelder*, then FCRA's specifying that willful

violations are subject to statutory damages "of not less than $100 and not more than $1,000"

provides equally sufficient notice.  By setting this range of statutory damages, Congress made

the policy choice that any willful violation of the FCRA could cost a defendant $1,000, and

every defendant is on notice of the potential cost of its liability for willfully violating the statute. The factfinder in any particular case may impose a damages award below this amount, subject to the $100 floor.  No defendant can claim surprise if its liability equals $1,000 per violation, nor any unfairness if its liability is less than that amount.

The Supreme Court squarely held in *Batchelder* that indeterminate sentencing statutes did not offend the Due Process Clause.  If—as defendants claim—it is unconstitutional for Congress to authorize "damages of not less than $100 and not more than $1,000" without providing statutory guidance on how to calculate damages within that range, then the longstanding practice of indeterminate sentencing would be unconstitutional *a fortiori*.

Indeed, notice concerns have even less resonance here than in *Batchelder*, because "[i]t is by now well settled that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way."  *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 637 (1993) (internal quotation marks and citations omitted).  Thus, "economic regulation is subject to a less strict vagueness test" than other legislation.  *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982).[1]

---

[1] Defendants seek to distinguish *Hoffman Estates* on grounds that FCRA leaves "businesses . . . without any guidance" in calculating how much less than $1,000 in statutory damages they might have to pay for willfully violating the law.  Def.'s Br. at 6 n.4.  Not only was the same argument considered and rejected in *Batchelder*, 442 U.S. at 123, but *Hoffman Estates* identified several additional factors, not mentioned by defendants, that call for increased deference to Congress's judgment here: "The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."  *Hoffman Estates*, 455 U.S. at 498-99.  Moreover, "a *scienter* requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to
(continued...)

Defendants rely upon the principle, described in *Giaccio v. Pennsylvania*, 382 U.S. 399 (1966) (cited in Defs.' Br. 5), that "a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case." *Giaccio*, 382 U.S. at 402-03. *Giacco* itself cautioned that it "cast no doubt whatever on the constitutionality" of a jury's "power to fix punishment within legally prescribed limits," *id*. at 405 n.8. Moreover, the Supreme Court later rejected a vagueness challenge to punitive-damage statutes based upon *Giacco*, observing that *Giacco* "did not concern jury discretion in fixing the amount of costs. Decisions about the appropriate consequences of violating a law are significantly different from decisions as to whether a violation has occurred." *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 24 n.12 (1991).

Defendants also rely upon a decision issued earlier this year by the Northern District of Alabama for the proposition that FCRA's statutory damages scheme is void for vagueness because it allows a jury "to wander indiscriminately between $100 and $1,000 for each willful [FCRA] violation," so that "one jury can decide that a particular violation calls for $100, while another jury can decide that precisely the same violation by the same vendor is worth $1,000, while other juries can, willy nilly, award something in between." *Grimes v. Rave Motion Pictures of Birmingham, LLC*, 552 F. Supp. 2d 1302, 1306 (N.D. Ala. 2008), *appeals docketed*, Nos. 08-13510-BB, 08-13616-BB (11th Cir. June 20, 2008). But the *Grimes* district court failed to identify or cite a single vagueness decisions to support its holding. *Id*. at 1305-07. The $900

---

[1] (...continued)
the complainant that his conduct is proscribed," *id*. at 499, a requirement provided here by FCRA's authorizing statutory damages only for willful noncompliance.

range between the largest and smallest possible statutory damages for a willful violation of

FCRA pales beside the $149,250 range between the largest and smallest possible Copyright Act

statutory damages for willful infringements, 17 U.S.C. § 504(c), so that if this Court were to

adopt the *Grimes* district court's vagueness reasoning, it would also be obliged to hold that

statutory damages under the Copyright Act are unconstitutional.  *Cf. Feltner v. Columbia*

*Pictures Television, Inc.*, 523 U.S. 340, 355 (1998) (recognizing that Copyright Act statutory

damages are "not fixed or readily calculable from a fixed formula," but holding nonetheless that

if a party so demands, they are to be determined by jury, rather than by judge) (internal quotation

marks and citation omitted).

Defendants are correct that some statutes authorizing statutory damages (each on a strict-

liability basis, unlike FCRA) do specify various factors as among those to be considered in

setting damages within their statutory range.  Defs.' Br. 5-6.  But Congress's choosing to provide

such statutory guidance in those strict-liability statutes can hardly mean that the Due Process

Clause requires Congress to provide such statutory guidance.  Numerous other statutes impose

statutory damage ranges without specifying mandatory factors to be considered in setting

damages within those ranges, and the Supreme Court has never suggested that this poses a due

process problem.  The most notable Federal statutes that authorize ranges of statutory

damages—but not factors to be considered in imposing them—include these:

- The Copyright Act, 17 U.S.C. § 504(c) (actual damages, or statutory damages of $750 to $30,000 per infringed work (and up to $150,000 per willfully infringed work)).

- Intellectual Property Protection and Courts Amendments Act of 2004, 18 U.S.C. § 2318(f)(4) (actual damages and profits, or at election of copyright owner, statutory damages of $2,500 to "as the court considers appropriate").

- Anti-Counterfeiting Consumer Protection Act of 1996, 15 U.S.C. § 1117(a), (c) (actual damages and profits, or at election of plaintiff, statutory damages of $500 to $100,000

per counterfeit mark "as the court considers just" (and up to $1 *million* per counterfeit mark for willful violations "as the court considers just").

- Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1117(a), (d) (actual damages and profits, or at election of plaintiff, statutory damages of $1,000 to $100,000 per domain name, "as the court considers just").

- Digital Millennium Copyright Act, 17 U.S.C. § 1203(c)(2)-(c)(3) (actual damages and profits, or at election of complaining party, statutory damages of $200 to $2,500 per violation "as the court considers just").

- Fraudulent conduct by invention promoter, 35 U.S.C. § 297(b)(1)(B) (actual damages, or statutory damages up to $5,000 "as the court considers just").

- Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2520(b)(2), (c)(1)(A) (actual damages, or statutory damages of $50 to $500, "and punitive damages in appropriate cases").

- Cable Communications Policy Act of 1984, 47 U.S.C. § 605(e)(3)(B)(iii), (e)(3)(C)(i)(II), (e)(3)(C)(ii) (actual damages and profits, or statutory damages of $1,000 to $10,000 "as the court considers just," plus if "the court finds that the violation was committed willfully and for purposes of direct or indirect commercial advantage or private financial gain, the court in its discretion may increase the award of damages, whether actual or statutory, by an amount of not more than $100,000 for each violation").

FCRA's range of statutory damages, $100 to $1,000, is far smaller than the range provided under the Copyright Act (currently $750 to $30,000 per infringed work), and yet the Supreme Court has held that an award within the Copyright Act's statutory range could not be an abuse of discretion. *Douglas v. Cunningham*, 294 U.S. 207, 210 (1935). The Due Process Clause simply does not require Congress to specify statutory criteria to set statutory damages.

## II.    DEFENDANTS' "DOUBLE PUNISHMENT" ARGUMENTS ARE UNAVAILING

As remedies for willful violations, FCRA authorizes plaintiffs to receive either actual or statutory damages, plus punitive damages, 15 U.S.C. § 1681n(a)(1)(A), (a)(2), although, importantly, plaintiffs here have foresworn punitive damages, Pls.' Notice of Withdrawal of Punitive Damages Claim (R. 205; filed Apr. 1, 2005). Defendants ask this Court to accept a

would-be "principle" against "double punishment" in a single action, and contend that their

would-be principle prohibits any consideration of such allegedly "deterrent" factors as

defendants' conduct, motivations, and state of mind, in setting statutory damages.  Defs.' Br. 8-

15.  As shown below, there is no principle against "double punishment" in a single action, and it

is entirely permissible for defendants' conduct and other allegedly "deterrent" factors to be

considered when statutory damages are determined.

> A.    **"Multiple punishments" in a single suit, either criminal or civil, are constitutionally permissible**

The heart of defendants' argument is that "[a]s a matter of due process, a party may not

be punished more than once for the same conduct."  Defs.' Br. 10.  Defendants cite the "double

jeopardy prohibition against successive criminal prosecution" as the "root" of their sweeping

assertion that "multiple punishments" may not be imposed in a single action.  *Id.*

The Double Jeopardy Clause has absolutely no application here.  To the contrary, the

Supreme Court "ha[s] long recognized that the Double Jeopardy Clause does not prohibit the

imposition of all additional sanctions that could, in common parlance, be described as

punishment."  *Hudson v. United States*, 522 U.S. 93, 98-99 (1997) (internal quotation marks and

citation omitted).  Instead, the Double Jeopardy Clause prohibits "the imposition of multiple

*criminal* punishments for the same offense."  *Id.* (emphasis in original; citations omitted).

Defendants make no claim, nor could they, that either statutory damages or punitive damages

imposed in a private action constitute criminal punishment.

Even in criminal contexts, moreover, Congress can impose multiple punishments for the

same offense, so long as it does so expressly.  *Missouri v. Hunter*, 459 U.S. 359, 368 (1983)

("'Where Congress intended, as it did here, to impose multiple punishments, imposition of such

sentences does not violate the Constitution.'") (quoting *Albernaz v. United States*, 450 U.S. 333, 344 (1981)); *accord Whalen v. United States*, 445 U.S. 684, 693 (1980) ("[W]here the offenses are the same . . . cumulative sentences are not permitted, unless elsewhere specially authorized by Congress."). Defendants' notion that "double punishments" in a single action are unconstitutional, if true, would eviscerate federal sentencing law, which authorizes courts to sentence a defendant to each of imprisonment, supervised release, restitution, fines, assessments, forfeiture, and (for some offenses) denial of federal benefits. U.S. Sentencing Guidelines Manual ch. 5, pts. C-E (2007); *id.* § 5F1.6; *accord Whalen*, 445 U.S. at 688 ("it could not be seriously argued that the imposition of both a fine and a prison sentence . . . constituted an impermissible punishment").

>    **B.    Defendants misconstrue judicial decisions restricting the availability of multiple punitive damage awards in multiple actions to prohibit Congress from authorizing both statutory and punitive damages in one action**

Defendants seek to support their would-be principle against "multiple punishments" in a single action by citing, out of context, decisions urging that when a defendant is sued for punitive damages, the punitive damage award should not be based upon harms to other, absent, parties who might later bring their own actions for precisely the same harms. Thus in *State Farm*, the Supreme Court held that it would be improper for punitive damages in one case to be based upon "the merits of other parties' hypothetical claims against a defendant." *State Farm v. Campbell*, 538 U.S. 408, 423 (2003). It was in this context that the Court went on to say, as defendants quote, that "[p]unishment on these bases creates the possibility of multiple punitive damages awards for the same conduct." *Id.* (quoted in Defs.' Br. 10). Defendants' brief omits the Court's explanatory phrase that immediately followed: "for in the usual case nonparties are not bound by the judgment some other plaintiff obtains." *Id.* Thus, the pitfall to avoid is letting

punitive damages based upon wrongs to an absent party be awarded against a defendant *if* the same defendant might later be sued for the same wrongs by the absent party itself (and the earlier award could not offset any of the later demands). Where an award is not based upon wrongs done to absent parties, there is no possibility of a duplicative recovery.[2]

In each instance, the court's concern has been to protect defendants from being assessed multiple punitive damage awards in multiple actions, each based upon the same misconduct toward the same victims. In FCRA, however, Congress authorized statutory damages and punitive damages to be sought in a single action. Its ability to do so—and the courts' ability to impose such damages—are in no way diminished by caselaw protecting defendants against multiple punitive damage awards in multiple actions for the same misconduct toward the same victims. Nor do defendants make any claim that they may face multiple actions seeking punitive damage (or any other) awards for the same wrongs done to the same Oregon policyholders who are members of the class the Court has certified in this action. Neither the FCRA statute, nor this action, poses any duplicative recovery concern. In any event, as defendants emphasize, the Supreme Court recently held that juries awarding punitive damages cannot base such awards

---

[2] The other cases on which Defendants rely highlight that the concern is to protect defendants who have wronged many potential plaintiffs from being subjected to multiple punitive damages awards in multiple actions for the same wrongs to the same victims. In *Williams v. ConAgra Poultry Co.*, the Eighth Circuit cautioned that where a plaintiff sued solely on its own behalf, basing punitive damages upon the defendant's similar conduct toward other victims who could bring their own independent actions "deprives the defendant of the safeguards against duplicative punishment *that inhere in the class action procedure.*" *Williams*, 378 F.3d 790, 797 (8th Cir. 2004) (emphasis added) (quoted—other than emphasized words—in Defs.' Br. 10). In *Johnson v. Ford Motor Co.*, the California Supreme Court held that "calculating punitive damages in an individual tort case by the profits made through similar torts against hundreds or thousands of *other* individuals creates possibilities for unfairness . . . which may be of constitutional dimension." *Johnson*, 113 P.3d 82, 94 (Cal. 2005) (emphasis in original) (final 10 words (from "creates possibilities" to end) quoted in Defs.' Br. 10).

upon wrongs done to absent, non-party victims.  *Philip Morris USA v. Williams*, 549 U.S. ___, 127 S. Ct. 1057, 1063 (2007) (cited in Defs.' Br. 15).

## C.    It is entirely permissible for statutory damages to deter illegal conduct by considering defendants' state of mind and economic motivations, as well as the mildness or severity of defendants' violations

Defendants contend that if a jury considers their state of mind and economic motivations, or whether their violations were mild or severe, any resulting statutory damages verdict would "serv[e] a punitive or deterrent function and not a compensatory one."  Defs.' Br. 10.  Because punitive damages are among FCRA's remedies for willful violations, defendants argue that it would have been "superfluous" for Congress to authorize any other "punitive" remedies; and thus the other remedies that Congress did authorize, such as statutory damages, must not be interpreted in such a way that they would be "punitive."  *Id*. at 9-11.

In short, defendants "argue that the law is punitive, because deterrence is one purpose of punishment."  *Smith v. Doe*, 538 U.S. 84, 102 (2003) (Alaska Sex Offender Registration Act).  But just as in *Smith*, "This proves too much.  Any number of governmental programs might deter crime without imposing punishment.  'To hold that the mere presence of a deterrent purpose renders such sanctions "criminal" would severely undermine the Government's ability to engage in effective regulation.'"  *Id*. (quoting *Hudson v. United States*, 522 U.S. 93, 105 (1997)).  Defendants' claim that it would have been "superfluous" for Congress to authorize more than one "punitive" remedy for willful violations of FCRA is belied by Congress's deliberately doing so in other contexts such as criminal sentencing, U.S. Sentencing Guidelines Manual ch. 5, pts. C-E (2007); *id*. § 5F1.6; and the occupational debarment and civil penalties both authorized under 12 U.S.C. § 93(a)-(b), for the banking violations considered in *Hudson*, 522 U.S. at 97.

Defendants urge that Congress intended statutory damages under FCRA to be "compensatory." (This Court has already ruled to similar effect. *Ashby v. Farmers Ins. Co. of Or.*, No. CV 01-1446-BR, 2004 WL 2359968, at *5 (D. Or. Oct. 18, 2004) ("statutory damages are an alternate remedy to actual damages under 15 U.S.C. § 1681n(a)(1)(B)"), *mot. to amend denied*, 2004 WL 5622940 (D. Or. Nov. 5, 2004).) This, defendants contend, prohibits letting a jury consider their state of mind, economic motivations, and so on, on grounds that doing so would render FCRA's statutory damages provision "deterrent" or even "punitive." Defs.' Br. 9-11. But even compensatory damages *per se* provide deterrence and for that matter "punishment" as well; the Supreme Court has characterized punitive damage awards as providing "deterrence and punishment *over and above* that provided by compensatory awards." *Smith v. Wade*, 461 U.S. 30, 54 (1983) (emphasis added); *accord Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005). Indeed, any award of relief, civil or penal, has deterrent effects. *Cf. Hudson*, 522 U.S. at 102 ("all civil penalties have some deterrent effect"). It is proper for statutory damages, in particular, to serve deterrent as well as compensatory purposes. The Supreme Court has acknowledged that the Copyright Act's statutory damages provision "not merely compels restitution of profit and reparation for injury but also is designed to discourage wrongful conduct." *F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 233 (1952). Applying *Woolworth*, the Ninth Circuit upheld an award of the largest possible statutory damages award for eighty Copyright Act violations, even though the plaintiff may have suffered only nominal damages, in part because of the deterrent effect of such an award. *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336-37 (9th Cir. 1990). *See also Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1011 (9th Cir.1994) ("statutory damages may serve completely different purposes than actual damages"; actual damages "are designed to compensate the plaintiff and to prevent the defendant's unjust

enrichment," while statutory damages for willful infringements have "punitive and deterrent purposes"); *accord Smith v. NBC Universal*, No. 06-Civ.-5350(SAS), 2008 WL 483604, at *4 (S.D.N.Y. Feb. 22, 2008) ("Deterrence is a factor that juries may take into account when determining statutory damages.") (Copyright Act).

Courts have held similarly concerning statutory damages provisions in farm-worker protection statutes. In *Martinez v. Shinn*, the Ninth Circuit held that statutory damages under the current Migrant and Seasonal Agricultural Worker Protection Act (AWPA), 29 U.S.C. § 1854(c), serve both deterrent and compensatory purposes, and it affirmed statutory damages intended both "to compensate the plaintiffs for not receiving timely payment and to deter the defendants from withholding timely payment in the future." *Martinez v. Shinn*, 992 F.2d 997, 999, 1001 (9th Cir. 1993) (internal quotation marks and emphases omitted); *accord Santiago v. Tamarack Tree Co.*, No. 06-CV-1811-HU, 2007 WL 3171137, at *3 (D. Or. Oct. 24, 2007) (Brown, J.) ("the purpose of statutory damages under AWPA is not only to compensate injuries, but also to promote enforcement of the Act and deter violations") (internal quotation marks omitted). Similarly, statutory damages under the former Farm Labor Contractor Registration Act (FLCRA), 7 U.S.C. § 2050a(b) (1976) (repealed and replaced by the AWPA) also served both deterrent and compensatory functions. *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1309 (9th Cir. 1990).[3]

_____

[3] Defendants assert that because punitive damages are not available under the Copyright Act or the AWPA, "FCRA's statutory damage provision [would be] unconstitutional if used to serve a punitive or deterrent function." Defs.' Br. 12 n.8. To the contrary, as noted, the Constitution authorizes multiple punishments in a single action, even for criminal offenses. *Missouri v. Hunter*, 459 U.S. at 368-69.

Several pages earlier in their brief, defendants assert that "FCRA is alone among the federal consumer statutes in that it permits recovery of both statutory damages and punitive

(continued...)

It is thus entirely appropriate for statutory damages under FCRA to be determined in accord with the statute's "underlying deterrent purpose." *Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 965-66 (6th Cir. 1998); *accord Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197, 1212-13 (C.D. Cal. 2007) (corporation properly subject to civil liability under § 1681n for acts of their agents because necessary to achieve "'*FCRA's deterrence goal*'") (quoting *Jones*; emphasis in original); *Del Amora v. Metro Ford Sales & Serv., Inc.*, 206 F. Supp. 2d 947, 951 (N.D. Ill. 2002) (FCRA expresses "Congress's intent to protect consumers from improper use of credit reports and to deter statutory violations").

### III.    FCRA'S STATUTORY DAMAGES PROVISION DOES NOT VIOLATE DUE PROCESS MERELY BECAUSE A JURY MIGHT RETURN A LARGE STATUTORY-DAMAGES VERDICT

#### A.    Considering whether potential statutory damages under FCRA might be constitutionally excessive is premature

"If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that [courts] ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Spector Motor Serv. v. McLaughlin*, 323 U.S. 101,

---

[3] (...continued)
damages." Defs.' Br. 9 n.7. Even if this were true, it would not show that it was unconstitutional for FCRA to authorize both statutory and punitive damages. In any event, defendants are mistaken; other federal statutes do authorize both forms of relief. *See* Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2520(b)(2), (c)(1)(A) (actual damages or statutory damages of $50 to $500, plus punitive damages in appropriate cases); Cable Communications Policy Act of 1984, 47 U.S.C. § 605(e)(3)(B)(iii), (e)(3)(C)(i)(II), (e)(3)(C)(ii) (either actual damages or statutory damages of $1,000 to $10,000 "as the court considers just"; plus, if "the court finds that the violation was committed willfully and for purposes of direct or indirect commercial advantage or private financial gain, the court in its discretion may increase the award of damages, whether actual or statutory, by an amount of not more than $100,000 for each violation"). Each of these statutes provides for a range of statutory damages, just as FCRA does. *See also* Or. Stat. Rev. Ann. § 97.760(3)(b), (c) (West 2007) (actual damages or "imputed damages in an amount not to exceed $10,000" for desecration of Indian burial sites, plus punitive damages for willful violations).

U.S. REPLY BRIEF RE. CONSTITUTIONALITY
OF FCRA STATUTORY DAMAGES            17

105 (1944).  As this Court has recognized, "[t]he class members are entitled to an award of statutory damages in the range of $100–$1000 only if [defendants] willfully violated FCRA's adverse action notice requirements," *Ashby v. Farmers Ins. Co. of* Or., No. CV 01-1446-BR, 2006 WL 6036462, at *1 (D. Or. Feb. 28, 2006); and "whether a FCRA violation is willful is a matter for the jury," *Ashby*, ___ F. Supp. 2d at ___, No. 01-CV-1446-BR, 2008 WL 2557982, at *16 (D. Or. June 20, 2008).  It is thus premature for the Court to weigh whether defendants' potential liability for statutory damages might exceed constitutional limits.  *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring).

We know of no other case (other than the *Grimes* district court decision) in which a court has purported to find that a potential verdict would be constitutionally excessive—much less to invalidate an Act of Congress on the ground that it would authorize such a verdict—before a jury has found the facts necessary to award statutory damages and has returned such a verdict. Numerous other courts have held that the required procedure, under both FCRA and other statutes, is to postpone considering any constitutional excessiveness challenge until after a statutory damages verdict is issued.[4]

--------

[4] Courts refusing to consider pre-verdict constitutional excessiveness challenges to potential FCRA statutory-damage verdicts include: *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 954 (7th Cir. 2006); *Pirian v. In-N-Out Burgers*, No. SACV-06-1251 DOC (MLGx), 2007 WL 1040864, at *5 (C.D. Cal. Apr. 5, 2007); *Ramirez v. Midwest Airlines, Inc.*, 537 F. Supp. 2d 1161, 1169 (D. Kan. 2008); *Arcilla v. Adidas Promotional Retail Operations, Inc.*, 488 F. Supp. 2d 965, 973 (C.D. Cal. 2007); *Kesler v. Ikea U.S. Inc.*, No. SACV 07-568 JVS (RNBx), 2008 WL 413268, at *8 (C.D. Cal. Feb. 4, 2008); *Klingensmith v. Max & Erma's Rests., Inc.*, No. 07-C-0318, 2007 WL 3118505, at *3 (W.D. Pa. Oct. 23, 2007).

These cases are in addition to similar FCRA statutory-damage decisions issued by at least seven Northern District of Illinois district judges.  *Matthews v. United Retail, Inc.*, 248 F.R.D. 210, 216 (N.D. Ill. 2008) (Castillo, J.); *Cicilline v. Jewel Food Stores, Inc.*, 542 F. Supp. 2d 831, 839-40 (N.D. Ill. 2008) (Dow, J.); *Follman v. Village Squire, Inc.*, 542 F. Supp. 2d 816, 821 (N.D. Ill. 2007) (Kendall, J.); *Troy v. Home Run Inn, Inc.*, No. 07-C-4331, 2008 WL 1766526, at

(continued...)

**B.    Any due-process analysis of FCRA's statutory-damages provision would measure proportionality by considering the public interest as well as private injury**

Defendants claim that if they are found liable for willfully violating the law, even the smallest possible statutory-damage verdict under FCRA would be unconstitutionally excessive under *St. Louis, Iron Mountain & Southern Railway Co. v. Williams*, 251 U.S. 63 (1919), and similar decisions. *Williams* addressed civil penalties, rather than statutory damages, so it is doubtful that its due process standards directly apply.[5] But as we now show, even assuming *Williams*' standards did apply, § 1681n(a)(1)(A) would readily pass muster.

In *Williams*, an Arkansas statute provided that a railroad passenger who was overcharged could sue the railroad to recover a statutory penalty of $50 to $300 per violation. Two passengers, each overcharged by 66 cents, brought suit and recovered $75. The railroad challenged the award as impermissibly excessive under the Due Process Clause. The Supreme

---

[4](...continued)

*3 (N.D. Ill. Apr. 14, 2008) (Kennelly, J.); *Krey v. Castle Motor Sales, Inc.*, 241 F.R.D. 608, 617-18 (N.D. Ill. 2007) (Coar, J.); *Troy v. Red Lantern Inn, Inc.*, No. 07-CV-2418, 2007 WL 4293014 (N.D. Ill. Dec. 4, 2007) (Aspen, J.); *Halperin v. Interpark , Inc.*, No. 07-CV-2161, 2007 WL 4219419, at *4 (N.D. Ill. Nov. 29, 2007) (Bucklo, J.).

Courts have similarly refused to consider pre-verdict constitutional excessiveness challenges to potential statutory damages under several other statutes. *Centerline Equip. Corp. v. Banner Pers. Serv., Inc.*, 545 F. Supp. 2d 768, 777-78 (N.D. Ill. 2008) ($500 mandatory statutory damages for sending unsolicited faxes in violation of Telephone Consumer Protection Ac, 47 U.S.C. § 227(b)(3)(B) (TCPA)); *Arrez v. Kelly Servs., Inc.*, 522 F. Supp. 2d 997, 1008 (N.D. Ill. 2007) (statutory damages under state law for failure to pay earned vacation and holiday pay); *Kavu, Inc. v. Omnipak Corp.*, 246 F.R.D. 642, 650-51 (W.D. Wash. 2007) (TCPA); *Kaufman v. ACS Sys., Inc.*, 2 Cal. Rptr. 3d 296, 325 (Ct. App. 2003) (TCPA); *DirecTV, Inc. v. Spillman*, No. Civ.A.SA-04-82-XR, 2004 WL 1875045, at *4 (W.D. Tex. Aug. 23, 2004) (statutory damages under state law for pirating satellite TV signals).

[5] *But see Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 276 (1989) (citing *Williams*, in dicta, as "some authority . . . for the view that the Due Process Clause places outer limits on the size of a civil damages award made pursuant to a statutory scheme").

Court characterized the statute as "essentially penal, because primarily intended to punish the carrier for taking more than the prescribed rate." *Williams*, 251 U.S. at 66. It held that while the Due Process Clause limits "the power of the states to prescribe penalties for violations of their laws, . . . the states still possess a wide latitude of discretion in the matter," and "their enactments transcend the limitation only where the penalty prescribed is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *Id.* at 66-67.

The Court held that the Arkansas penalty was permissible under this standard "[w]hen it is considered with due regard for the interests of the public, the numberless opportunities for committing the offense, and the need for securing uniform adherence to established passenger rates." *Id.* at 67. The Court acknowledged that "[w]hen the penalty is contrasted with the overcharge possible in any instance it of course seems large, but . . . its validity is not to be tested that way"—*i.e.*, not by comparing it to the actual private injury in any individual case. *Id.* Instead, "the Legislature may adjust its amount to the public wrong rather than the private injury." *Id.* at 66.

Defendants contend that the hypothetical minimum award of statutory damages in this case would be unconstitutionally excessive under *Williams* for two reasons. The first is that the class members allegedly did not suffer any actual injury,[6] whereas the plaintiffs in *Williams* did suffer actual losses, albeit *de minimis* ones. Defs.' Br. 17-18. But *Williams* explicitly provides that the excessiveness inquiry looks to "the public wrong rather than the private injury," and that

_____

[6] Particularly before trial, defendants' assertion that class members did not suffer actual losses is speculative. The class does not exclude individuals who suffered financial losses; the plaintiffs have merely elected to pursue statutory damages rather than actual damages. It is impossible to predict the extent to which a potential statutory damages award in this case might be "compensatory" versus "deterrent"—even assuming the two can ever be separated.

"the validity [of the award] is not to be tested" by measuring it against "the overcharge possible in any instance." *Williams*, 251 U.S. at 67. Instead, the considerations that mattered were "the interests of the public, the numberless opportunities for committing the offense, and the need for securing uniform adherence to established passenger rates." *Id.* at 66.

Here, those considerations indicate no constitutional excessiveness for statutory damages under FCRA against insurers and other credit-report users that fail to give consumers the notifications Congress required when they took adverse action based upon their consumers' credit reports. First, "the interests of the public" here are at least as consequential as they were in *Williams*. As explained above, FCRA's adverse-notification requirements are intended "to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report." S. Rep. No. 91-517, at 1 (1969) (copy attached as Ex. 1). Being notified when an adverse action has been taken is absolutely essential; "[u]nless a person knows he is being rejected for credit or insurance or employment because of a credit report, he has no opportunity to be confronted with the charges against him and tell his side of the story." *Id*. at 3. There is a strong public interest in prohibiting users of credit reports from taking adverse action against consumers but failing to disclose to them adequately that they have done so based upon credit report information that is often inaccurate, arbitrary, and incomplete. The courts owe strong deference to Congress's determination that $100 to $1,000 is the appropriate statutory damage range for users of credit reports who violate the requirements of the Fair Credit Reporting Act. In *Williams*, where the Supreme Court upheld civil penalties imposed under a statutory range of $50 to $300 per violation, the Court stressed that although such awards are subject to the Due Process Clause, legislatures "possess a wide latitude of discretion in the matter." *Williams*, 251 U.S. at 66. *See also Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 196

(1997) ("Even in the realm of First Amendment questions . . . deference must be accorded to [Congress's] findings as to the harm to be avoided and to the remedial measures adopted for that end."); cf. *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 20 (1991) ("As long as the discretion [allowed in determining punitive damages] is exercised within reasonable constraints, due process is satisfied.").[7]

Second, the "opportunities for committing the offense" are just as "numberless" here as they were in *Williams*; the willful failure of an insurer to meet its obligations under FCRA can result in the uncorrected use of thousands or even millions of negative credit reports. Finally, the need to "secur[e] uniform adherence" to FCRA's adverse-action notification requirements is surely as great as the need to secure uniform adherence to railroad passenger tariffs in *Williams*. Under these circumstances, the minimum statutory award of $100 cannot possibly be dismissed as "wholly disproportioned to the offense."

Defendants also suggest that even the smallest possible statutory damages under FCRA would "annihilate even large companies"—if not in this case, then in the consolidated cases they are defending in the Western District of Oklahoma. Defs.' Br. 7 & n.6. Even assuming defendants could not pay a class-wide award of statutory damages (and they submit no evidence to that effect), this has nothing to do with the constitutionality of § 1681n(a)(1)(A), but only with whether a particular statutory-damages verdict would exceed constitutional due-process bounds.

─────────────

[7] Caselaw under the analogous requirements of the Excessive Fines Clause of the Eighth Amendment confirms the deference owed to Congress. In *United States v. Bajakajian*, the Supreme Court held that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature." 524 U.S. 321, 336 (1998) (quoting *Solem v. Helm*, 463 U.S. 277, 290 (1983) ("Reviewing courts . . . should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes"); *Gore v. United States*, 357 U.S. 386, 393 (1958) ("Whatever views may be entertained regarding severity of punishment, . . . these are peculiarly questions of legislative policy.")).

*Cf. Ashby v. Farmers Ins. Co. of Or.*, No. CV 01-1446-BR, 2004 WL 5622940 (D. Or. Nov. 5,

2004) (finding defendants' alleged ability to pay a class-wide verdict at end of case irrelevant to

whether Court should certify a class under Fed. R. Civ. P. 23).  Defendants' due-process

reasoning amounts to a rule that statutory damages must make lawbreaking affordable.  That is,

at the least, not self-evident.[8]  If the size of a statutory-damages verdict did have constitutional

implications, the solution would not be to hold an Act of Congress unconstitutional, but to

reduce the verdict sufficiently to avoid entering a constitutionally excessive judgment.  As the

Seventh Circuit has observed, a FCRA class-action statutory-damages verdict "that would be

unconstitutionally excessive may be reduced," after the verdict is returned, when "a judge may

evaluate the defendant's overall conduct and control its total exposure."  *Murray v. GMAC*

*Mortgage Corp.*, 434 F.3d 948, 954 (7th Cir. 2006); *cf. Honda Motor Co. v. Oberg*, 512 U.S.

415, 421-35 (1994) (invalidating, on due process grounds, Oregon statute that prohibited post-

verdict judicial review or reduction of punitive-damages verdicts).  Thus, in a case relied upon

by defendants, the Ninth Circuit reduced a $1,846,500 award of statutory damages under a farm-

worker protection statute on grounds that it "exceeded what was necessary to compensate any

potential injury . . . [and] . . . to enforce the Act or deter future violations."  *Six Mexican Workers*

*v. Ariz. Citrus Growers*, 904 F.2d 1301, 1309 (9th Cir. 1990).  In the same way, this Court

---

[8] As the Supreme Court has said, "a rule of liability which merely takes away the profits from [a copyright violation] would offer little discouragement to infringers. . . .  The statutory rule, formulated after long experience, . . . is designed to discourage wrongful conduct."  *F.W. Woolworth*, 344 U.S. at 233.  Contrary to defendants' suggestion, the Due Process Clause "does not require Congress to make illegal behavior affordable, particularly for multiple violations."  *Centerline Equip. Corp. v. Banner Pers. Serv., Inc.*, 545 F. Supp. 2d. 768, 778 (N.D. Ill. 2008) (internal quotation marks and citation omitted) (TCPA statutory damages); *accord Kavu, Inc. v. Omnipak Corp.*, 246 F.R.D. 642, 650 (W.D. Wash. 2007) (Truth in Lending Act); *ESI Ergonomic Solutions, LLC v. United Artists Theatre Circuit, Inc.,* 50 P.3d 844, 851 (Ariz. Ct. App. 2002) (TCPA).

should see if a jury returns a statutory-damages verdict, and only then consider whether the Constitution requires reducing it.  Defendants' request that this Court declare § 1681n(a)(1)(A) unconstitutional is premature, and any verdict will be subject to post-trial review for excessiveness.  If defendants want an answer to their constitutional question now, the answer should be that the statute is constitutional.

### C.    FCRA statutory damages are not subject to, and in any event do not violate, constitutional limitations on punitive damages

#### 1.    *Even in considering jury awards of punitive damages, courts must consider potential harm as well as actual harm*

In *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), the Supreme Court formulated three basic "guideposts" for courts to evaluate whether a jury punitive-damage verdicts is impermissibly excessive under the Due Process Clause: (1) "the degree of reprehensibility" of the defendant's actions; (2) "the disparity between the harm or potential harm suffered" by the plaintiff and the magnitude of the award; and (3) "the difference between this remedy and the civil penalties authorized or imposed in comparable cases."  *Gore*, 517 U.S. at 575; *see also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003).  Defendants here contend that, in the absence of proof of individualized harm, *any* statutory damages would be excessive under *Gore* and its progeny.

These concerns have no more force under the Supreme Court's punitive damages jurisprudence than they do under *Williams*.  Even assuming, as defendants do (*but see* footnote 6 at p. 20, *supra*) that no class member suffered any actual losses, *Gore* and its progeny look to "the harm *or potential harm*" suffered by the plaintiffs.  *Gore*, 517 U.S. at 575 (emphasis added); *State Farm*, 538 U.S. at 418 ("the disparity between [the award and] the actual *or potential* harm

suffered by the plaintiff") (emphasis added); *TXO Prod. Co. v. Alliance Res. Corp.*, 509 U.S. 443, 460 (1993) ("It is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused") (emphasis in original). Defendants' thousands of violations manifestly had the *potential* to cause grave losses to their policy-holders. Whether it poses an unacceptable risk of harm for an insurer not to give consumers notice of raising their premiums based upon negative information in their credit reports is a matter for Congress, rather than the courts. *Williamson v. Lee Optical of Okla.*, 348 U.S. 483, 487 (1955) ("The Oklahoma law may exact a needless, wasteful requirement in many cases. But it is for the legislature, not the courts, to balance the advantages and disadvantages of the new requirement.").

> **2.      *Statutory damage ranges enacted by Congress are not subject to the due process tests applied to jury awards of punitive damages***

Any reliance upon *Gore* and its progeny is misplaced for an additional and more fundamental reason. Although *Williams* was a civil-penalty decision, rather than a statutory-damages decision, any excessiveness review of FCRA statutory damages would be governed by standards similar to those prescribed in *Williams* for statutory penalties, and not by the standards developed by the Supreme Court to oversee the awarding of punitive damages. As other courts have recognized, statutory damage statutes do not threaten unforeseeable and unbounded liability of the punitive-damage variety that *Gore* subjects to exacting judicial scrutiny. As the Supreme Court has explained, judicial review "of a jury's award for arbitrariness and the review of legislation surely are significantly different." *TXO Prod. Corp.*, 509 U.S. at 456.

*Gore*'s own framework makes clear that statutory damages are outside its ambit. Its three "guideposts" are not a test for excessiveness *per se*, but a test of whether a defendant had "constitutionally adequate notice of the magnitude of the sanction that [the government] might

impose" on him.  *Gore*, 517 U.S. at 574.  Thus, *Gore* renders an "excessive" punitive-damages award unconstitutional not due to its size alone, but because due process required that the defendant have fair notice of the magnitude of its potential liability.

Because fair notice is the ultimate touchstone of *Gore* and its progeny, *Gore*'s guideposts are irrelevant to statutory damages such as those authorized by Congress here.  Unlike punitive damages, which have no fixed limit, § 1681n(a)(1)(A) establishes clear and specific bounds that give a defendant notice of the magnitude of its potential liability.  It was this statutory feature that led the Supreme Court to hold in *Batchelder* that indeterminate criminal sentencing statutes provide criminal defendants with constitutionally adequate notice.  *United States v. Batchelder*, 442 U.S. 114 (1979).  Statutory damages under FCRA provide equally adequate notice.

The *Gore* framework is also inapposite to statutory damages because it calls upon a court to compare a jury's punitive-damage verdict to "the civil penalties authorized or imposed in comparable cases."  *Gore*, 517 U.S. at 575.  Assuming that statutory damages under FCRA are penalties—a dubious assumption (*see* p. 15 *supra*)—they would themselves be "civil penalties authorized or imposed in comparable cases."  Applying *Gore* here would require comparing FCRA's statutory-damages provision to itself.

That *Gore* uses civil penalties as a constitutional benchmark further demonstrates that its three-part test is not meant to govern such legislative enactments.  In fact, to the contrary, *Gore* holds that "a reviewing court engaged in determining whether an award of punitive damages is excessive should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue."  *Gore*, 517 U.S. at 583 (internal quotation marks omitted).  If FCRA's statutory damages provision is to be treated as a penalty (which defendants dispute), it

necessarily embodies "legislative judgments concerning appropriate sanctions," and is therefore entitled to "substantial deference" that jury punitive-damage verdicts do not share.

For all of these reasons, other courts have declined to subject statutory damages to excessiveness review under *Gore* and its progeny. For example, in *Zomba Enterprises, Inc.* v. *Panorama Records, Inc.*, 491 F.3d 574 (6th Cir. 2007), *reh'g en banc denied*, Nos. 06-5013 & 06-5266 (6th Cir. Oct. 5, 2007), *cert. denied*, 553 U.S. ___, 128 S. Ct. 2429 (2008), the Sixth Circuit held that awards of statutory damages under the Copyright Act are subject to review not under *Gore*, but instead under the *Williams* standard for civil penalties. *Id.* at 587-88. The Sixth Circuit added that the *Williams* standard "is extraordinarily deferential—even more so than in cases applying abuse-of-discretion review." *Id.* at 587.[9] Similarly, in *Lowry's Reports, Inc.* v. *Legg Mason, Inc.*, 302 F. Supp. 2d 455, 459-60 (D. Md. 2004), the district court held that *Gore*'s standards did not apply to judicial review of a jury verdict for $19 million in statutory damages under the Copyright Act. The court pointed out that "[s]tatutory damages exist in part because of the difficulties in providing—and providing compensation for—actual harm," and "may only be awarded when a plaintiff forgoes the right to collect actual damages." *Id.* at 460. The court reasoned that "[t]he unregulated and arbitrary use of judicial power that the *Gore* guideposts remedy is not implicated in Congress's carefully crafted and reasonably constrained statute." *Id. Lowry*'s reasoning applies even more forcefully here, where the maximum award is $1,000 per willful violation, rather than $150,000 per willfully copyrighted work.

---

[9] In rejecting an Excessive Fines Clause challenge to a decision imposed $190 million in statutory penalties under the False Claims Act and a similar state statute, a district judge in the Northern District of Illinois recently said, "considerations pertinent to the validity of jury awards are not the same as those attendant to damage amounts set by statutes." *United States ex rel. Tyson v. Amerigroup Ill., Inc.*, 488 F. Supp. 2d 719, 748 (N.D. Ill. 2007), *appeals dismissed per stipulation*, Nos. 07-2111 & 07-2113 (7th Cir. Sept. 12, 2008).

FCRA's statutory damages range of $100 to $1,000 is comparable to the $500 mandatory statutory damages amount Congress set for transmitting unsolicited fax advertisements in violation of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227(b)(3)(B); and the courts have repeatedly rejected the same due-process excessiveness challenges raised here when made against TCPA's $500 statutory damage provision.[10]

Courts considering excessiveness challenges to various other statutes have also found *Gore* and its progeny inapplicable.[11] To our knowledge, the *Grimes* district court decision is the only one to review and invalidate statutory damages under any statute on the basis of *Gore*'s

---

[10] *Centerline Equip. Corp. v. Banner Pers. Serv., Inc.*, 545 F. Supp. 2d 768, 777-78 (N.D. Ill. 2008); *Sadowski v. Med1 Online, LLC*, No. 07-C-2973, 2008 WL 489360, at *5-*6 (N.D. Ill. Feb. 20, 2008); *Italia Foods, Inc v. Marinov Enters., Inc.*, No. 07-C-2494, 2007 WL 4117626, at *4 (N.D. Ill. Nov. 16, 2007); *Phillips Randolph Enters., LLC v. Rice Fields*, No. 06-C-4968, 2007 WL 129052, at *2 (N.D. Ill. Jan. 11, 2007); *Accounting Outsourcing, LLC. v. Verizon Wireless Pers. Commc'ns,* 329 F. Supp. 2d 789, 808-09 (M.D. La. 2004); *Texas v. Am. Blastfax, Inc.*, 121 F. Supp. 2d 1085, 1090-91 (W.D. Tex. 2000); *Kenro, Inc. v. Fax Daily, Inc.*, 962 F. Supp. 1162, 1165-67 (S.D. Ind. 1997); *ESI Ergonomic Solutions, LLC v. United Artists Theatre Circuit, Inc.*, 50 P.3d 844, 850 (Ariz. Ct. App. 2002); *Kaufman v. ACS Sys., Inc.*, 2 Cal. Rptr. 3d 296, 325-26 (Ct. App. 2003); *Harjoe v. Herz Fin.*, 108 S.W.3d 653, 654-55 (Mo. 2003) (*per curiam*); *Chair King, Inc. v. GTE Mobilnet of Houston, Inc.*, 135 S.W.3d 365, 385-86 (Tex. App. 2004), *rev'd on other grounds*, 184 S.W.3d 707 (Tex. 2006).
    At least four of these decisions explicitly refused to apply *Gore* and other punitive-damage decisions to excessiveness challenges to statutory damages under the TCPA. *Sadowski*, No. 07-C-2973, 2008 WL 489360, at *5; *Phillips Randolph*, No. 06-C-4968, 2007 WL 129052, at *2; *Accounting Outsourcing*, 329 F. Supp. 2d at 809; *Kenro*, 962 F. Supp. at 1165.

[11] *Arrez v. Kelly Servs., Inc.*, 522 F. Supp. 2d 997, 1008 (N.D. Ill. 2007) (statutory damages under state law for failure to pay employees earned vacation and holiday pay); *DirecTV, Inc. v. Cantu*, No. SA-04-CV-136-RF, 2004 WL 2623932, at *4 (W.D. Tex. Sept. 29, 2004) (statutory damages under state law prohibiting satellite TV piracy); *Native Am. Arts, Inc. v. Bundy-Howard, Inc.*, 168 F. Supp. 2d 905, 914 n.6 (N.D. Ill. 2001) (statutory damages under Indian Arts and Crafts Act); *Express Valet, Inc. v. City of Chicago*, 869 N.E.2d 964, 981-82 (Ill. App. Ct. 2007) (statutory penalties for operating valet parking facilities without municipal license); *In re Marriage of Chen & Ulner*, 820 N.E.2d 1136, 1152 (Ill. App. Ct. 2004) (statutory damages under state law for employer's failure to forward child-support moneys withheld from employee's pay).

standards for punitive damages.  But that court erred in applying *Gore* to statutory damages in the first place; it erred in applying *Gore* to an award that had yet to be made; and it erred in concluding that § 1681n(a)(1)(A) is incapable of producing an award that satisfies *Gore*.  The only other district court we know of squarely to rule on the constitutionality of statutory damages under FCRA held that "at the level of a single violation, it is not at all excessive to award even the maximum statutory damages, even to a plaintiff who had suffered no pecuniary damages," and stated that it was premature to consider whether a potential class-wide statutory damage award might exceed due-process limits.  *Arcilla v. Adidas Promotional Retail Operations, Inc.*, 488 F. Supp. 2d 965, 972-73 (C.D. Cal. 2007).  This Court should reject *Grimes* and follow the sound reasoning of every other court to consider such constitutional excessiveness attacks upon statutory damage provisions by deferring its decision until the jury returns its fact-findings, and then making any review under *Williams* rather than *Gore*.

### D.    Due process does not require that substantial statutory-damage awards be supported by proof of "actual damages"

Defendants protest that FCRA's statutory damages provision is void for vagueness, Defs.' Br. 5-7, but simultaneously object that "the Court cannot simply 'add' criteria in an attempt to salvage the statute," *id*. at 14.[12]  In fact, many statutes authorize far wider ranges of statutory damage awards than does FCRA.  The most prominent, the Copyright Act, authorizes

---

[12] Defendants' only authority for this proposition is *United States v. Evans*, 333 U.S. 483 (1948).  The statute at issue there prohibited bringing in or landing illegal aliens; and also concealing or harboring illegal aliens.  The government "in effect concede[d] that in terms the section prescribes no penalty for concealing or harboring.  But it argue[d] that inclusion of them as offenses becomes meaningless unless the penalty provision, in spite of its wording, is construed to apply to them as well as to bringing in or landing."  *Evans*, 333 U.S. at 487.

*Evans* thus prohibits a court's reading a penalty into a statute that does not include one— a far cry from determining statutory damages within a statutory range, as under FCRA, or sentencing a defendant under a statute that specifies the maximum penalty, as under *Batchelder*.

statutory damages of $750 to $150,000 per willfully infringed work, and (like FCRA) provides

no statutory guidance on how to set damages within this range.  17 U.S.C. § 504(c).[13]  Such

statutory damages are "not fixed or readily calculable from a fixed formula," *Feltner v.*

*Columbia Pictures Television, Inc.*, 523 U.S. 340, 353 (1998) (internal quotation marks and

citation omitted); but they are to be determined by jury upon demand by either party, *id.* at 355.

Similarly, the Anti-Counterfeiting Consumer Protection Act of 1996, 15 U.S.C. § 1117(c),

authorizes statutory damages between $500 and $100,000 (and up to $1 million for willful

violations) for certain counterfeit violations, but, like FCRA and the Copyright Act, it provides

no guidance in how such statutory damages should be determined.  The courts' response is to use

the common-law method of borrowing and adapting from caselaw under other statutes.[14]  Thus,

earlier this year, the Eastern District of California observed that the Anti-Counterfeiting

Consumer Protection Act "does not provide guidelines for courts to use in determining an

---

[13] Thus the Supreme Court held nearly 90 years ago that in Copyright Act cases, "the measure of the [statutory] damages to be paid" is based upon "what is just in the particular case, considering the nature of the copyright, the circumstances of the infringement and the like, . . . but with the express qualification that in every case the assessment must be . . . neither more than the maximum nor less than the minimum."  *L.A. Westermann Co. v. Dispatch Printing Co.*, 249 U.S. 100, 106 (1919); *accord F.W. Woolworth*, 344 U.S. at 233 (quoting *L.A. Westermann*); *LA News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 996 (9th Cir. 1998) ("The district court has wide discretion in determining the amount of statutory damages to be awarded, constrained only by the specified maxima and minima.  The court is guided by what is just in the particular case, considering the nature of the copyright, the circumstances of the infringement and the like.") (internal quotation marks and citations omitted).

[14] The common-law method is endorsed by a passage partially quoted in defendants' brief.  Justice Brennan concurred in a punitive-damages decision to express his concern that, "[w]ithout statutory (or at least common-law) standards for the determination of how large an award of punitive damages is appropriate in a given case, juries are left largely to themselves in making this important, and potentially devastating, decision."  *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 281 (1989) (Brennan, J., concurring).  Defendants quote Justice Brennan's "left largely to themselves" language, Defs.' Br. 16, but omit his reference to common-law standards for determining punitive damages.

appropriate award." *Microsoft Corp. v. Nop*, 549 F. Supp. 2d 1233, 1237 (E.D. Cal. 2008)

(citation omitted).  Rather than hold the statute unconstitutional on that basis, or declare that

without proof of actual loss, any award larger than the minimum would be unconstitutional (as

defendants here urge), the court observed that "[c]ourts have found guidance in the case law

relating to the analogous provision for statutory damages in [the Copyright Act,] 17 U.S.C.

§ 504(c)." *Id*. at 1237-38 (citations omitted); *accord Guess?, Inc. v. Gold Ctr. Jewelry*, 997 F.

Supp. 409, 411 (S.D.N.Y. 1998) ("while there is no precise formula, even under the Copyright

Act, for the determination of exactly what damages are just in a given case, the defendant's

intent and the need to deter future violations are appropriate considerations [under the Anti-

Counterfeiting Consumer Protection Act,] along with the economic benefits and detriments to

the plaintiff and defendant"), *rev'd on other grounds sub nom. Gucci Am., Inc. v. Gold Ctr.*

*Jewelry*, 158 F.3d 631, 635 (2d Cir. 1998); *Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F.

Supp. 2d 567, 584 (E.D. Pa. 2002).[15]

Defendants appear to concede that some amount of statutory damages is available

without proof of actual damages.  Defs. Br. 16; *see, e.g.*, *Murray v. GMAC Mortg. Corp.*, 434

F.3d 948, 953 (7th Cir. 2006) ("statutes such as the Fair Credit Reporting Act provide for modest

[statutory] damages without proof of injury").  But they contend that the Due Process Clause, as

---

[15] Also satisfying due-process criteria are the seven factors used to set statutory damages under farm-worker protection statutes:

> 1) the amount of award to each plaintiff, 2) the total award, 3) the nature and persistence of the violations, 4) the extent of the defendant's culpability, 5) damage awards in similar cases, 6) the substantive or technical nature of the violations, and 7) the circumstances of each case.

*Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1309 (9th Cir. 1990) (Farm Labor Contractor Registration Act (FLCRA) statutory damages) (citation omitted); *accord Martinez v. Shinn*, 992 F.2d 997, 999 (9th Cir. 1993) (applying same standards for statutory damages under the Migrant and Seasonal Agricultural Worker Protection Act (AWPA)).

applied by *Gore* and its progeny, requires that anything more than the smallest possible statutory damages must be supported by "evidence proving the amount of Plaintiffs' individual harm." Defs.' Br. 16.  To the contrary, statutory damage awards larger than the smallest possible are routinely awarded in other contexts without proof of actual injury.  Indeed, *maximum* awards have been issued (and affirmed on appeal) without proof of actual damages.  *See, e.g.*, *Douglas v. Cunningham*, 294 U.S. 207, 208, 210 (1935) (Copyright Act; upholding maximum possible statutory damages where newspaper published author's story in 384,000 Sunday issues; "at the close of the trial the petitioners admitted inability to prove actual damages"); *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336-37 (9th Cir. 1990) (Copyright Act; affirming maximum possible statutory damages award of $4 million, even though plaintiff's harms were said to be nominal).  In sum, defendants are mistaken to contend that the Due Process Clause requires that anything greater than minimal statutory damages must be supported by proof of actual damages.

### E.    Defendants do not have greater due process rights in class-action cases than in individual party actions

Defendants suggest that their due-process challenges against FCRA's statutory minimum damage provision apply with particular vigor because these are class actions, and urge the Court, Defs.' Br. 19-22, once again, to vacate its October 2004 decision to certify a class in this case, due to defendants' renewed assertion that the possibility that a jury could return a large statutory-damage verdict violates due process.  *Ashby v. Farmers Ins. Co. of Or.*, No. CV 01-1446-BR, 2004 WL 2359968 (D. Or. Oct. 18, 2004), *mot. to amend denied*, 2004 WL 5622940 (D. Or. Nov. 5, 2004).  Defendants cite no caselaw for the proposition that the constitutionality of a statutory-damages provision is determined differently in a class action than in a non-class action

suit.  To the contrary, class-action suits are subject to the same constitutional analysis as any

other action, and the Supreme Court has held that class relief is available "[i]n the absence of a

direct expression by Congress of its intent to depart from the usual course."  *Califano v.

Yamasaki*, 442 U.S. 682, 700 (1979).  To hold that due process forbids class-action suits seeking

statutory damages would effectively insulate large-scale violators from enforcement.  *Deposit

Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980); *accord Braxton v. Farmer's Ins. Group*,

209 F.R.D. 654, 662 (N.D. Ala. 2002) (FCRA class-action suit; "the cost of investigating and

trying these cases individually likely exceeds the value of any statutory and/or punitive damage

award that may be due to any particular class claimant."), *aff'd sub nom. Braxton v. Fire Ins.

Exch.*, 91 Fed. App'x 656 (11th Cir. 2003) (unpublished table decision); *Krey v. Castle Motor

Sales, Inc.*, 241 F.R.D. 608, 618 (N.D. Ill. 2007) (FCRA class-action suit) (same).[16]

 Defendants observe that Congress has limited class relief under three specific consumer-

protection statutes that, unlike FCRA, impose strict liability for statutory damages.  Defs. Br. 18

& n.11.  This merely demonstrates that Congress knows that it can limit class-action relief and

knows how to do so.[17]  And many other statutes, like FCRA, impose statutory damages without

---

 [16] Defendants distort the holding of *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564,
576 (1982) (cited in Defs.' Br. 19).  The Court there upheld over $300,000 in statutory damages
awarded to a seaman because his employer improperly withheld $412.50 from his pay.  It
observed that:

  [T]he legislature not infrequently finds that harsh consequences must be visited
  upon those whose conduct it would deter.  It is probably true that Congress did
  not precisely envision the grossness of the difference in this case between the
  actual wages withheld and the amount of the award required by the statute. . . .
  The remedy for any dissatisfaction with the results in particular cases lies with
  Congress and not with this Court.  Congress may amend the statute; we may not.

*Id.* (citations omitted.)

 [17] Defendants find it "inconceivable" that Congress meant to let consumers bring class-
(continued...)

limiting class-action relief.  This is true for numerous privacy-related statutory damage actions,[18] as well as the Copyright Act, 17 U.S.C. § 504(c), the Anti-Counterfeiting Consumer Protection Act of 1996, 15 U.S.C. § 1117(c), the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1117(d), and the Digital Millennium Copyright Act, 17 U.S.C. § 1203(c)(3).  Defendants cannot plausibly maintain that Congress's decision to restrict class-action relief under some statutory damage schemes means that the Due Process Clause requires it to do so for all statutory damage schemes.

---

[17](...continued)
action actions for violations of FCRA's adverse-notification requirements "for only a seven-year window," from 1996 to 2003.  Defs. Br. 19 n.11 (emphasis omitted).  This distorts history; the FACTA legislation enacted in 2003 had nothing to do with limiting class-action relief, but rather—far more broadly—removed *all* private causes of action for this kind of FCRA violation, individual and class alike.  15 U.S.C. § 1681m(h)(8) (as enacted by FACTA in 2003).  In any event, the parties have already litigated the effect of this provision of FACTA, and the Court has already ruled that FACTA has no effect on actions (individual or class) seeking relief for FCRA violations that predated FACTA's enactment.  *Ashby v. Farmers Ins. Co. of Or.*, ___ F. Supp. 2d ___, No. 01-CV-1446-BR, 2008 WL 2557982, at *2-*3 (D. Or. June 20, 2008).

   Far more to the point, Congress's recent enactment of the Clarification Act, Pub. L. No. 110-241, 122 Stat. 1565, 1566 (2008) (copy attached as Ex. 5), shows that Congress is well able retroactively to eliminate certain causes of action when it wishes.

   [18] *See, e.g.*, Right to Financial Privacy Act, 12 U.S.C. § 3417(a)(1) (actual damages, plus $100 statutory damages, plus punitive damages for willful or intentional violations; no limit on class actions); Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2520(b)(2), (c)(1)(A) (greater of actual damages or statutory damages of $50 to $500, plus punitive damages in appropriate cases; no limit on class actions); *id.*, 18 U.S.C. § 2707(c) (actual damages but no less than $1,000, plus punitive damages if the violation is willful or intentional; no limit for class actions); Video Privacy Protection Act of 1988, 18 U.S.C. § 2710(c)(2)(A) ("actual damages but not less than liquidated damages in an amount of $2,500," plus punitive damages; no limit on class actions); Freedom of Access to Clinic Entrances Act of 1994, 18 U.S.C. § 248(c)(1)(B) (actual damages or $5,000 statutory damages, plus punitive damages; no limit on class actions).

## CONCLUSION

For the reasons stated above, the Court should find that FCRA's statutory damages provision, 15 U.S.C. § 1681n(a)(1)(A), is not void for vagueness, and is not an impermissible "double punishment."  The Court should decline to rule on whether a potential statutory-damages verdict might be constitutionally excessive, as premature; but if the Court does wish to decide that constitutional question now, it should hold that FCRA's range of statutory damages does not exceed due-process limits.  Finally, the Court should rule that due process does not require proof of actual harms to sustain a statutory damages award larger than the minimum.


Dated: September 22, 2008                    Respectfully submitted,
       Washington, DC

                                        **FOR THE UNITED STATES OF AMERICA**
                                        GREGORY G. KATSAS
                                        Assistant Attorney General
                                        Civil Division
                                          U.S. DEPARTMENT OF JUSTICE

                                        KARIN J. IMMERGUT
                                        United States Attorney

                                       _s/ Kelly Zusman_____
                                        KELLY ZUSMAN
                                        OSB Number 891843
                                        Assistant United States Attorney
                                        Mark O. Hatfield U.S. Courthouse
                                        1000 SW Third Ave., Suite 600
                                        Portland, OR  97204
                                        Telephone: 503-727-1009
                                        Facsimile: 503-727-1117
                                        E-mail: Kelly.Zusman@usdoj.gov

EUGENE M. THIROLF, Director
KENNETH L. JOST, Deputy Director
JILL FURMAN, Assistant Director

  s/ Daniel K. Crane-Hirsch
DANIEL K. CRANE-HIRSCH
Trial Attorney, Office of Consumer Litigation
U.S. Department of Justice
PO Box 386
Washington, DC  20044-0386
Telephone: 202-616-8242
Facsimile: 202-514-8742
E-mail: daniel.crane-hirsch@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2008, I electronically filed the foregoing document, and the following Declaration of Daniel K. Crane-Hirsch and its exhibits, with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record, including the following:

**Plaintiffs' Counsel**

N. Robert Stoll (rstoll@ssbls.com)
Steven D. Larson (slarson@ssbls.com)
David F. Rees (drees@ssbls.com)
Mark A. Friel (mfriel@ssbls.com)
Stoll Stoll Berne Lokting & Schlachter, P.C.
209 SW Oak St., Suite 500
Portland, OR  97204

Charles A. Ringo (Charlie@Ringolaw.com)
Charlie Ringo Law Offices
974 NW Riverside Blvd.
Bend, OR  97709

**Defendants' Counsel:**

Barnes H. Ellis (bhellis@stoel.com)
Timothy W. Snider (twsnider@stoel.com)
Stephen A. Redshaw (saredshaw@stoel.com)
Stoel Rives LLP
900 SW Fifth Ave., Suite 2600
Portland, OR  97204

   s/ Daniel K. Crane-Hirsch
DANIEL K. CRANE-HIRSCH
Trial Attorney, Office of Consumer Litigation
U.S. Department of Justice
PO Box 386
Washington, DC  20044-0386
Telephone: 202-616-8242
Facsimile: 202-514-8742
E-mail: daniel.crane-hirsch@usdoj.gov

GREGORY G. KATSAS, Assistant Attorney General
EUGENE M. THIROLF, Director, Office of Consumer Litigation
    By: DANIEL K. CRANE-HIRSCH, daniel.crane-hirsch@usdoj.gov
U.S. Department of Justice, Office of Consumer Litigation
PO Box 386
Washington, DC  20044-0386
Telephone: 202-616-8242
Facsimile: 202-514-8742

KARIN J. IMMERGUT, United States Attorney
    By: KELLY ZUSMAN, Kelly.Zusman@usdoj.gov
U.S. Attorney's Office
Mark O. Hatfield U.S. Courthouse
1000 SW Third Ave., Suite 600
Portland, OR  97204
Telephone: 503-727-1009
Facsimile: 503-727-1117

Attorneys for Intervenor-Plaintiff the United States of America

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| DOUGLAS ASHBY, *et al.*, **Plaintiffs**, and | Case No. 01-1446-BR |
| UNITED STATES OF AMERICA, **Intervenor-Plaintiff**, | **DECLARATION OF DANIEL K. CRANE-HIRSCH IN SUPPORT OF THE UNITED STATES' REPLY BRIEF IN SUPPORT OF CONSTITUTIONALITY OF FCRA'S STATUTORY DAMAGES PROVISION** |
| v. | |
| FARMERS INSURANCE CO. OF OREGON, INC., *et al.*, **Defendants**. | |
| | Oral argument set for Oct. 6, 2008 |

1.      My name is Daniel K. Crane-Hirsch.  I am an attorney for the United States of America, and am over 18 years of age.

2.    The attached exhibits are true and accurate copies of the following:

| Exhibit | Description |
|---------|-------------|
| 1 | S. Rep. No. 91-517 (1969) |
| 2 | 115 Cong. Rec. 33,408-12 (1969) (comments of Sens. Proxmire and Williams) |
| 3 | Consumer Credit Reporting Reform Act of 1996 ("Reform Act"), Pub. L. No. 104-208, secs. 2401, 2411-2412, 110 Stat. 3009, 3009-426, 3009-443 to 3009-447 (codified as amended at 15 U.S.C. §§ 1681m–1681n) |
| 4 | Fair and Accurate Credit Transactions Act of 2003 (FACTA), Pub. L. No. 108-117, sec. 311(a), 117 Stat. 1952, 1988-89 (codified at 15 U.S.C. § 1681m(h)). |
| 5 | Credit and Debit Card Receipt Clarification Act of 2007 [*sic*] ("Clarification Act"), Pub. L. No. 110-241, 122 Stat. 1565-1566 (June 3, 2008) |

Signed under penalties of perjury under 28 U.S.C. § 1746.

Dated: September 22, 2008        s/ Daniel K. Crane-Hirsch
Washington, DC            DANIEL K. CRANE-HIRSCH
                  Trial Attorney, Office of Consumer Litigation
                  U.S. Department of Justice
                  PO Box 386
                  Washington, DC  20044-0386
                  Telephone: 202-616-8242
                  Facsimile: 202-514-8742
                  E-mail: daniel.crane-hirsch@usdoj.gov

GREGORY G. KATSAS, Assistant Attorney General
EUGENE M. THIROLF, Director, Office of Consumer Litigation
    By: DANIEL K. CRANE-HIRSCH, daniel.crane-hirsch@usdoj.gov
U.S. Department of Justice, Office of Consumer Litigation
PO Box 386
Washington, DC  20044-0386
Telephone: 202-616-8242
Facsimile: 202-514-8742

KARIN J. IMMERGUT, United States Attorney
    By: KELLY ZUSMAN, Kelly.Zusman@usdoj.gov
U.S. Attorney's Office
Mark O. Hatfield U.S. Courthouse
1000 SW Third Ave., Suite 600
Portland, OR  97204
Telephone: 503-727-1009
Facsimile: 503-727-1117

Attorneys for Intervenor-Plaintiff the United States of America

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| DOUGLAS ASHBY, *et al.*, **Plaintiffs**, and | Case No. 01-1446-BR |
| UNITED STATES OF AMERICA, **Intervenor-Plaintiff**, | **DECLARATION OF DANIEL K. CRANE-HIRSCH IN SUPPORT OF THE UNITED STATES' REPLY BRIEF IN SUPPORT OF CONSTITUTIONALITY OF FCRA'S STATUTORY DAMAGES PROVISION** |
| v. | |
| FARMERS INSURANCE CO. OF OREGON, INC., *et al.*, **Defendants**. | |
| | Oral argument set for Oct. 6, 2008 |

1.     My name is Daniel K. Crane-Hirsch.  I am an attorney for the United States of America, and am over 18 years of age.

2.      The attached exhibits are true and accurate copies of the following:

| Exhibit | Description |
|---------|-------------|
| 1 | S. Rep. No. 91-517 (1969) |
| 2 | 115 Cong. Rec. 33,408-12 (1969) (comments of Sens. Proxmire and Williams) |
| 3 | Consumer Credit Reporting Reform Act of 1996 ("Reform Act"), Pub. L. No. 104-208, secs. 2401, 2411-2412, 110 Stat. 3009, 3009-426, 3009-443 to 3009-447 (codified as amended at 15 U.S.C. §§ 1681m–1681n) |
| 4 | Fair and Accurate Credit Transactions Act of 2003 (FACTA), Pub. L. No. 108-117, sec. 311(a), 117 Stat. 1952, 1988-89 (codified at 15 U.S.C. § 1681m(h)). |
| 5 | Credit and Debit Card Receipt Clarification Act of 2007 [*sic*] ("Clarification Act"), Pub. L. No. 110-241, 122 Stat. 1565-1566 (June 3, 2008) |

Signed under penalties of perjury under 28 U.S.C. § 1746.

Dated: September 22, 2008          s/ Daniel K. Crane-Hirsch
       Washington, DC             DANIEL K. CRANE-HIRSCH
                                  Trial Attorney, Office of Consumer Litigation
                                  U.S. Department of Justice
                                  PO Box 386
                                  Washington, DC  20044-0386
                                  Telephone: 202-616-8242
                                  Facsimile: 202-514-8742
                                  E-mail: daniel.crane-hirsch@usdoj.gov

Calendar No. 511

| 91st Congress<br>*1st Session* | SENATE | Report<br>No. 91–517 |
| --- | --- | --- |

# FAIR CREDIT REPORTING

REPORT

OF THE

## COMMITTEE ON
## BANKING AND CURRENCY
## UNITED STATES SENATE

TO ACCOMPANY

## S. 823



November 5, 1969.—Ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1969

37–010

## COMMITTEE ON BANKING AND CURRENCY

JOHN SPARKMAN, Alabama, *Chairman*

WILLIAM PROXMIRE, Wisconsin
HARRISON A. WILLIAMS, JR., New Jersey
EDMUND S. MUSKIE, Maine
THOMAS J. McINTYRE, New Hampshire
WALTER F. MONDALE, Minnesota
ERNEST F. HOLLINGS, South Carolina
HAROLD E. HUGHES, Iowa
ALAN CRANSTON, California

WALLACE F. BENNETT, Utah
JOHN G. TOWER, Texas
EDWARD W. BROOKE, Massachusetts
CHARLES H. PERCY, Illinois
CHARLES E. GOODELL, New York
ROBERT W. PACKWOOD, Oregon

DUDLEY L. O'NEAL, Jr., *Staff Director and General Counsel*
JOHN R. EVANS, *Minority Staff Director*
KENNETH A. McLEAN, *Professional Staff Member*

(II)

# CONTENTS

| | Page |
|---|---|
| Purpose of the legislation | 1 |
| History of the legislation | 2 |
| Growth of the credit reporting industry | 2 |
| Problems of the credit reporting industry | 3 |
| Section-by-section summary | 4 |
| Cordon rule dispensed with | 8 |

(III)

# Calendar No. 511

| 91st Congress } | SENATE | { Report |
|---|---|---|
| *1st Session* } | | No. 91–517 |

## FAIR CREDIT REPORTING

———————

November 5, 1969.—Ordered to be printed

———————

Mr. Proxmire, from the Committee on Banking and Currency, submitted the following

## REPORT

[To accompany S. 823]

The Committee on Banking and Currency, to which was referred the bill (S. 823) to enable consumers to protect themselves against arbitrary, erroneous, and malicious credit information, having considered the same, reports favorably thereon with amendments and recommends that the bill (as amended) do pass.

### Purpose of the Legislation

The purpose of the fair credit reporting bill is to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report. The bill also seeks to prevent an undue invasion of the individual's right of privacy in the collection and dissemination of credit information.

Whenever an individual is rejected for credit, insurance or employment because of an adverse credit report, the individual is given the right to be told the name of the agency making the report.

Credit reporting agencies would be required to inform the consumer of all the information in his credit file. Following disclosure, the consumer would be given an opportunity to correct inaccurate or misleading information in his credit file. In addition, the bill requires that the information in a person's file be kept confidential and used only for legitimate-business transactions. Under most circumstances, adverse information older than 7 years could not be reported. The legislation also establishes the right of a consumer to be informed of investigations into his personal life.

The bill covers reports on consumers when used for obtaining credit, insurance or employment. However, the bill does not cover business credit reports or business insurance reports.

(1)

S. Rept. 91–517

2

The bill recognizes the vital role played by credit reporting agencies in our economy. Those who extend credit or insurance or who offer employment have a right to the facts they need to make sound decisions. Likewise, the consumer has a right to know when he is being turned down for credit, insurance, or employment because of adverse information in a credit report and to correct any erroneous information in his credit file. The procedures established in the bill assure the free flow of credit information while at the same time they give the consumer access to the information in his credit file so that he is not unjustly damaged by an erroneous credit report.

## History of the Legislation

The Fair Credit Reporting bill was introduced by Senator William Proxmire on January 31, 1969. Hearings before the Subcommittee on Financial Institutions were held from May 19 through May 23. The subcommittee met in executive session on October 9 and recommended the bill with amendments to the full committee. The full committee met on October 22 and ordered the bill reported with additional amendments.

## Growth of the Credit Reporting Industry

One of the phenomenal growth records since the end of World War II has been the growth of the consumer credit industry. At the end of 1945 the American consumer owed less than $6 billion, whereas he now owes over $116 billion. With the growth of consumer credit, a vast credit reporting industry has developed to supply credit information. The growth of computer technology has facilitated the storage and interchange of information on consumers and opens the possibility of a nationwide data bank covering every citizen.

As an example of the size of the industry, the Associated Credit Bureaus, a major trade association, has over 2,200 individual members serving 400,000 creditors in 36,000 communities. These credit bureaus maintain credit files on more than 110 million individuals and in 1967 they issued over 97 million credit reports. Credit bureaus typically supply information on a person's financial status, bill paying record and items of public record such as arrests, suits, judgments, and the like. The information is generally furnished to creditors for extending credit although it may also be used for employment purposes.

One of the fastest growing credit bureaus already has 27 million files on computer tape. Moreover, the firm is adding names at the rate of 7 million a year. If this growth rate is maintained, the firm will have data on every American family in their computer file within a few years. Last year the firm made 7 million reports to creditors.

Another firm prominent in the insurance reporting field has 1,800 offices in the United States and Canada. This firm has dossiers on 45 million individuals and makes 35 million reports a year to their 40,000 customers. Insurance reporting firms investigate people who apply for insurance, generally through interviews with neighbors and coworkers. Their files include information on a person's character, habits, and morals as well as his financial status. Once the information is in the file, it can be used again for future insurance or employment reports.

S. Rept. 91–517

3

Until this year, there has been virtually no State legislation regulating credit reporting other than a 1916 Oklahoma statute with limited scope. In 1969, credit reporting legislation was introduced in 27 states and two States—Massachusetts and New Mexico—passed a statute. Because of the nationwide character of the credit reporting business, firms which operate on a nationwide scale expressed a preference for Federal regulation rather than State legislation during the hearings on S. 823. Moreover, New York State officials who testified expressed a need for Federal legislation to supplement any future State legislation which may be enacted.

## Problems of the Credit Reporting Industry

Given the rapid expansion of the credit reporting industry and the almost complete lack of regulation, it is inevitable that some problems will arise. For the most part, the credit reporting system has served the consumer well and the abuses have not been widespread. Nonetheless, congressional hearings have shown that some abuses do exist. Moreover, industry leaders have agreed that there have been some abuses and many have already taken voluntary steps to correct them. The leaders of the credit reporting industry are likewise agreed upon the need for Federal legislation to insure that guidelines apply uniformly and fairly to all segments of the industry.

One problem which the hearings on S. 823 identified is the inability at times of the consumer to know he is being damaged by an adverse credit report. Standard agreements between credit reporting agencies and the users of their reports prohibit the user from disclosing the contents of the report to the consumer. In some cases, the user is even precluded from mentioning the name of the credit reporting agency. Unless a person knows he is being rejected for credit or insurance or employment because of a credit report, he has no opportunity to be confronted with the charges against him and tell his side of the story.

A second problem is that even if the person knows the name of the credit reporting agency, he is not always given access to the information in his file. Insurance reporting firms generally do not admit to making a report on an individual and ordinarily will not reveal the contents of their file to him. Credit bureaus sometimes build roadblocks in the path of the consumer. For example, the credit bureau industry trade publication, in frankly discussing this problem, states that some bureaus discourage consumer interviews "by placing a nuisance charge on the investigation, or merely placing the date of the interview as much as 2 weeks away."

A third problem is that even when individuals gain access to the information in their credit file, they sometimes have difficulty in correcting inaccurate information. Some credit reporting agencies proceed on the assumption that an individual is guilty until proven innocent and refuse to delete information which is no longer verifiable unless the consumer can prove otherwise. In other cases, the consumer may have difficulty in getting his version of a legitimate dispute recorded in his credit file. For example, a consumer may withhold payment from a creditor because the merchandise was defective. His credit record may simply show that he has refused to pay without entering his reasons.

S. Rept. 91–517

4

A fourth problem is that the information in a person's credit file is not always kept strictly confidential. As an example, a reporter for a major TV network was able to obtain 10 out of 20 reports requested at random from 20 credit bureaus by using the name of a completely fictitious company under the guise of offering the individuals credit.

A fifth problem is that investigative type credit reports sometimes gather highly sensitive and personal information about a person's private life, such as racial or ethnic descent, domestic trouble, housekeeping habits, and conditions of yard. Moreover, because of its very nature much of the information on a person's general character, habits and morals is based on someone's subjective opinion rather than objective fact. Some of the information collected on investigative reports may be only marginally related to the purpose of granting credit or insurance and may tend to invade the individual's right to reasonable privacy.

A sixth problem deals with the handling of public record information. Most credit bureaus systematically compile public record information such as records of suits, tax liens, arrests, indictments, convictions, bankruptcies, judgments and the like. This information is then included on a person's report when he applies for credit, or in some cases when he applies for employment. Unfortunately, the information cannot always be kept up to date either because it is costly or because the correct information is simply not available. Thus, it is possible for a credit bureau to report a record of a suit or arrest without indicating that the suit was dismissed or the arrest charges dropped. Because public record information is reported to employers as well as creditors, a consumer's future employment career could be jeopardized because of an incomplete credit report.

A seventh problem is concerned with the reporting of information about a person's earlier credit difficulties. Creditors obviously have a right to know if a person has had trouble in paying his bills. At the same time it can be unfair to burden a consumer for life with a bad credit record if he has improved his performance. The Associated Credit Bureaus has recognized this problem and had proposed voluntary guidelines to its members to the effect that adverse information not be reported if it is older than 7 years or 14 years in the case of bankruptcies. Nonetheless, these guidelines are not necessarily followed by reporting agencies who are not members of the ACB.

## Section-By-Section Summary

*Section 601.—Short Title.—*This section indicates that the act may be cited as the "Fair Credit Reporting Act."

*Section 602.—Statement of Purpose.—*This section indicates a need to establish safeguards for the reporting of information on consumers so as to assure its confidentiality, accuracy, relevancy, and proper utilization.

*Section 603.—Definitions and Rules of Construction.—*A "consumer report" is defined under subsection (d) as a report on an individual when the information has been collected or is to be used for credit, insurance, or employment purposes. The term does not include information reported by a creditor or other person when the information is confined to the creditor's own transactions or experience with the consumer. However, if the creditor obtains information on a consumer

5

from third parties and reports it to another person, such communication would be deemed a consumer report regardless of whether a fee was charged for the report.

The term "consumer report" also does not include communications between a credit card company and a retail merchant when the communication authorizes or approves a specific extension of credit directly or indirectly by the credit card company. The term "directly or indirectly" is used to cover the situation where the legal arrangements on which the credit card plan is based call for the merchant to extend the credit and assign the resulting evidence of indebtness to the credit card company. In such instance, the credit card company is indirectly extending the credit. The credit card company would be required, as a creditor, to comply with the disclosure provisions of section 615.

Finally, the term "consumer report" does not cover communications between a finance company or other creditor and a retail merchant concerning the approval of a specific extension of credit directly or indirectly by the finance company, provided the merchant identifies the finance company and the finance company complies with the disclosure provisions of section 615. The word "indirectly" again refers to the situation where the retail merchant initially extends credit but then assigns the resulting evidence of indebtedness to the finance company or other creditor who approved the transaction.

The purpose of these exclusions is to assure that creditors who are acting as creditors are not classified as a consumer reporting agency, provided they comply with the disclosure obligations required of creditors under section 615.

Under subsection (e), the term "investigative consumer report" is further defined as one in which personal-type information on a consumer's character, reputation, personal characteristics, or mode of living is obtained through interviews with neighbors, associates, and the like.

Under subsection (f), the term "consumer reporting agency" is defined as anyone who regularly furnishes consumer reports whether for fees or otherwise. If a creditor regularly compiles information on consumers from third parties and furnishes that information to other persons either for fees or otherwise, the creditor becomes a consumer reporting agency and is subject to the applicable provisions of the act.

*Section 604.—Permissible Purposes of Reports.*—This section limits the furnishing of consumer reports to five purposes: (1) credit; (2) insurance; (3) employment; (4) obtaining a governmental license or other benefit; or (5) other legitimate business need involving a business transaction with the consumer. Any broader use would require either a court order or the consumer's written permission.

*Section 605.—Obsolete Information.*—This section prohibits the reporting of adverse information older than 7 years, or 14 years in the case of information on bankruptcies, except in connection with life insurance contracts in excess of $25,000, extensions of creidt in excess of $50,000, or employment applications for jobs with an annual salary in excess of $20,000.

*Section 606.—Disclosure of Investigative Reports.*—This section requires those who order investigative reports to disclose to the consumer that an investigative report may be made, that the report may in-

6

volve information on his character, general reputation, personal characteristics and mode of living as applicable, and that he has the right to request a complete and accurate disclosure of the nature and scope of the investigation. This provision would not apply if the report is for employment purposes and the consumer has not specifically applied for the employment.

*Section 607.—Compliance Procedures.*—This section requires reporting agencies to maintain procedures to preserve the confidentiality and proper use of information. Users must certify the purposes for which information will be used and agree not to use the information for other purposes. A reporting agency must make a reasonable effort to check out new users and refrain from making reports if it has reasonable grounds for believing the report will not be used for an authorized purpose.

*Section 608.—Disclosures to Governmental agencies.*—The disclosure of information to governmental agencies is limited to identifying type information such as name, address and place of employment unless the governmental agency has obtained a court order or is a bona fide creditor, insurer, employer, or licensor.

*Section 609.—Disclosures to Consumers.* This section requires reporting agencies to disclose, at the request of a consumer, the nature and substance of all information in the consumer's file, the sources of the information unless it is an investigative report, and the persons who have received reports on the consumer during the past 6 months for credit or insurance purposes and the past 2 years for employment purposes.

*Section 610.—Conditions of Disclosure to Consumers.*—This section requires disclosures to be made during normal business hours and on reasonable notice. The disclosure may be made at the credit reporting agency or over the phone if the consumer so requests in writing and furnishes proper identification. Reporting agencies must provide trained personnel to explain the information in a consumer's file. The consumer has the right to have one person accompany him. Reporting agencies, their sources and the users of information are given immunity from libel or other suits as a result of information in their credit file disclosed to consumers pursuant to section 609, 610 and 615 unless the information was furnished with malice or willful intent to injure the consumer. The immunity provisions under this section do not extend to information acquired by a consumer through other means.

*Section 611.—Procedure in Case of Disputed Accuracy.*—If the completeness or accuracy of an item of information is challenged by a consumer, the credit reporting agency must reinvestigate and record its current status. Inaccurate or unverifiable information must be deleted. The consumer has a right to file a brief explanatory statement on disputed items which must accompany future reports. The consumer may also request that previous recipients be notified of any corrections.

*Section 612.—Charges for Certain Disclosures.*—Disclosures shall be free of charge to consumers who are rejected for credit, insurance, or employment or who are charged higher rates for credit or insurance and who have been so notified by the creditor, insurer, or employer.

7

Similarly, disclosure charges cannot be made to persons who have received a dunning letter from a collection affiliate of the reporting agency. In all other cases, the reporting agency may establish a reasonable disclosure charge.

The cost of sending corrected information to the prior recipients of a report shall be at the expense of the reporting agency when information is deleted because it is inaccurate or unverifiable. When the item is in dispute, the reporting agency may charge the consumer for notifying prior recipients.

*Section 613.—Public Record Information for Employment Purposes.*—Reporting agencies cannot report adverse items of public record information for employment purposes unless they maintain strict procedures to keep the information up to date. If this cannot be done, the consumer must be notified that the adverse information is being reported and to whom at the time the report is made.

*Section 614.—Restrictions on Investigative Consumer Reports.*—Adverse information developed on investigative reports which is more than 3 months old cannot be reported again unless it is reverified. Those who make investigative reports must follow procedures to assure maximum possibly accuracy.

*Section 615.—Requirements on Users of Consumer Reports.*—Those who reject a consumer for credit, insurance or employment or who charge a higher rate for credit or insurance wholly or partly because of a consumer report must, upon written request, so advise the consumer and supply the name and address of the reporting agency. If a consumer is turned down for credit or charged a higher rate based on information other than a consumer report, the nature and substance of this information must also be disclosed on written request. The consumer's right to make such a request must be disclosed if he is turned down for credit, employment, or insurance or charged a higher rate for credit or insurance. Such disclosure must be made at the time such adverse action is communicated to the consumer. However, the user has no liability under this section until the adverse action has actually been communicated to the consumer.

*Section 616.—Civil Liability for Willful Non-Compliance.*—Consumers can bring civil actions to enforce compliance. If a willful violation can be shown, the consumer can collect actual damages, punitive damages of up to $1,000 and attorney fees.

*Section 617.—Civil Liability for Grossly Negligent Non-Compliance.*—If the consumer can show a grossly negligent violation, he can collect actual damages plus attorney fees.

*Section 618.—Jurisdiction of Courts.*—Civil actions may be brought in Federal or State courts within 2 years of the violation.

*Section 619.—Obtaining Information Under False Pretenses.*—Any person who knowingly and willfully obtains a consumer report under false pretenses can be fined up to $5,000 and imprisoned up to 1 year, or both.

*Section 620.—Administrative Enforcement.*—Compliance would be further enforced by the Federal Trade Commission with respect to consumer reporting agencies and users of reports who are not regulated by another Federal agency. The FTC can use the cease and desist authorities and other procedural, investigative and enforcement powers which it has under the FTC Act to secure compliance.

8

Compliance on the part of financial institutions or common carriers regulated by another Federal agency would be enforced by that agency, using its existing enforcement authorities to bring about compliance.

*Section 621.—Relation to State Laws.*—State laws which are inconsistent with the Federal law are preempted to the extent of the inconsistency. However, no State law would be preempted unless compliance would involve a violation of Federal law.

*Effective Date.* The act becomes effective in 6 months following its enactment.

## Cordon Rule

In the opinion of the committee, it is necessary to dispense with the requirements of subsection 4 of rule XXIX of the Standing Rules of the Senate in order to expedite the business of the Senate in connection with this report.

O



UNITED STATES        OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 91st CONGRESS
FIRST SESSION

## VOLUME 115—PART 25

NOVEMBER 6, 1969, TO NOVEMBER 17, 1969
(PAGES 33255 TO 34516)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1969

however, are the testimony and observations of many who, although philosophically opposed to Judge Haynsworth, commend the nomination or, at least find the criticism of him unjust. The opinions of those who speak against their own philosophical interests should be entitled to great weight.

Mr. John P. Frank, attorney, testified in favor of Judge Haynsworth. He served as law clerk to Justice Black, he has taught at Yale and Indiana Law Schools, and has written about the Supreme Court, he is a member of the Advisory Committee of the Supreme Court and the Judicial Conference on Civil Procedure. He filed the first brief calling for total school desegregation in 1950 in the case of Sweatt against Painter. He was the first to write in favor of what has become known as the one-man, one-vote rule. He was cocounsel in Miranda against Arizona. In his testimony he said:

I would without doubt have preferred a different administration to be appointing a more liberal Justice. But my side lost an election, and the fact of the matter is that as a member of the bar we are called upon by canon 8 to rise to the defense of judges unjustly criticized, and it is my abiding conviction, sir, that the criticism directed to the disqualification or nondisqualification of Judge Haynsworth is truly an unjust criticism which cannot be fairly made.

This quotation is from page 123 of the hearings record.

Mr. Frank's testimony was directed toward the issue of Judge Haynsworth's ownership of a one-seventh interest in Carolina Vend-A-Matic and whether he should have disqualified himself in the Darlington case. His brief was persuasive. The overwhelming weight of authority required Judge Haynsworth to sit in the case, not to disqualify himself.

Prof. G. W. Foster, Jr., teaches law at the University of Wisconsin. A devoted civil rights advocate, Professor Foster played a prominent role in the promulgation of the original Department of Health, Education, and Welfare school desegregation guidelines in 1965. In his prepared statement which was submitted to the committee and is a part of the record, Professor Foster says:

My presence today is explained by my wish to speak to the charges that Judge Haynsworth is a racial segregationist. Judge Haynsworth is not a segregationist . . .

Judge Haynsworth is an intelligent, sensitive, reasoning man. His record as a judge shows him to be a man capable of continuing growth and responsive to the needs for change where needs are persuasively shown to exist. . . . (H)e will make a first-rate Associate Justice.

Prof. Alexander Bickel, of Yale Law School, summed up, in a recent article for New Republic, as follows:

But President and Senate are partners, and the Constitution gives the President the initiative. If in order to refashion the Court so as to please himself, he were to attempt to move it beyond an ideologically moderate position, senators who are of a different mind ought to resist. But Judge Haynsworth is no reactionary. His civil rights record is centerist, although more cautious than some senators might like. If the Senate demands precisely the ideological profile it would prefer, the appointment process will be in deadlock. Judge Haynsworth should be seen

ideologically as falling within the area of tolerance in which the Senate defers to the President's initiative.

Speaking during the hearings primarily on the issue of Judge Haynsworth's labor rulings was Louis B. Fine who is a former president of the Virginia Bar Lawyers Association, a member of the board of governors of the American Trial Lawyers Association, and who has served as counsel for the Teamster, the Painters Union, the Carpenters Union, and the Longshoremen's Union of Norfolk. He testified:

I think it is manifestly unfair to have said that Judge Haynsworth was antilabor when, as a matter of fact, he only decided the cases and only wrote one opinion out of 10 that were reversed out of a total of 47. Even the Lord couldn't do much better under the total circumstances, and I say that while I have been and am representing labor, labor is not in a fraternity house with the judicial administration of justice. It is just like any other litigant, and that labor must depend upon the economic and social justice as it appears to a conscientious judge.

The evidence is overwhelming that Clement Haynsworth is a conscientious judge. Those who knew him best, his fellows on the Fourth Circuit Court of Appeals, have affirmed their confidence in his integrity and his ability.

The American Bar Association Committee on the Federal Judiciary interviewed a cross-section of the legal community that worked with Judge Haynsworth. Attorneys from each State in the Fourth Circuit were contacted: some represented plaintiffs in personal injury cases, some represented defendants, two were deans of law schools, two represented labor unions, one did admiralty work for shipowners, another represented seamen and longshoremen, two were outstanding Negro lawyers. As Judge Walsh said in summarizing the investigation:

All of the persons interviewed regarding Judge Haynsworth expressed confidence in his integrity, his intellectual honesty, his judicial temperament and his professional ability.

I am impressed by this testimony, the abundance of it, and the sources from which it comes. Judge Haynsworth is not an average, colorless official as some have charged. He has a justly deserved reputation for scholarly analysis and well-written opinions.

I commend President Nixon for making this nomination. The attacks have been furious and the smoke they threw up has been thick, but they have been shown to be without foundation. President Nixon has been unwavering in his support for the nominee. Judge Haynsworth deserves such support.

I yield the floor.

## AMENDMENT OF THE CONSUMER PROTECTION CREDIT ACT

The Senate resumed the consideration of the bill (S. 823) to enable consumers to protect themselves against arbitrary, erroneous, and malicious credit information.

Mr. PROXMIRE. Mr. President, this is the fair credit reporting bill, which has been reported by the Committee on

Banking and Currency, I believe by a unanimous vote.

The purpose of the fair credit reporting bill is to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report. The bill also seeks to prevent an undue invasion of the individual's right to privacy in the collection and dissemination of credit reports.

Whenever an individual is rejected for credit, insurance, or employment because of an adverse credit report, the individual is given the right to be told the name of the agency making the report.

Credit reporting agencies would be required to inform the consumer of all the information in his credit file. Following disclosure, the consumer would be given an opportunity to correct inaccurate or misleading information in his credit file. In addition, the bill requires that the information in a person's file be kept confidential and used only for legitimate business transactions. Under most circumstances, adverse information older than 7 years could not be reported. The legislation also establishes the right of a consumer to be informed of investigations into his personal life.

The bill covers reports on consumers when used for obtaining credit, insurance or employment. However, the bill does not cover business credit reports or business insurance reports.

The bill recognizes the vital role played by credit reporting agencies in our economy. Those who extend credit or insurance or who offer employment have a right to the facts they need to make sound decisions. Likewise, the consumer has a right to know when he is being turned down because of an adverse credit report and to correct any erroneous information in his credit file. The procedures established in the bill assure the free flow of credit information while at the same time they give the consumer access to his credit file so that he is not unjustly damaged by an erroneous credit report.

GROWTH OF THE CREDIT REPORTING INDUSTRY

Mr. President, few Members of the Senate, and I think few people in our country, realize the terrific scope of credit reporting, or realize how rapidly the consumer credit industry has grown. The figures are really astonishing.

One of the phenomenal growth records since the end of World War II has been the growth of the consumer credit industry. At the end of 1945 the American consumer owed less than $6 billion, whereas he now owes over $116 billion. With the growth of consumer credit, a vast credit reporting industry has developed to supply credit information. The growth of computer technology has facilitated the storage and interchange of information on consumers and opens the possibility of a nationwide data bank covering every citizen.

As a matter of fact, it is my understanding that almost every adult in America has a credit file containing information on him. Few individuals realize that these credit files are in existence. However, such a file can have a very serious effect on whether a man gets em-

ployment or insurance. It can have a disastrous effect, as our hearings show it has had a disastrous effect, on some individuals.

As an example of the size of the industry, the Associated Credit Bureaus, a major trade association, has over 2,200 individual members serving 400,000 creditors in 36,000 communities. These credit bureaus maintain credit files on more than 110 million individuals and in 1967 they issued over 97 million credit reports. Credit bureaus typically supply information on a person's financial status, bill paying record and items of public record such as arrests, suits, judgments, and the like. The information is generally furnished to creditors for extending credit although it may also be used for employment purposes.

One of the fastest growing credit bureaus already has 27 million files on computer tape. Moreover, the firm is adding names at the rate of 7 million a year. If this growth rate is maintained, the firm will have data on every American family in their computer file within a few years. Last year the firm made 7 million reports to creditors.

Another firm prominent in the insurance reporting field has 1,800 offices in the United States and Canada. This firm has dossiers on 45 million individuals and makes 35 million reports a year to their 40,000 customers. Insurance reporting firms investigate people who apply for insurance, generally through interviews with neighbors and coworkers. Their files include information on a person's character, habits and morals as well as his financial status. Once the information is in the file, it can be used again for future insurance or employment reports.

Until this year, there has been virtually no State legislation regulating credit reporting other than a 1916 Oklahoma statute with limited scope. In 1969, credit reporting legislation was introduced in 27 States and two States—Massachusetts and New Mexico—passed a statute. Because of the nationwide character of the credit reporting business, firms which operate on a nationwide scale expressed a preference for Federal regulation rather than State legislation during the hearings on S. 823. Moreover, New York State officials who testified expressed a need for Federal legislation to supplement any future State legislation which may be enacted.

PROBLEMS OF THE CREDIT REPORTING INDUSTRY

Given the rapid expansion of the credit reporting industry and the almost complete lack of regulation, it is inevitable that some problems will arise. For the most part, the credit reporting system has served the consumer well. Nonetheless, congressional hearings have shown that some abuses do exist. Moreover, industry leaders have agreed that there have been some abuses and many have already taken voluntary steps to correct them. The leaders of the credit reporting industry are likewise agreed upon the need for Federal legislation to insure that guidelines apply uniformly and fairly to all segments of the industry.

One problem which the hearings on S. 823 identified is the frequent inability of the consumer to know he is being damaged by an adverse credit report. Standard agreements between credit reporting agencies and the users of their reports prohibit the user from disclosing the contents of the report to the consumer. In some cases, the user is even precluded from mentioning the name of the credit reporting agency. Unless a person knows he is being rejected for credit or insurance or employment because of a credit report, he has no opportunity to be confronted with the charges against him and tell his side of the story.

Under the fair credit reporting bill, this problem would be solved by requiring those who turn someone down for credit, insurance or employment because of an adverse credit report to disclose the name and address of the credit reporting agency. The disclosure would be at the written request of the consumer; however, the creditor, insurer, or employer, would be required to disclose to the consumer his right to make such a request at the time the adverse information was communicated. This disclosure requirement would alert consumers that they are being turned down on the basis of an adverse credit report. Other provisions in the bill would then give the consumer an opportunity to correct any misleading or inaccurate information in the report.

A second problem is that even if the person knows the name of the credit reporting agency, he is not always given access to his file. Insurance reporting firms generally do not admit to making a report on an individual and ordinarily will not reveal the contents of their file to him. Credit bureaus sometimes build roadblocks in the path of the consumer. For example, the credit bureau industry trade publication, in frankly discussing this problem, states that some bureaus discourage consumer interviews "by placing a nuisance charge on the investigation, or merely placing the date of the interview as much as 2 weeks away."

The bill deals with this problem by requiring that credit reporting agencies interview consumers during normal business hours and on reasonable notice and disclose all the information in the consumer's file. Moreover, a charge for such interview cannot be made if the consumer is turned down for credit, insurance, or employment, or if he has received a collection letter from a collection affiliate of the credit reporting agency. In other cases, the reporting agency would be permitted to levy a reasonable charge.

Access to the file would also be facilitated by giving the consumer the right to have a person with him when he discusses his credit file. This would enable the Neighborhood Legal Service and similar groups to assist low-income consumers in dealing with credit reporting agencies. In addition, the credit reporting agency would be required to have trained personnel available to discuss a consumer's credit file with him.

A third problem is that even when individuals gain access to their credit file, they sometimes have difficulty in correcting inaccurate information. Some credit reporting agencies proceed on the assumption that an individual is guilty until proven innocent and refuse to delete information which is no longer verifiable unless the consumer can prove otherwise. In other cases, the consumer may have difficulty in getting his version of a legitimate dispute recorded in his credit file. For example, a consumer may withhold payment from a creditor because the merchandise was defective. His credit record may simply show that he has refused to pay without entering his reasons.

The bill would deal with this problem by requiring credit reporting agencies to delete information from their files if it is found to be inaccurate or if it can no longer be verified. If there is a dispute between the consumer and the merchant or other source of information, the consumer is given the right to file a brief explanatory statement setting forth his side of the story. This statement or a clear and accurate summary thereof would have to be included on all subsequent reports made by the credit reporting agency. I am hopeful that this provision would prevent unscrupulous creditors from unjustly damaging the credit reputation of the consumer when the merchant himself is at fault.

A fourth problem is that the information in a person's credit file is not always kept strictly confidential. As an example, a reporter for a major TV network was able to obtain 10 out of 20 reports requested at random from 20 credit bureaus by using the name of a completely fictitious company.

This problem would be dealt with by requiring credit bureaus to maintain procedures to safeguard the confidentiality of the information in their files. Those who requested credit reports would have to certify the purposes for which they are requested and agree not to use the information for any other purposes. The credit reporting agency would have to make a reasonable effort to determine the authenticity of new prospective users of reports. Moreover, any persons who obtained a credit report under false pretenses could be fined up to $5,000 and imprisoned up to 1 year, or both.

A fifth problem is that investigative-type credit reports often gather highly sensitive and personal information about a person's private life. Moreover, because of its very nature, most of the information on a person's general character, habits, and morals is based on someone's subjective opinion rather than objective fact. Some of the information collected on investigative reports appears to be only marginally related to the purpose of granting credit or insurance and may tend to invade the individual's right to reasonable privacy.

As an illustration of the personal type of information being collected, the hearings on S. 823 revealed the following items on consumers are included on the report forms of insurance reporting firms; Racial or ethnic descent; drinking habits; reasons for drinking; domestic trouble; immoral conduct; gambling activities; use of drugs; type or reputation of associates; general character and reputation; type of neighborhood; family reputation; housekeeping habits; condition of yard; number of bathrooms per resident; connection with illegal liquor; reasons for divorce or separa-

tion; care of children; attitude toward authority; quarrelsome behavior; abuse of family; argumentative, antagonistic; antisocial or uncooperative attitudes; and common law marriage. Many of these obviously are not relevant to whether a man should have credit, or whether he is a good credit risk.

This problem would be dealt with by requiring those who order investigative reports on a consumer's character, general reputation, personal characteristics, or mode of living to disclose such fact to the consumer. In addition, the consumer would have the right to receive a complete and accurate disclosure of the nature and scope of the investigation if he makes a written request. This right to make such a written request would also have to be disclosed by the person ordering the investigative report.

I am hopeful that this provision will bring to a halt the unwarranted snooping into a person's private life. Even insurance industry representatives had to admit during the hearings on S. 823 that some of the questions appearing on insurance reporting forms are silly, unnecessary, and unduly intrusive. There seems to be no legitimate reasons why insurance companies need to know the number of bathrooms a person has or whether he is a neat housekeeper or whether he mows his lawn. No actuarial statistics are available to relate these factors to mortality.

A sixth problem deals with the handling of public record information. Most credit bureaus systematically compile public record information such as records of suits, tax liens, arrests, indictments, convictions, bankruptcies, judgments, and the like. This information is then included on a person's report when he applies for credit, or in some cases when he applies for employment. Unfortunately, the information cannot always be kept up to date either because it is costly or because the correct information is simply not available. Thus, it is possible for a credit bureau to report a record of a suit or arrest without indicating that the suit was dismissed or the arrest charges dropped. Because public record information is reported to employers as well as creditors, a consumer's future employment career could be jeopardized because of an incomplete credit report.

In order to deal with this problem, the bill requires that if a credit reporting agency collects public record information and furnishes such information to prospective employers, it must maintain strict procedures to keep the information up to date. If this cannot be done the reporting agency must notify the consumer that the adverse information is being reported at the time it is reported. The reporting agency must also disclose the name of the person to whom the information is reported. This disclosure principal would alert consumers to the fact that adverse information of a public nature is being reported on them. If the information is inaccurate or out of date, the consumer would then have an opportunity to correct the information by contacting the credit bureau.

A seventh problem is concerned with the reporting of information about a person's earlier credit difficulties. Creditors obviously have a right to know if a person has had trouble in paying his bills. At the same time it is unfair to burden a consumer for life with a bad credit record if he has improved his performance. The Associated Credit Bureaus has recognized this problem and had proposed voluntary guidelines to its members to the effect that adverse information not be reported if it is older than 7 years or 14 years in the case of bankruptcies. Nonetheless, these guidelines are not necessarily followed by reporting agencies who are not members of the ACB. The Associated Credit Bureaus has worked to enforce these guidelines on a voluntary basis.

The bill would handle this problem by prohibiting the reporting of adverse information older than 7 years or 14 years in the case of bankruptcies, thus extending the ACB voluntary guidelines to other segments of the industry. However, an exemption would be made in the case of large life insurance transactions in excess of $25,000, large credit transactions in excess of $50,000 and employment reports involving an annual salary in excess of $20,000. In these cases, the committee felt that because of the large amounts of money involved the user of the credit report has a right to go back beyond 7 years to determine if there is any adverse information in the person's credit file. However, in the vast majority of cases the 7-year requirement would enable the average consumer to start with a clean slate.

Mr. President, I believe this bill is a reasonable bill. It is fair to the consumer and fair to the credit reporting industry and those who use credit reports. The industry has voluntarily cooperated with the committee in developing sound and workable legislation which accomplishes the objectives without imposing unduly restrictive requirements on the industry. I believe the example we have set in this legislation should serve as a guide to future consumer legislation.

Whenever consumers have a substantial problem in the marketplace, there is no reason why consumer groups, the industry and Government cannot work together to come up with a reasonable approach for solving the problem. They certainly have done so this time.

I pay tribute to the industry. They showed a great deal of initiative and intelligence and cooperation in coming to the committee and discussing with all members of the committee the problems and the kind of legislation that would be workable and practicable and would do the job.

We discussed the matter in great detail with the Associated Credit Bureau, the consumer groups, and with interested groups.

I think we have a bill that will work and do the job for the consumer and will protect the very important interests of a vital industry.

Mr. President, I compliment the senior Senator from Utah (Mr. BENNETT) and the able chairman of this committee (Mr. SPARKMAN) for their constructive cooperation on this legislation. The com-

mittee has reported a fair and workable bill and I recommend its enactment to the Senate.

Mr. JAVITS. Mr. President, will the Senator yield?

Mr. PROXMIRE. I yield.

Mr. JAVITS. Mr. President, I submitted some amendments which were referred to the committee, and I am glad to see that the committee has paid attention to these amendments, especially the one which relates to the ability of the consumer to present his side of the case. Much of the effect of these provisions have been added to the bill. I am troubled, however, by one aspect which I think is important.

Mr. PROXMIRE. Mr. President, before the Senator comes to that matter, I point out that the Senator from New York was very helpful to the committee.

The Senator from New York is a leading consumer's advocate. He is very expert in the matter. His advice and recommendations to the committee were very helpful.

Mr. JAVITS. Mr. President, I am very pleased that the Senator feels that way. When I was attorney general of New York, I had a great deal to do with consumer fraud. And my successor, Attorney General Lefkowitz, is considered to be very much of a leader in this field. I profited greatly from my consultations with him with respect to the questions which I will raise.

First, the Senator will recall that I suggested to the committee the possibility of granting authority to the attorney general of a State to seek a permanent injunction against a credit reporting agency or user of information which does not comply with the law. Could the Senator tell us what is the scheme of enforcement which commended itself to the committee which makes the committee feel that it was better to omit that authority in States' attorneys general?

Mr. PROXMIRE. The suggestion of the Senator from New York was discussed in some detail. It was felt that this could somewhat complicate the bill. There was a particular feeling that this ought to be as uniform nationally as possible because of the nature of the credit reporting industry, which crosses State lines so freely, so widely, and so regularly. So the enforcement was given to the Federal Trade Commission instead of the individual States' attorneys general.

Mr. JAVITS. The purpose of that, then, was uniformity of litigation and uniformity of decision?

Mr. PROXMIRE. That is correct.

Mr. JAVITS. I think that is sound.

I would assume, however—and may the record clearly show—that it is intended that the attorneys general of the States are encouraged to carry on consumer protection activities, that it is the intention of Congress that they may be considered part of the enforcement mechanism by which this particular measure will operate, and that their complaint will be given very considerable weight by the enforcing agency.

Mr. PROXMIRE. By all means. And I am delighted that the Senator has emphasized this, because this is the type

*November 6, 1969*    CONGRESSIONAL RECORD — SENATE    33411

of legislation which can work effectively only if States' attorneys general, who are recognized so widely as the enforcing arm in the States, do feel that they have this responsibility and feel free to exercise it when called upon to do so.

Mr. JAVITS. So that in our legislative oversight, I hope very much that the Committee on Banking and Currency, which reported the bill, will have that in mind, so that some accounting might be asked of the attention paid by the Federal Trade Commission to the complaints of attorneys general.

Mr. PROXMIRE. I appreciate that very much. That is something that we will certainly watch and encourage.

Mr. JAVITS. And I will assume the same accounting will be taken of the other enforcement agencies within the bill?

Mr. PROXMIRE. That is correct.

Mr. JAVITS. The other thing that puzzles me with a scheme of this character, and I realize that it is sort of webbed through the bill, is this: The scheme of operation which gives notice to the consumer, who is the subject of possibly arbitrary, erroneous, and malicious credit information, that there is something in the files about him or that something is being looked into which affects him, in order that he might head off, with his explanation or deletion at the earliest possible time the particular information about him which is arbitrary, erroneous, and malicious.

For example, I note that section 606(b), on page 14, line 10, which refers to this concept of notice deals only with an "investigative consumer report," defined as one dealing more with character and methods of living, and so forth, but does not deal with the credit worthiness of the consumer. Credit worthiness comes under another heading of "consumer report."

If the Senator will bear with me and look at the bottom of page 15, section 609, he will note the words "Every consumer reporting agency shall, upon request."

When I offered my amendments, I had hoped that the committee would get as near as possible to making it the responsibility of the credit reporting agency to notify the person, the subject of the report, as it began to prepare a report on him, so that he would know that he is being investigated and could begin at that particular moment to deal with anything that might be unearthed and written about him that would be very deleterious.

I am sure the Senator knows the normal processes of life. This concern does not involve General Motors or General Electric. It involves very ordinary people who might seek credit from a department store or a restaurant of any one of a dozen things of that character. Before he even knows that he is being looked into or that there is a credit report on him, he is characterized as a deadbeat, a drunkard, or a wife beater, and that is the end of that. He will never catch up with that. It is only then by the bill's provisions concerning credit worthiness, that he may be able to make a request to evaluate the information that characterized him in such a way.

I am stating it in the worst possible way, but I should like the Senator to explain how he feels—understanding that because this is his bill there may be many other considerations of which the Senator is aware—he is trying within reason to give the consumer a fair break on that equation.

Mr. PROXMIRE. As I drafted this bill originally, I provided that whenever adverse information is included in any file, the consumer would have to be notified, and I was strongly for that. This was discussed by the committee. It was discussed in the hearings at some length. We were finally convinced that this would involve so much expense and so much difficulty for the credit agencies that they had a legitimate complaint about it. Therefore, we took something which would be less satisfactory to the consumer—I would agree—but which would work in most cases; that is, whenever a consumer is turned down, he then would have the right to find out what is in his credit file and to have it corrected.

The Senator from New York is absolutely correct in his implications about inaccurate, untrue, or slanderous information in a file which many people might not know exists. But the theory is that until they are damaged in some way by an adverse reaction on employment, insurance, or credit, they do not have as much basis for correcting it.

Mr. JAVITS. How does the consumer get the reporting agency to backtrack with the company, for example, that denied him credit on the basis of an erroneous report? Does the bill make the credit agency correct its error, even though it is post facto?

Mr. PROXMIRE. They would be required to delete the information which is inaccurate. They would be required to notify the recipients of the credit report that it had been deleted and corrected.

Mr. JAVITS. That is very important. That is clear in the bill?

Mr. PROXMIRE. That is clear in the bill.

Mr. JAVITS. The Senator represents that to the Senate?

Mr. PROXMIRE. That is correct.

Mr. JAVITS. They have to backtrack as far back as to the very people who denied the credit on the ground of an erroneous report?

Mr. PROXMIRE. That is correct.

Mr. JAVITS. And they have to do that in writing?

Mr. PROXMIRE. The Senator is correct.

Mr. JAVITS. That is important, because the credit agency's value as an item of their good will, is their veracity. So that is a sanction, and it is intended to be?

Mr. PROXMIRE. It certainly is.

Mr. JAVITS. That is, a sanction on the individual reporting agency?

Mr. PROXMIRE. That is correct.

Mr. JAVITS. Suppose the information is malicious. Is there anything that prevents the individual from seeking redress in a civil suit? I realize the good faith problem which is involved, but would the bill cut off the right to penalize the reporting agency in the event of malice?

Mr. PROXMIRE. If he feels it is malicious. The reporting agency could still get a waiver in which it could not be held that it was malicious until he could prove it. The burden of proof would be on the complainant, on the consumer. But he can bring the suit.

Mr. JAVITS. There is nothing in the bill that exempts the agency from malicious conduct? There is some analogy here, of course, to the New York Times case in Mississippi.

Mr. PROXMIRE. That is correct.

Mr. JAVITS. I just want to be positive that we are not giving some kind of license to the reporting agency to which it is not entitled.

Mr. PROXMIRE. Let me read the section, so that we will be perfectly clear. Page 17, line 9, reads as follows:

(e) Except as provided in sections 616 and 617, no consumer shall have any claim against or bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 609, 610, or 615, except as to false information furnished with malice or willful intent to injure such consumer.

I would think that that exception clause would meet the point made by the Senator from New York.

Mr. JAVITS. So care has been taken to preserve the right of action for the consumer.

Mr. PROXMIRE. That provision was patterned after the New York State law.

Mr. JAVITS. Yes. Care has been taken to protect the right of action where it is premised on non-good-faith reporting.

Mr. PROXMIRE. The Senator is correct; malice.

Mr. JAVITS. Nothing in section 616 or section 617 negates that preservation of right in the consumer. Is that right?

Mr. PROXMIRE. No. That gives the consumer the right to file his complaint.

Mr. JAVITS. So that the civil liabilities of section 616 and section 617 do not prevent the consumer from suing and recovering, if he can prove that false information was taken or was furnished with malice or willful intent to injure him.

Mr. PROXMIRE. No. On page 23 there is spelled out how he can do it. It seems to me this would strengthen the consumer's position and it would not and does not intend to diminish it.

Mr. JAVITS. And certainly it is not intended to cut off his right of recovery, even without the limitation in section 616 and section 617, if he can prove what the Senator read, that it was false information furnished with malice or willful intent.

Mr. PROXMIRE. That is correct.

Mr. JAVITS. That is very important because I realize the reporting agencies get something out of this. They get a limitation of liability; the right to publish certain information, as in periodicals, not notifying the consumer until he is hurt.

Mr. PROXMIRE. That is the quid quo pro for full disclosure.

Mr. JAVITS. I understand. I have been in a few businesses myself. But when a really outrageous case is involved,

33412      CONGRESSIONAL RECORD — SENATE      *November 6, 1969*

we do not want to hobble the injured party at all; if anybody is maliciously harmed he would have recourse.

Mr. PROXMIRE. I thank the Senator for his help.

Mr. JAVITS. Mr. President, the Senator from Wisconsin, as often happens here, has done a monumental job of great importance to the lives of the rank and file of our people. I wanted to be sure these essential elements of fairness have been preserved.

Mr. PROXMIRE. I thank the Senator.

THE FAIR CREDIT REPORTING ACT—A GIANT STEP FORWARD IN INCREASED CONSUMER PROTECTION

Mr. WILLIAMS of New Jersey. Mr. President, as one of the original sponsors of the Fair Credit Reporting Act, I am most gratified that this legislation is now before the Senate. When enacted this bill will close what in my opinion has been an unfortunate gap in our Nation's consumer protection laws. It will prevent consumers from being unjustly damaged by inaccurate credit reports. At the same time it will also insure the individual's right to privacy in the field of credit reporting.

This legislation will not place undue burdens on legitimate credit bureaus. It will allow credit bureaus to continue the gathering and supplying of data which is essential for fair and just credit ratings.

This bill recognizes the vital role played by credit reporting agencies in our economy. No one disagrees with the premise that those who extend credit have a right to the facts needed in order to make sound decisions. On the other hand, the consumer has equal right to know why he is refused credit because of an adverse report. His right to correct inaccuracies and to submit explanatory material is also of the utmost importance. The right of rebuttal provided for in this legislation is an inherent one under our traditions of fairplay and jurisprudence. Presently, there are far too many cases where adverse credit reports cause irreparable harm to the individual without his being afforded the opportunity to answer the charges, correct inaccuracies or in some cases to even know that such a report has been issued. The Fair Credit Reporting Act will put an end to these unwarranted practices.

Under this bill credit reporting agencies are required to make full disclosure to the consumer of all of the information obtained. The consumer will then be given the opportunity to correct inaccurate or misleading data. The bill also requires that this information be kept confidential and used only for legitimate business purposes. The consumer is also given the right to be informed of investigations into his personal life.

While most credit bureaus already operate within the framework of this bill, the rapid expansion of the credit reporting industry, where today files are maintained on more than 110,000,000 individuals, coupled with an almost complete lack of State regulation has caused some problems to arise. Hearings held earlier this year before the Banking and Currency Committee showed that in some cases highly confidential and personal data had been disseminated as a result

of random telephone calls or letters. In these cases not even a cursory check was made on the individual making the request for the data or its ultimate use.

An even more striking example of the need for this legislation was presented on CBS television earlier this year. At that time a reporter for the network was able to obtain 10 out of 20 of the credit reports on individuals whom he selected at random from 20 credit bureaus. To make matters worse, the reporter obtained this information by claiming that he represented a completely fictitious company. I am sure all will agree that basic protections are necessary to preserve the rights of the individual in such instances.

The Fair Credit Reporting Act is a reasonable and sensible approach toward alleviating these problem areas. Its provisions will not hinder credit bureaus in the collection of legitimate data. The bill will, however, preserve the basic rights of the individual. It will allow the subject of an adverse credit report to be fully informed of the charges levied against him. When such charges are inaccurate, the right to explain or refute is also present. These rights are basic to our American heritage and must not be infringed upon. Finally, this legislation will help to preserve the individual's right to privacy, especially where highly personal information is involved.

These are the rights which the Fair Credit Reporting Act seeks to protect. Surely no one would deny these rights to any of our Nation's citizens or quarrel with the purpose of this most important consumer protection legislation.

Mr. BENNETT, I commend the Senator from Wisconsin for the long, difficult, most necessary work he has done in connection with the important legislation now before the Senate.

Mr. PROXMIRE. I thank the Senator from New Jersey. I know of no one who has worked harder, more consistently, or more effectively on behalf of the consumer than the Senator from New Jersey not only on this bill but in other bills before the Senate.

Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The bill clerk proceeded to call the roll.

Mr. MANSFIELD. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

ORDER FOR ADJOURNMENT

Mr. MANSFIELD. Mr. President, I ask unanimous consent that when the Senate completes its business today, it stand in adjournment until 12 o'clock noon tomorrow.

The PRESIDING OFFICER. Without objection, it is so ordered.

ORDER FOR RECOGNITION OF SENATOR GRAVEL AT THE CONCLUSION OF MORNING BUSINESS TOMORROW

Mr. MANSFIELD. Mr. President, I ask unanimous consent that sometime at a

convenient point during the morning hour, or at the conclusion of morning business, the distinguished Senator from Alaska (Mr. GRAVEL) be allowed to proceed for not to exceed 30 minutes.

The PRESIDING OFFICER. Without objection, it is so ordered.

ORDER OF BUSINESS

Mr. MANSFIELD. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The bill clerk proceeded to call the roll.

Mr. BENNETT. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

AMENDMENT OF CONSUMER PROTECTION CREDIT PLAN

The Senate resumed the consideration of the bill (S. 823) to enable consumers to protect themselves against arbitrary, erroneous, and malicious credit information.

Mr. BENNETT. Mr. President, I appreciate the courtesy of the Senate, and of my colleague from Wisconsin (Mr. PROXMIRE) in particular, in giving me this opportunity to participate in the presentation of the bill.

I am sorry I could not be on the floor during my colleague's discussion of it, but I am involved in a conference downstairs, and I hope that what I shall say will fit in with what has gone before, because obviously I am in no position to be sure.

Mr. President, I support this legislation, although I believe that the need for it has been greatly exaggerated.

The committee members and representatives of both the reporting agencies and the industries which they serve have worked hard to reach agreement on responsible legislation which would protect the legitimate interests of both consumers and industry. I believe that those representing the industries which will be covered by this legislation should be commended for their untiring efforts and their willingness to view not only their own interest but that of consumers whom they ultimately serve.

Of course, I realize that there are some segments of the industry which are disappointed, which feel that it does not adequately take care of their particular and perhaps different needs. But, with this bill, we are breaking new ground, and I am sure if time reveals that we have made mistakes, or we have overlooked situations, the committee can come back and remedy the deficiencies.

This bill covers all types of reports on consumers, even though one might be led to believe that it covers only credit reports. In addition to credit reports, reports are also made on individuals seeking employment and individuals seeking insurance. In fact, reports dealing with insurance and employment are necessarily more detailed in most instances than those on individuals seeking credit. Because of this additional detail, this legislation is more onerous on reporting

\*Public Law 104–208
104th Congress

# An Act

Making omnibus consolidated appropriations for the fiscal year ending September 30, 1997, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

## DIVISION A

That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the several departments, agencies, corporations and other organizational units of the Government for the fiscal year 1997, and for other purposes, namely:

## TITLE I—OMNIBUS APPROPRIATIONS

Sec. 101. (a) For programs, projects or activities in the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1997, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

## AN ACT

Making appropriations for the Departments of Commerce, Justice, and State, the Judiciary, and related agencies for the fiscal year ending September 30, 1997, and for other purposes.

## TITLE I—DEPARTMENT OF JUSTICE

### GENERAL ADMINISTRATION

#### SALARIES AND EXPENSES

For expenses necessary for the administration of the Department of Justice, $75,773,000 of which not to exceed $3,317,000 is for the Facilities Program 2000, to remain available until expended: *Provided,* That not to exceed 43 permanent positions and 44 full-time equivalent workyears and $7,477,000 shall be expended for the Department Leadership Program exclusive of augmentation that occurred in these offices in fiscal year 1996: *Provided further,* That not to exceed 41 permanent positions and 48 full-time equivalent workyears and $4,660,000 shall be expended for the Offices of Legislative Affairs and Public Affairs:

Sept. 30, 1996
[H.R. 3610]

Omnibus Consolidated Appropriations Act, 1997.

Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1997.
Department of Justice Appropriations Act, 1997.

---

\*Note: This is a typeset print of the original hand enrollment as signed by the President on September 30, 1996. The text is printed without corrections. Missing text in the original is indicated by a footnote.

PUBLIC LAW 104–208—SEPT. 30, 1996    110 STAT. 3009–426

### SEC. 2306. INCREASE IN CERTAIN CREDIT UNION LOAN CEILINGS.

Section 107(5)(A) of the Federal Credit Union Act (12 U.S.C. 1757(5)(A)) is amended—

(1) in clause (iv), by striking "$10,000" and inserting "$20,000"; and

(2) in clause (v), by striking "$10,000" and inserting "$20,000".

### SEC. 2307. BANK INVESTMENTS IN EDGE ACT AND AGREEMENT CORPORATIONS.

The 10th undesignated paragraph of section 25A of the Federal Reserve Act (12 U.S.C. 618) is amended by striking the last sentence and inserting the following: "Any national bank may invest in the stock of any corporation organized under this section. The aggregate amount of stock held by any national bank in all corporations engaged in business of the kind described in this section or section 25 shall not exceed an amount equal to 10 percent of the capital and surplus of such bank unless the Board determines that the investment of an additional amount by the bank would not be unsafe or unsound and, in any case, shall not exceed an amount equal to 20 percent of the capital and surplus of such bank.".

# Subtitle D—Consumer Credit

## CHAPTER 1—CREDIT REPORTING REFORM

<div style="float:right">

Consumer Credit Reporting Reform Act of 1996.
15 USC 1601 note.

</div>

### SEC. 2401. SHORT TITLE.

This chapter may be cited as the "Consumer Credit Reporting Reform Act of 1996".

### SEC. 2402. DEFINITIONS.

(a) ADVERSE ACTION.—Section 603 of the Fair Credit Reporting Act (15 U.S.C. 1681a) is amended by adding at the end the following new subsection:

"(k) ADVERSE ACTION.—

"(1) ACTIONS INCLUDED.—The term 'adverse action'—

"(A) has the same meaning as in section 701(d)(6) of the Equal Credit Opportunity Act; and

"(B) means—

"(i) a denial or cancellation of, an increase in any charge for, or a reduction or other adverse or unfavorable change in the terms of coverage or amount of, any insurance, existing or applied for, in connection with the underwriting of insurance;

"(ii) a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee;

"(iii) a denial or cancellation of, an increase in any charge for, or any other adverse or unfavorable change in the terms of, any license or benefit described in section 604(a)(3)(D); and

"(iv) an action taken or determination that is—

"(I) made in connection with an application that was made by, or a transaction that was initiated by, any consumer, or in connection with a

110 STAT. 3009–443    PUBLIC LAW 104–208—SEPT. 30, 1996

"(1) IN GENERAL.—Except as provided in subsections (b), (c), and (d), a consumer reporting agency may impose a reasonable charge on a consumer—

"(A) for making a disclosure to the consumer pursuant to section 609, which charge—

"(i) shall not exceed $8; and

"(ii) shall be indicated to the consumer before making the disclosure; and

"(B) for furnishing, pursuant to section 611(d), following a reinvestigation under section 611(a), a statement, codification, or summary to a person designated by the consumer under that section after the 30-day period beginning on the date of notification of the consumer under paragraph (6) or (8) of section 611(a) with respect to the reinvestigation, which charge—

"(i) shall not exceed the charge that the agency would impose on each designated recipient for a consumer report; and

"(ii) shall be indicated to the consumer before furnishing such information.

"(2) MODIFICATION OF AMOUNT.—The Federal Trade Commission shall increase the amount referred to in paragraph (1)(A)(i) on January 1 of each year, based proportionally on changes in the Consumer Price Index, with fractional changes rounded to the nearest fifty cents.

"(b) FREE DISCLOSURE AFTER ADVERSE NOTICE TO CONSUMER.—Each consumer reporting agency that maintains a file on a consumer shall make all disclosures pursuant to section 609 without charge to the consumer if, not later than 60 days after receipt by such consumer of a notification pursuant to section 615, or of a notification from a debt collection agency affiliated with that consumer reporting agency stating that the consumer's credit rating may be or has been adversely affected, the consumer makes a request under section 609.

"(c) FREE DISCLOSURE UNDER CERTAIN OTHER CIRCUMSTANCES.—Upon the request of the consumer, a consumer reporting agency shall make all disclosures pursuant to section 609 once during any 12-month period without charge to that consumer if the consumer certifies in writing that the consumer—

"(1) is unemployed and intends to apply for employment in the 60-day period beginning on the date on which the certification is made;

"(2) is a recipient of public welfare assistance; or

"(3) has reason to believe that the file on the consumer at the agency contains inaccurate information due to fraud.

"(d) OTHER CHARGES PROHIBITED.—A consumer reporting agency shall not impose any charge on a consumer for providing any notification required by this title or making any disclosure required by this title, except as authorized by subsection (a).".

**SEC. 2411. DUTIES OF USERS OF CONSUMER REPORTS.**

(a) DUTIES OF USERS TAKING ADVERSE ACTIONS.—Section 615(a) of the Fair Credit Reporting Act (15 U.S.C. 1681m(a)) is amended to read as follows:

"(a) DUTIES OF USERS TAKING ADVERSE ACTIONS ON THE BASIS OF INFORMATION CONTAINED IN CONSUMER REPORTS.—If any person takes any adverse action with respect to any consumer that is

PUBLIC LAW 104–208—SEPT. 30, 1996      110 STAT. 3009–444

based in whole or in part on any information contained in a consumer report, the person shall—

"(1) provide oral, written, or electronic notice of the adverse action to the consumer;

"(2) provide to the consumer orally, in writing, or electronically—

"(A) the name, address, and telephone number of the consumer reporting agency (including a toll-free telephone number established by the agency if the agency compiles and maintains files on consumers on a nationwide basis) that furnished the report to the person; and

"(B) a statement that the consumer reporting agency did not make the decision to take the adverse action and is unable to provide the consumer the specific reasons why the adverse action was taken; and

"(3) provide to the consumer an oral, written, or electronic notice of the consumer's right—

"(A) to obtain, under section 612, a free copy of a consumer report on the consumer from the consumer reporting agency referred to in paragraph (2), which notice shall include an indication of the 60-day period under that section for obtaining such a copy; and

"(B) to dispute, under section 611, with a consumer reporting agency the accuracy or completeness of any information in a consumer report furnished by the agency.".

(b) DUTIES OF USERS MAKING CERTAIN CREDIT SOLICITATIONS.— Section 615 of the Fair Credit Reporting Act (15 U.S.C. 1681m) is amended by adding at the end the following new subsection:

"(d) DUTIES OF USERS MAKING WRITTEN CREDIT OR INSURANCE SOLICITATIONS ON THE BASIS OF INFORMATION CONTAINED IN CONSUMER FILES.—

"(1) IN GENERAL.—Any person who uses a consumer report on any consumer in connection with any credit or insurance transaction that is not initiated by the consumer, that is provided to that person under section 604(c)(1)(B), shall provide with each written solicitation made to the consumer regarding the transaction a clear and conspicuous statement that—

"(A) information contained in the consumer's consumer report was used in connection with the transaction;

"(B) the consumer received the offer of credit or insurance because the consumer satisfied the criteria for credit worthiness or insurability under which the consumer was selected for the offer;

"(C) if applicable, the credit or insurance may not be extended if, after the consumer responds to the offer, the consumer does not meet the criteria used to select the consumer for the offer or any applicable criteria bearing on credit worthiness or insurability or does not furnish any required collateral;

"(D) the consumer has a right to prohibit information contained in the consumer's file with any consumer reporting agency from being used in connection with any credit or insurance transaction that is not initiated by the consumer; and

"(E) the consumer may exercise the right referred to in subparagraph (D) by notifying a notification system established under section 604(e).

"(2) DISCLOSURE OF ADDRESS AND TELEPHONE NUMBER.—A statement under paragraph (1) shall include the address and toll-free telephone number of the appropriate notification system established under section 604(e).

"(3) MAINTAINING CRITERIA ON FILE.—A person who makes an offer of credit or insurance to a consumer under a credit or insurance transaction described in paragraph (1) shall maintain on file the criteria used to select the consumer to receive the offer, all criteria bearing on credit worthiness or insurability, as applicable, that are the basis for determining whether or not to extend credit or insurance pursuant to the offer, and any requirement for the furnishing of collateral as a condition of the extension of credit or insurance, until the expiration of the 3-year period beginning on the date on which the offer is made to the consumer.

"(4) AUTHORITY OF FEDERAL AGENCIES REGARDING UNFAIR OR DECEPTIVE ACTS OR PRACTICES NOT AFFECTED.—This section is not intended to affect the authority of any Federal or State agency to enforce a prohibition against unfair or deceptive acts or practices, including the making of false or misleading statements in connection with a credit or insurance transaction that is not initiated by the consumer.".

(c) DUTIES OF USERS MAKING OTHER SOLICITATIONS.—Section 615 of the Fair Credit Reporting Act (15 U.S.C. 1681m) is amended by adding at the end the following new subsection:

"(e)

(d) CONFORMING AMENDMENT.—Section 615(c) of the Fair Credit Reporting Act (15 U.S.C. 1681m(c)) is amended by striking "subsections (a) and (b)" and inserting "this section".

(e) DUTIES OF PERSON TAKING CERTAIN ACTIONS BASED ON INFORMATION PROVIDED BY AFFILIATE.—Section 615(b) of the Fair Credit Reporting Act (15 U.S.C. 1681m(b)) is amended—

(1) by striking "(b) Whenever credit" and inserting the following:

"(b) ADVERSE ACTION BASED ON INFORMATION OBTAINED FROM THIRD PARTIES OTHER THAN CONSUMER REPORTING AGENCIES.—

"(1) IN GENERAL.—Whenever credit";

(2) by adding at the end the following new paragraph:

"(2) DUTIES OF PERSON TAKING CERTAIN ACTIONS BASED ON INFORMATION PROVIDED BY AFFILIATE.—

"(A) DUTIES, GENERALLY.—If a person takes an action described in subparagraph (B) with respect to a consumer, based in whole or in part on information described in subparagraph (C), the person shall—

"(i) notify the consumer of the action, including a statement that the consumer may obtain the information in accordance with clause (ii); and

"(ii) upon a written request from the consumer received within 60 days after transmittal of the notice required by clause (i), disclose to the consumer the nature of the information upon which the action is based by not later than 30 days after receipt of the request.

"(B) ACTION DESCRIBED.—An action referred to in subparagraph (A) is an adverse action described in section

603(k)(1)(A), taken in connection with a transaction initiated by the consumer, or any adverse action described in clause (i) or (ii) of section 603(k)(1)(B).

"(C) INFORMATION DESCRIBED.—Information referred to in subparagraph (A)—

"(i) except as provided in clause (ii), is information that—

"(I) is furnished to the person taking the action by a person related to the person taking the action by common ownership or affiliated by common corporate control to the person taking the action; and

"(II) bears on the credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living of the consumer; and

"(ii) does not include—

"(I) information solely as to transactions or experiences between the consumer and the person furnishing the information; or

"(II) information in a consumer report.".

**SEC. 2412. CIVIL LIABILITY.**

(a) CIVIL LIABILITY FOR WILLFUL NONCOMPLIANCE.—Section 616 of the Fair Credit Reporting Act (15 U.S.C. 1681n) is amended by striking "Any consumer reporting agency or user of information which" and inserting "(a) IN GENERAL.—Any person who".

(b) MINIMUM CIVIL LIABILITY FOR WILLFUL NONCOMPLIANCE.— Section 616(a)(1) of the Fair Credit Reporting Act (15 U.S.C. 1681n(1)), as so designated by subsection (a) of this section, is amended to read as follows:

"(1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000; or

"(B) in the case of liability of a natural person for obtaining a consumer report under false pretenses or knowingly without a permissible purpose, actual damages sustained by the consumer as a result of the failure or $1,000, whichever is greater;".

(c) CIVIL LIABILITY FOR KNOWING NONCOMPLIANCE.—Section 616 of the Fair Credit Reporting Act (15 U.S.C. 1681n) is amended by adding at the end the following new subsection:

"(b) CIVIL LIABILITY FOR KNOWING NONCOMPLIANCE.—Any person who obtains a consumer report from a consumer reporting agency under false pretenses or knowingly without a permissible purpose shall be liable to the consumer reporting agency for actual damages sustained by the consumer reporting agency or $1,000, whichever is greater.".

(d) CIVIL LIABILITY FOR NEGLIGENT NONCOMPLIANCE.—Section 617 of the Fair Credit Reporting Act (15 U.S.C. 1681o) is amended by striking "Any consumer reporting agency or user of information which" and inserting "(a) IN GENERAL.—Any person who".

(e) ATTORNEY'S FEES.—

(1) WILLFUL NONCOMPLIANCE.—Section 616 of the Fair Credit Reporting Act (15 U.S.C. 1681n) is amended by adding at the end the following new subsection:

"(c) ATTORNEY'S FEES.—Upon a finding by the court that an unsuccessful pleading, motion, or other paper filed in connection

with an action under this section was filed in bad faith or for purposes of harassment, the court shall award to the prevailing party attorney's fees reasonable in relation to the work expended in responding to the pleading, motion, or other paper.".

(2) NEGLIGENT NONCOMPLIANCE.—Section 617 of the Fair Credit Reporting Act (15 U.S.C. 1681o) is amended by adding at the end the following new subsection:

"(b) ATTORNEY'S FEES.—On a finding by the court that an unsuccessful pleading, motion, or other paper filed in connection with an action under this section was filed in bad faith or for purposes of harassment, the court shall award to the prevailing party attorney's fees reasonable in relation to the work expended in responding to the pleading, motion, or other paper.".

### SEC. 2413. RESPONSIBILITIES OF PERSONS WHO FURNISH INFORMATION TO CONSUMER REPORTING AGENCIES.

(a) IN GENERAL.—The Fair Credit Reporting Act (15 U.S.C. 1681 et seq.) is amended—

15 USC 1681t.

(1) by redesignating section 623 as section 624; and

(2) by inserting after section 622 the following:

15 USC 1681s–2.

### "SEC. 623. RESPONSIBILITIES OF FURNISHERS OF INFORMATION TO CONSUMER REPORTING AGENCIES.

"(a) DUTY OF FURNISHERS OF INFORMATION TO PROVIDE ACCURATE INFORMATION.—

"(1) PROHIBITION.—

"(A) REPORTING INFORMATION WITH ACTUAL KNOWLEDGE OF ERRORS.—A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or consciously avoids knowing that the information is inaccurate.

"(B) REPORTING INFORMATION AFTER NOTICE AND CONFIRMATION OF ERRORS.—A person shall not furnish information relating to a consumer to any consumer reporting agency if—

"(i) the person has been notified by the consumer, at the address specified by the person for such notices, that specific information is inaccurate; and

"(ii) the information is, in fact, inaccurate.

"(C) NO ADDRESS REQUIREMENT.—A person who clearly and conspicuously specifies to the consumer an address for notices referred to in subparagraph (B) shall not be subject to subparagraph (A); however, nothing in subparagraph (B) shall require a person to specify such an address.

"(2) DUTY TO CORRECT AND UPDATE INFORMATION.—A person who—

"(A) regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about the person's transactions or experiences with any consumer; and

"(B) has furnished to a consumer reporting agency information that the person determines is not complete or accurate,

shall promptly notify the consumer reporting agency of that determination and provide to the agency any corrections to that information, or any additional information, that is necessary to make the information provided by the person to

117 STAT. 1952          PUBLIC LAW 108–159—DEC. 4, 2003

Public Law 108–159
108th Congress

An Act

To amend the Fair Credit Reporting Act, to prevent identity theft, improve resolution of consumer disputes, improve the accuracy of consumer records, make improvements in the use of, and consumer access to, credit information, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*,

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

(a) SHORT TITLE.—This Act may be cited as the "Fair and Accurate Credit Transactions Act of 2003".

(b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Dec. 4, 2003
[H.R. 2622]

Fair and
Accurate Credit
Transactions Act
of 2003.
15 USC 1601
note.

Sec. 1. Short title; table of contents.
Sec. 2. Definitions.
Sec. 3. Effective dates.

TITLE I—IDENTITY THEFT PREVENTION AND CREDIT HISTORY
RESTORATION

Subtitle A—Identity Theft Prevention

Sec. 111. Amendment to definitions.
Sec. 112. Fraud alerts and active duty alerts.
Sec. 113. Truncation of credit card and debit card account numbers.
Sec. 114. Establishment of procedures for the identification of possible instances of
identity theft.
Sec. 115. Authority to truncate social security numbers.

Subtitle B—Protection and Restoration of Identity Theft Victim Credit History

Sec. 151. Summary of rights of identity theft victims.
Sec. 152. Blocking of information resulting from identity theft.
Sec. 153. Coordination of identity theft complaint investigations.
Sec. 154. Prevention of repollution of consumer reports.
Sec. 155. Notice by debt collectors with respect to fraudulent information.
Sec. 156. Statute of limitations.
Sec. 157. Study on the use of technology to combat identity theft.

TITLE II—IMPROVEMENTS IN USE OF AND CONSUMER ACCESS TO CREDIT
INFORMATION

Sec. 211. Free consumer reports.
Sec. 212. Disclosure of credit scores.
Sec. 213. Enhanced disclosure of the means available to opt out of prescreened
lists.
Sec. 214. Affiliate sharing.
Sec. 215. Study of effects of credit scores and credit-based insurance scores on
availability and affordability of financial products.
Sec. 216. Disposal of consumer report information and records.
Sec. 217. Requirement to disclose communications to a consumer reporting agency.

TITLE III—ENHANCING THE ACCURACY OF CONSUMER REPORT
INFORMATION

Sec. 311. Risk-based pricing notice.

made by subsection (a) after notice duly given in the Federal Register and an opportunity for public comment in accordance with section 553 of title 5, United States Code.

# TITLE III—ENHANCING THE ACCURACY OF CONSUMER REPORT INFORMATION

**SEC. 311. RISK-BASED PRICING NOTICE.**

(a) DUTIES OF USERS.—Section 615 of the Fair Credit Reporting Act (15 U.S.C. 1681m), as amended by this Act, is amended by adding at the end the following:

"(h) DUTIES OF USERS IN CERTAIN CREDIT TRANSACTIONS.—

"(1) IN GENERAL.—Subject to rules prescribed as provided in paragraph (6), if any person uses a consumer report in connection with an application for, or a grant, extension, or other provision of, credit on material terms that are materially less favorable than the most favorable terms available to a substantial proportion of consumers from or through that person, based in whole or in part on a consumer report, the person shall provide an oral, written, or electronic notice to the consumer in the form and manner required by regulations prescribed in accordance with this subsection.

"(2) TIMING.—The notice required under paragraph (1) may be provided at the time of an application for, or a grant, extension, or other provision of, credit or the time of communication of an approval of an application for, or grant, extension, or other provision of, credit, except as provided in the regulations prescribed under paragraph (6).

"(3) EXCEPTIONS.—No notice shall be required from a person under this subsection if—

"(A) the consumer applied for specific material terms and was granted those terms, unless those terms were initially specified by the person after the transaction was initiated by the consumer and after the person obtained a consumer report; or

"(B) the person has provided or will provide a notice to the consumer under subsection (a) in connection with the transaction.

"(4) OTHER NOTICE NOT SUFFICIENT.—A person that is required to provide a notice under subsection (a) cannot meet that requirement by providing a notice under this subsection.

"(5) CONTENT AND DELIVERY OF NOTICE.—A notice under this subsection shall, at a minimum—

"(A) include a statement informing the consumer that the terms offered to the consumer are set based on information from a consumer report;

"(B) identify the consumer reporting agency furnishing the report;

"(C) include a statement informing the consumer that the consumer may obtain a copy of a consumer report from that consumer reporting agency without charge; and

"(D) include the contact information specified by that consumer reporting agency for obtaining such consumer reports (including a toll-free telephone number established by the agency in the case of a consumer reporting agency described in section 603(p)).

"(6) RULEMAKING.—

"(A) RULES REQUIRED.—The Commission and the Board shall jointly prescribe rules.

"(B) CONTENT.—Rules required by subparagraph (A) shall address, but are not limited to—

"(i) the form, content, time, and manner of delivery of any notice under this subsection;

"(ii) clarification of the meaning of terms used in this subsection, including what credit terms are material, and when credit terms are materially less favorable;

"(iii) exceptions to the notice requirement under this subsection for classes of persons or transactions regarding which the agencies determine that notice would not significantly benefit consumers;

"(iv) a model notice that may be used to comply with this subsection; and

"(v) the timing of the notice required under paragraph (1), including the circumstances under which the notice must be provided after the terms offered to the consumer were set based on information from a consumer report.

"(7) COMPLIANCE.—A person shall not be liable for failure to perform the duties required by this section if, at the time of the failure, the person maintained reasonable policies and procedures to comply with this section.

"(8) ENFORCEMENT.—

"(A) NO CIVIL ACTIONS.—Sections 616 and 617 shall not apply to any failure by any person to comply with this section.

"(B) ADMINISTRATIVE ENFORCEMENT.—This section shall be enforced exclusively under section 621 by the Federal agencies and officials identified in that section.".

(b) RELATION TO STATE LAWS.—Section 625(b)(1) of the Fair Credit Reporting Act (15 U.S.C. 1681t(b)(1)), as so designated by section 214 of this Act, is amended by adding at the end the following:

"(I) section 615(h), relating to the duties of users of consumer reports to provide notice with respect to terms in certain credit transactions;".

## SEC. 312. PROCEDURES TO ENHANCE THE ACCURACY AND INTEGRITY OF INFORMATION FURNISHED TO CONSUMER REPORTING AGENCIES.

(a) ACCURACY GUIDELINES AND REGULATIONS.—Section 623 of the Fair Credit Reporting Act (15 U.S.C. 1681s–2) is amended by adding at the end the following:

"(e) ACCURACY GUIDELINES AND REGULATIONS REQUIRED.—

"(1) GUIDELINES.—The Federal banking agencies, the National Credit Union Administration, and the Commission shall, with respect to the entities that are subject to their respective enforcement authority under section 621, and in coordination as described in paragraph (2)—

"(A) establish and maintain guidelines for use by each person that furnishes information to a consumer reporting agency regarding the accuracy and integrity of the information relating to consumers that such entities furnish to

PUBLIC LAW 110–241—JUNE 3, 2008        122 STAT. 1565

Public Law 110–241
110th Congress

## An Act

To amend the Fair Credit Reporting Act to make technical corrections to the definition of willful noncompliance with respect to violations involving the printing of an expiration date on certain credit and debit card receipts before the date of the enactment of this Act.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Credit and Debit Card Receipt Clarification Act of 2007".

**SEC. 2. FINDINGS; PURPOSE.**

(a) FINDINGS.—The Congress finds as follows:

(1) The Fair and Accurate Credit Transactions Act (commonly referred to as "FACTA" ) was enacted into law in 2003 and 1 of the purposes of such Act is to prevent criminals from obtaining access to consumers' private financial and credit information in order to reduce identity theft and credit card fraud.

(2) As part of that law, the Congress enacted a requirement, through an amendment to the Fair Credit Reporting Act, that no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the card holder at the point of the sale or transaction.

(3) Many merchants understood that this requirement would be satisfied by truncating the account number down to the last 5 digits based in part on the language of the provision as well as the publicity in the aftermath of the passage of the law.

(4) Almost immediately after the deadline for compliance passed, hundreds of lawsuits were filed alleging that the failure to remove the expiration date was a willful violation of the Fair Credit Reporting Act even where the account number was properly truncated.

(5) None of these lawsuits contained an allegation of harm to any consumer's identity.

(6) Experts in the field agree that proper truncation of the card number, by itself as required by the amendment made by the Fair and Accurate Credit Transactions Act, regardless of the inclusion of the expiration date, prevents a potential fraudster from perpetrating identity theft or credit card fraud.

(7) Despite repeatedly being denied class certification, the continued appealing and filing of these lawsuits represents

June 3, 2008
[H.R. 4008]

Credit and Debit Card Receipt Clarification Act of 2007.
15 USC 1601 note.

15 USC 1681n note.

a significant burden on the hundreds of companies that have been sued and could well raise prices to consumers without corresponding consumer protection benefit.

(b) PURPOSE.—The purpose of this Act is to ensure that consumers suffering from any actual harm to their credit or identity are protected while simultaneously limiting abusive lawsuits that do not protect consumers but only result in increased cost to business and potentially increased prices to consumers.

### SEC. 3. CLARIFICATION OF WILLFUL NONCOMPLIANCE FOR ACTIONS BEFORE THE DATE OF THE ENACTMENT OF THIS ACT.

(a) IN GENERAL.—Section 616 of the Fair Credit Reporting Act (15 U.S.C. 1681n) is amended by adding at the end the following new subsection:

"(d) CLARIFICATION OF WILLFUL NONCOMPLIANCE.—For the purposes of this section, any person who printed an expiration date on any receipt provided to a consumer cardholder at a point of sale or transaction between December 4, 2004, and the date of the enactment of this subsection but otherwise complied with the requirements of section 605(g) for such receipt shall not be in willful noncompliance with section 605(g) by reason of printing such expiration date on the receipt.".

15 USC 1681n note.

(b) SCOPE OF APPLICATION.—The amendment made by subsection (a) shall apply to any action, other than an action which has become final, that is brought for a violation of 605(g) of the Fair Credit Reporting Act to which such amendment applies without regard to whether such action is brought before or after the date of the enactment of this Act.

Approved June 3, 2008.

LEGISLATIVE HISTORY—H.R. 4008:

CONGRESSIONAL RECORD, Vol. 154 (2008):
    May 13, considered and passed House.
    May 20, considered and passed Senate.

○